**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

NARGUESS NOOHI, individually, and on
behalf of other members of the general public
similarly situated,

                Plaintiff,

    VS.

JOHNSON & JOHNSON CONSUMER, INC.,
DOES 1-100, INCLUSIVE.

                Defendants.

Case No. 2:20-cv-03575

**REBUTTAL EXPERT REPORT OF**
**DAVID REIBSTEIN, PH.D.**

July 1, 2022

# TABLE OF CONTENTS

I.   Introduction.................................................................................................................1

    A.   Assignment .........................................................................................................1

    B.   Summary of Conclusions....................................................................................1

    C.   Qualifications......................................................................................................4

    D.   Compensation......................................................................................................6

    E.   Documents Relied Upon ......................................................................................6

II.  Background..................................................................................................................6

    A.   Plaintiff's Allegations .........................................................................................6

    B.   Product Background.............................................................................................8

    C.   Overview of Roberts Report..............................................................................10

        1.   Proposed Qualitative Market Research ................................................. 11

        2.   Proposed Quantitative Market Research ............................................... 12

        3.   Proposed Damages Analysis ................................................................. 15

    D.   Overview of Van Westendorp Price Elasticity Method.....................................17

III. Analysis of Roberts Report.......................................................................................18

    A.   Dr. Roberts Fails to Articulate a Valid Damages Methodology.......................18

    B.   Dr. Roberts' Proposed Survey Relies on the Van Westendorp Price Elasticity Method,
         which is Not an Accepted or Valid Method for Measuring WTP ..............................23

    C.   Dr. Roberts' Proposed Survey Design Would Artificially Inflate the Value of the
         Challenged Oil-Free Claim................................................................................27

        1.   Proposed Methodology Suffers from Hypothetical Bias, which Leads to
            Overstated Estimates of WTP............................................................... 28

        2.   Proposed Survey Design Inappropriately Focuses Respondents on the
            Challenged Claim Over Other Product Features, Resulting in Focalism Bias.. 29

        3.   Within-Subjects Design Creates Demand Artifacts that Further Inflate the
            Importance of the Challenged Claim...................................................... 32

        4.   Proposed "But-for World" is Unrealistic and Loss Aversion Leads Respondents
            to Put More Weight on the Challenged Claim ...................................... 34

    D.   Dr. Roberts' Proposed Methodology Fails to Account for Competition and Supply-
         Side Factors .......................................................................................................35

    E.   Dr. Roberts' Proposed Methodology Ignores Heterogeneity Across Class Members
         and Does Not Provide a Way to Measure Individual Damages .................................41

    F.   Dr. Roberts' Assumption of a Price Premium Associated with the Challenged Oil-
         Free Claim is Inconsistent with Real-world Evidence ................................................47

IV.  Conclusion ................................................................................................................49

## I.      INTRODUCTION

### A.      Assignment

1.      I, David Reibstein, submit this expert report on behalf of Johnson & Johnson Consumer, Inc. ("JJCI" or "Defendant") in the above captioned lawsuit. I have been retained to provide expert analysis and testimony, if necessary, regarding the opinions contained in the expert report submitted by Dr. Wade C. Roberts on behalf of Plaintiffs.[1]

2.      I have specifically been retained to assess the appropriateness of Dr. Roberts' proposed survey methodology for purposes of calculating damages. As part of that assessment, I discuss the proposed qualitative and quantitative market research methods underlying Dr. Roberts's approach. I understand that another expert has been retained to assess the sufficiency of specific elements of Dr. Roberts' proposed research design.

3.      This report summarizes the opinions that I have formed to date. I may modify my opinions, if necessary, based on further review and analysis of information provided to me subsequent to the filing of this report.

### B.      Summary of Conclusions

4.      My review and analysis of Dr. Roberts' proposed methodology reveals several flaws that render it unusable and uninformative for purposes of assessing damages to the proposed class.

5.      First, Dr. Roberts fails to articulate a methodology for calculating alleged damages suffered by the proposed class. Dr. Roberts generally proposes using a Van Westendorp pricing exercise to measure the range of respondents' willingness to pay for the Neutrogena Oil-Free

---

[1]      Expert Report of Wade C. Roberts, May 2, 2022 ("Roberts Report").

Moisturizer product both before and after exposure to information challenging the oil-free claim but makes only vague allusions to how he would use these survey results to "illustrate" and "facilitate[] the measurement of" damages to the proposed class. Dr. Roberts provides no process in which his proposed methodology can be applied to quantify damages. As such, Dr. Roberts has not provided the Court with *any* implementable methodology for quantifying damages, let alone one that is valid and reliable. Moreover, Dr. Roberts testified in deposition that even the limited information provided in his report is subject to change, rendering his report uninformative as to the validity and viability of the approach he would ultimately use (which may or may not follow what was described in his report).

6.      Further, based on the information provided in Dr. Roberts's report, Dr. Roberts' proposed survey design and analysis are severely flawed and cannot be relied upon for purposes of calculating damages. Specifically:

- Dr. Roberts' proposed survey methodology relies on the Van Westendorp price elasticity method, which is not an accepted method for measuring willingness to pay in academic research or litigation matters. More generally, the Van Westendorp method relies on direct elicitation (*i.e.*, directly asking consumers what they would be willing to pay), which is widely recognized to generate invalid estimates of consumer willingness to pay.

- Dr. Roberts' proposed survey design suffers from a number of flaws that lead respondents to place more weight on the oil-free claim than they otherwise would in reality, including hypothetical bias, focalism bias, demand artifacts, and loss aversion. As a result of these flaws, Dr. Roberts proposed methodology would generate overstated estimates of consumers' willingness to pay for the challenged

oil-free claim, which, in turn, would lead to exaggerated measures of damages to the putative class.

- Dr. Roberts' proposed methodology fails to account for competition and other supply-side factors, rendering it unusable for purposes of determining the market value of the challenged oil-free claim. An attempt to determine the market value of the oil-free claim requires a careful analysis of the difference between the prices proposed class members actually paid for the relevant product and the prices that would have occurred in the "but-for" marketplace had the allegedly misleading oil-free claim had not been included with the product. Here, Dr. Roberts' proposed methodology only attempts to measure stated consumer willingness to pay and entirely disregards the role of supply-side factors in shaping market prices in a hypothetical "but-for" world without the challenged claim. Without adequately accounting for supply-side factors, Dr. Roberts' proposed methodology cannot ascertain the market price of the product without the challenged claim, and thus, cannot provide a valid measure of economic damages to the class.

- Dr. Roberts' proposed methodology cannot measure the alleged harm, if any, experienced by each individual class member. According to Plaintiff, Dr. Roberts' methodology would generate a "single remedy" that could be applied for every member of the proposed class. However, heterogeneity in preferences for oil-free skincare products and experiences with the Neutrogena Oil-Free Moisturizer indicates that any alleged harm caused by the inclusion of the oil-free claims varies substantially across proposed class members, rendering a uniform "single remedy" inappropriate for purposes of calculating individual damages. Dr. Roberts'

3

proposed methodology does not identify any way of distinguishing differing levels of harm among proposed class members and, as such, cannot be used to determine individual damages.

- Finally, Dr. Roberts' assumption that the oil-free claim enables the Neutrogena Oil-Free Moisturizer to command a premium price in the marketplace is inconsistent with real-world evidence of Neutrogena moisturizer product prices. My analysis of Neutrogena moisturizers reveals that oil-free Neutrogena moisturizers are priced *lower* on average than non-oil-free Neutrogena moisturizers, both across all products and across the subset of non-anti-aging products. This evidence is not supportive of a price premium associated with the oil-free claim.

### C.    Qualifications

7.    I am the William Stewart Woodside Professor, and Professor of Marketing at the Wharton School of Business at the University of Pennsylvania. I have been teaching Marketing classes at the graduate level for more than 25 years. Classes that I have taught include Marketing Strategy and Marketing Research in the Wharton MBA Program, as well as Competitive Marketing Strategy, Marketing Metrics, Pricing Strategies, and various other programs for Wharton's Executive Education Program. Over the course of my teaching career, I have been honored with more than 30 teaching awards. For several years, I was the Vice Dean of the Wharton School of Business at the University of Pennsylvania and the Director of the Graduate Division.

8.    My research focuses on competitive marketing strategies, branding, product line decisions, and marketing metrics, among other areas. These areas are directly implicated in this case. My research on competitive marketing strategies addresses competitors' reactions to marketing actions, offering companies insight into ways to anticipate these reactions and use them

4

to develop effective strategies. I have authored or co-authored more than 50 articles published in top-tier peer-reviewed academic journals, including *Marketing Science*, *Journal of Marketing Research*, *Journal of Consumer Research*, *Harvard Business Review*, *Marketing Letters*, *Journal of Marketing*, and *The International Journal of Research in Marketing*. I am also the author or coauthor of several books and book chapters on subjects that include competitive marketing strategy, global branding, and marketing performance measurement, among others. I have published numerous papers on survey analysis, including several papers evaluating the validity and reliability of different kinds of survey designs. I have also applied survey design and implementation in practice through consulting engagements with major corporations.

9.      I served on the Board of the American Marketing Association for several years, some of that time as the Chairman and several years on the Executive Committee of the Board. I am a former Executive Director of the Marketing Science Institute, and consult extensively on marketing issues with leading companies worldwide, in a wide variety of fields, including GE, Intel, PepsiCo, Lutron, Pfizer, Google, British Airways, Rohm and Haas, and many others. Topics on which I have been asked to consult in the past include branding, brand management, product line extensions, marketing strategy, marketing resource allocation, marketing metrics, sales force planning and incentives, marketing research, and other marketing activities.

10.      I received my Ph.D. from Purdue University and B.S. and B.A. degrees from the University of Kansas. In 2005, I received the John S. Day Distinguished Alumni Academic Service Award from Purdue University's Krannert School of Management, an honor given to graduates whose service within the academic community reflects the spirit and service of former Krannert Dean John Day. A copy of my CV, together with a list of the trial and deposition testimony I have given in the last four years, is attached as Exhibit 1.

### D.     Compensation

11.     I have billed Defendants on a time-and-materials basis for my work. My hourly billing rate is $1,200. In addition, I receive compensation based on the professional fees of Analysis Group. My compensation is not contingent on my findings, testimony rendered, or on the outcome of this litigation.

### E.     Documents Relied Upon

12.     In undertaking my analysis, I have relied upon information from a variety of sources, each of which has been identified in Exhibit 2. These sources include, among other things, Dr. Roberts' report and deposition, case documents, skincare product websites, and academic articles regarding surveys and market research methods. I also have relied upon my professional judgment and expertise, gathered from many years of marketing and survey analysis in a variety of industries.

13.     Some of the analysis that supports the opinions expressed in this report was performed by staff members at Analysis Group, working under my direction and supervision.

## II.     BACKGROUND

### A.     Plaintiff's Allegations

14.     This matter is a consumer class action in which Plaintiff Ms. Narguess Noohi, individually and on behalf of all others similarly situated, alleges that the labeling on Neutrogena Oil-Free Face Moisturizer for Sensitive Skin (hereinafter referred to as "Neutrogena Oil-Free Moisturizer") is false and misleading.[2] Specifically, Plaintiff alleges that JJCI materially

---

[2]     Plaintiff's Second Amended Complaint, July 8, 2021 ("Second Amended Complaint"), at ¶¶ 1, 8-11; Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Class Certification Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) and to be Appointed Class Counsel, August 15, 2022 ("Motion for Class Certification"), at p. 3.

misrepresents the Neutrogena Oil-Free Moisturizer as being "oil-free" when it contains certain ingredients that, according to Plaintiff, "are oils and contain the characteristics of oils."[3]

15.     Plaintiff alleges that, as a result of the oil-free claim, she and other consumers similarly situated were deceived into purchasing the Neutrogena Oil-Free Moisturizer product under the belief that it did not contain oil.[4] Specifically, Plaintiff alleges that "[h]ad Defendant not falsely advertised, marketed or misrepresented the Class Products, Plaintiff and Class Members would not have purchased the Class Products. Defendant's conduct therefore caused and continues to cause economic harm to Plaintiff and Class Members."[5] Plaintiff seeks "[a]ctual damages suffered by Plaintiff and Class Members as applicable or full restitution of all funds acquired from Plaintiff and Class Members from the sale of misbranded Class Products during the relevant class period."[6]

16.     Plaintiff seeks to certify a class of consumers consisting of "[a]ll persons, who, between April 17, 2016 and the date of class certification, purchased one or more Neutrogena Oil Free Moisture Sensitive Skin products in the state of California."[7] According to Plaintiff, the Neutrogena Oil-Free Moisturizer product has never been reformulated, and the ingredients she challenges as "oils" have been in the product throughout the class period and remain in the product today.[8]

---

[3]     Motion for Class Certification, at p. 2. *See also*, Second Amended Complaint, at ¶ 1.
[4]     Second Amended Complaint, at ¶¶ 12-21; Motion for Class Certification"), at pp. 10-11.
[5]     Second Amended Complaint, at ¶ 80. *See also*, Motion for Class Certification, at p. 10.
[6]     Second Amended Complaint, at ¶ 95.
[7]     Motion for Class Certification, at pp. 3-4.
[8]     Motion for Class Certification, at p. 6.

**B.      Product Background**

17.      Oil-free skincare products have become a popular form of skincare for consumers with acne or oily skin.[9] Although some amount of oil on the skin is beneficial, excess oil can clog pores, cause skin to appear shiny, and lead to acne breakouts.[10] According to the American Academy of Dermatology, dermatologists may recommend choosing skincare products labeled "oil-free" and "non-comedogenic"[11] to control oily skin because "products that have these labels— including cleansers, moisturizers and makeup—won't clog your pores or cause acne."[12] Some beauty magazines and websites also recommend oil-free moisturizers for use with oily or acne-prone skin.[13]

18.      The Neutrogena Oil-Free Moisturizer product was launched by JJCI in 1999.[14] In 2020, Neutrogena's Oil-Free Moisture product line (which includes the at-issue Neutrogena Oil-Free Moisturizer product) accounted for approximately $28.9 million in revenue, making it Neutrogena's third best-selling facial moisturizer product line.[15] The Neutrogena Oil-Free Moisturizer is available for in-store or online purchase from various drugstores and big-box retailers, such as Walgreens, Target, and Walmart.[16] The Neutrogena Oil-Free Moisturizer is also

---

[9]    Draelos, Z. D., "The Skin Moisturizer Debate: Oil or Oil-Free?," *Cosmetic Dermatology*, Vol. 23, No. 7 (2010), pp. 302-303; https://dermatology.mhmedical.com/content.aspx?bookid=2812&sectionid=244978358 (viewed 5/31/2022).

[10]   https://www.nbcnews.com/select/lifestyle/best-products-oily-skin-according-dermatologists-ncna1025881 (viewed 5/25/2022).

[11]   A non-comedogenic substance is one that does not have the potential to clog pores in the skin. *See* https://www.medicalnewstoday.com/articles/noncomedogenic (viewed 6/3/2022).

[12]   https://www.aad.org/public/everyday-care/skin-care-basics/dry/oily-skin (viewed 5/25/2022). *See also,* Rodan, K., et al., "Skincare Bootcamp: The Evolving Role of Skincare," *Plastic and Reconstructive Surgery. Global Open*, Vol. 4, No. 12 (Suppl.) (2016), pp.1-6, at p. 4 ("In acne-prone skin, noncomedogenic, oil-free products with either zinc oxide or avobenzone as an active ingredient are recommended").

[13]   *See, e.g.*, https://www.allure.com/gallery/15-best-summer-moisturizers-for-oily-skin (viewed 5/25/2022); https://www.marieclaire.com/beauty/g34399769/best-oil-free-moisturizers/ (viewed 5/25/2022); https://www.harpersbazaar.com/uk/beauty/skincare/news/g24310/best-face-moisturisers/ (viewed 5/31/2022).

[14]   JJCI-NOOHI_00011809, at slide 4.

[15]   JJCI-NOOHI_00010254, at sheet "Total Facial Care $."

[16]   *See, e.g.*, https://www.walgreens.com/store/c/neutrogena-oil-free-daily-sensitive-skin-face-moisturizer-fragrance-free/ID=prod6035-product (viewed 6/10/2022); https://www.target.com/p/neutrogena-oil-free-daily-

available for direct purchase from Neutrogena.com and Amazon.com.[17] Neutrogena's website
describes the product as a "lightweight, water-based formula [that] is gentle, yet effective for even
sensitive skin and won't leave your face feeling greasy or looking shiny," with listed ingredients
including water, glycerin, ethylhexyl palmitate, dimethicone, and various other components.[18] The
current packaging for the Neutrogena Oil-Free Moisturizer advertises several benefits of the
product, including that it provides effective moisturization and that is ideal for sensitive skin and
does not clog pores.[19] Consistent with this, an internal JJCI presentation summarizing Neutrogena
product platforms describes Oil-Free Moisture products as offering "ultra-light moisture that's
easy on your skin" that is "[f]ree of fragrance, dyes, alcohol."[20] The presentation also notes that
Oil-Free Moisture products are targeted toward "Young Skin, Entry level" consumers aged 25-39
with a "skin need" of "simple maintenance."[21]

19.     The Neutrogena Oil-Free Moisturizer is specifically recommended by some
dermatologists. Based on a 2019 study conducted by Ipsos, the Neutrogena Oil-Free Moisturizer
is recommended by approximately 30 percent of dermatologists surveyed.[22] Dr. Leslie Baumann,
a licensed dermatologist retained by JJCI in this matter, is aware of the product's ingredients

---

sensitive-skin-face-moisturizer-4-fl-oz/-/A-11536498 (viewed 6/10/2022);
https://www.walmart.com/ip/Neutrogena-Oil-Free-Moisture-Ultra-Gentle-Face-Moisturizer-Sensitive-Skin-
Care-4-fl-oz-118-ml/10805084 (viewed 6/10/2022).

[17]   *See* https://www.neutrogena.com/products/skincare/neutrogena-oil-free-face-moisturizer-for-sensitive-skin-
fragrance-free-non-comedogenic/6805400.html (viewed 6/29/2022); https://www.amazon.com/Neutrogena-
Moisturizer-Ultra-Gentle-Lightweight-Moisturizers/dp/B000052YOX?ref_=ast_sto_dp&th=1&psc=1 (viewed
6/27/2022).

[18]   https://www.neutrogena.com/products/skincare/neutrogena-oil-free-face-moisturizer-for-sensitive-skin-
fragrance-free-non-comedogenic/6805400.html (viewed 6/29/2022).

[19]   https://www.neutrogena.com/products/skincare/neutrogena-oil-free-face-moisturizer-for-sensitive-skin-
fragrance-free-non-comedogenic/6805400.html (viewed 6/29/2022).

[20]   JJCI-NOOHI_00014735, at PDF p. 1.

[21]   JJCI-NOOHI_00014735, at PDF p. 1. *See also*, Deposition of Kathryn Drehs Sauers, April 19, 2022 ("Drehs
Sauers Deposition"), at p. 21 (noting that the Neutrogena Oil-Free Moisturizer product is targeted toward
"young skin type consumer[s]").

[22]   JJCI-NOOHI_00011321-322, at 322.

(including those challenged by Plaintiff) and stated that she would specifically recommend the
Neutrogena Oil-Free Moisturizer to patients seeking an oil-free moisturizer.[23]

### C. Overview of Roberts Report

20.     According to his report, Dr. Roberts was asked to "formulate an opinion on whether
a method exists to determine economic damages (on a class wide basis) using common evidence
relating to the 'oil-free' misrepresentation" and to "determine the most appropriate methodology,
if any, for evaluating economic damages relating to this matter."[24] Dr. Roberts opines that
"determination of class wide economic damages for this case is possible" by properly designing
and implementing market research to compare "the class wide economic value obtained from the
currently available set of products verses the counterfactual class wide economic value that would
have been obtained with the 'oil-free' attribute removed from the packaging."[25] Dr. Roberts
proposes conducting both qualitative and quantitative market research to accomplish this goal.[26]

21.     In deposition, Dr. Roberts explained that the methodology proposed in his report
relies heavily on input from Customer Lifecycle, a market research company.[27] According to Dr.
Roberts, Customer Lifecycle has helped him determine the best market research approach to
address his assignment, design the research proposed in his report, and determine screening criteria
to identify the relevant population.[28] According to Dr. Roberts, if he moves forward with his
proposed research, Customer Lifecycle will also be primarily responsible for drafting the survey
questions, ensuring they are free of bias, designing the stimuli presented to respondents, and

---

[23]    Expert Report of Leslie Baumann, M.D., July 1, 2022.
[24]    Roberts Report, at p. 2. *See also*, Motion for Class Certification, at p. 13.
[25]    Roberts Report, at pp. 3-4. Plaintiff also suggests that Dr. Roberts' proposed analysis will also inform the
        question of whether the alleged misrepresentation was material to the proposed class. *See* Motion for Class
        Certification, at p. 14.
[26]    Roberts Report, at p. 3.
[27]    Deposition of Wade Roberts, June 16, 2022 ("Roberts Deposition"), at pp. 89-91, 99-100.
[28]    Roberts Deposition, at pp. 99-102.

overseeing the execution of both the qualitative and quantitative research.[29] According to Dr. Roberts, "survey research is not [his] primary area of expertise" and Customer Lifecycle is the marketing expert in this case.[30]

22.     In addition, while Dr. Roberts' report claims to provide a "detailed description of the proposed methodologies and specific details regarding the implementation of these methodologies," Dr. Roberts testified in deposition that the methodology described in his report is "tentative" and "very preliminary."[31]

### 1.     Proposed Qualitative Market Research

23.     Dr. Roberts proposes conducting qualitative market research to "help determine the extent to which consumers rely on the 'oil-free' statements connected to Neutrogena's product when making purchasing decisions" and "illuminate the reasons why consumers prefer to purchase and use products that are oil-free."[32] Dr. Roberts identifies the "correct population set" for this research as "women over the age of 18."[33] Dr. Roberts does not specify how many participants would be recruited for the proposed qualitative research in his report.[34] In his deposition, Dr. Roberts testified that he would seek to sample 2,000 to 4,000 California residents who purchased Neutrogena Oil-Free Moisturizer.[35]

24.     Dr. Roberts proposes conducting qualitative research in the form of group sessions or one-on-one interviews in which moderators will ask participants general questions to "elicit feedback about participants' behavior and beliefs" and more specific questions about "reactions to

---

[29]   Roberts Deposition, at pp. 89-92, 101, 216-218.
[30]   Roberts Deposition, at pp. 84, 196.
[31]   Roberts Deposition, at pp. 82-83, 117, 215-216, 230.
[32]   Roberts Report, at pp. 2-3.
[33]   Roberts Report, at p. 6. He also notes that other screening questions may be asked to determine "whether an individual is eligible to participate" in the qualitative market research, but does not specify what, if any, screening criteria would be used. Roberts Report, at pp. 6-7.
[34]   Roberts Report, at p. 7.
[35]   Roberts Deposition, at pp. 177-178, 180.

a change in the marketplace."[36] Dr. Roberts does not specify the exact questions that would be asked of participants but provides a small number of potential examples, such as "What is good or bad about a cosmetic that contains oil?" and "What would you do if you found out a cosmetic contained oil when you thought it did not?"[37] Dr. Roberts notes that the quantitative survey would "incorporate key findings from the qualitative portion of the research," but does not indicate specifically how these results would be used.[38] In his deposition, Dr. Roberts testified that he would ask respondents about their willingness to pay ("WTP") for the Neutrogena Oil-Free Moisturizer product as part of the qualitative research, which he indicated would be used to inform the prices considered in the quantitative survey.[39]

### 2.   Proposed Quantitative Market Research

25.     Dr. Roberts claims that "[t]he most suitable research design to obtain statistically significant findings for this project involve a pre/post-exposure price elasticity study," in which respondents' perceptions and WTP for the at-issue Neutrogena Oil-Free Moisturizer product will be measured before and after exposure to information "challenging the 'oil-free' claim."[40] Specifically, Dr. Roberts proposes a "survey process design" that includes the following elements:[41]

- **Screening questions:** In his report, Dr. Roberts states that in order to qualify for the survey, respondents (i) must be from California, (ii) must be 18 years of age or older, (iii) must have purchased Neutrogena Oil-Free Moisturizer online or through

---

[36]   Roberts Report, at p. 7.
[37]   Roberts Report, at p. 7. Dr. Roberts testified that he has not drafted the questions that will be asked in the qualitative research. Roberts Deposition, at pp. 98-99.
[38]   Roberts Report, at p. 13.
[39]   Roberts Deposition, at pp. 174-177.
[40]   Roberts Report, at p. 8.
[41]   Roberts Report, at p. 13.

a brick-and-mortar store within the last 12-24 months,[42] (iv) must be female "based
on Neutrogena's target audience," and (v) must meet certain racial demographic
quotas based on the 2020 California census.[43] However, in deposition, Dr. Roberts
emphasized that the screening criteria presented in his report are "examples" and
are likely to change. Dr. Roberts also added in his deposition that, contrary to what
was stated in his report, he would include men in his sample.[44]

- **Questions about the perceptions of Neutrogena oil-free product:** After passing
  the screening questions, the survey would introduce the "Neutrogena product" and
  ask a series of questions to measure perceptions of the product, such as "overall
  product satisfaction, likelihood of recommending the product, likelihood of
  repurchasing or reusing the product, and feelings of brand loyalty to the product."[45]
  Dr. Roberts suggests that these questions would ask respondents to provide ratings-
  based responses, but does not specify what rating scale would be used.[46] In his
  deposition, Dr. Roberts stated that these perception questions have not been
  developed yet and are tentative and preliminary.[47]

- **Van Westendorp pricing exercise for oil-free product:** Respondents would then
  complete a "Van Westendorp pricing exercise," which "measures the prices at
  which consumers find the product to be too inexpensive to be considered, a good

---

[42]   In his report, Dr. Roberts states that he will require respondents to have purchased "Neutrogena product" in the
       last 12 to 24 months. Dr. Roberts clarified in deposition that he intends to restrict the sample for both the
       qualitative and quantitative research to those who have purchased the at-issue product, Neutrogena Oil-Free
       Moisturizer. Roberts Report, at pp. 13-14; Roberts Deposition, at pp. 212-213.
[43]   Roberts Report, at pp. 13-14.
[44]   Roberts Deposition, at pp. 147-148.
[45]   Roberts Report, at pp. 9, 12-13.
[46]   *See* Roberts Report, at p. 12 (proposing to analyze the "Top 2 Box Ratings").
[47]   Roberts Deposition, at p. 215.

value, expensive but still worth considering, and finally, too expensive to be considered."[48] Dr. Roberts proposes following this exercise with open-ended questions to "capture other thoughts and perceptions from consumers."[49] Dr. Roberts does not identify any of the specific questions that would be asked in the Van Westendorp pricing exercise, or in the open-ended follow-up questions.

- **Information challenging the oil-free claim:** According to Dr. Roberts, "[n]ext, information will be introduced challenging the 'oil-free' claim. Specifically, an explanation will be given relating to the terms and conditions which challenge the 'oil-free' nature of the product."[50] Dr. Roberts does not specify what information would be presented or how it would be communicated to respondents. In deposition, Dr. Roberts testified that this "information" "still has to be designed" and that Customer Lifecycle will be responsible for designing it.[51]

- **Repeated questions regarding perceptions of the product:** The survey would then repeat the questions regarding perceptions of the product in order to measure how respondents' perceptions change given the new information challenging the oil-free claim.[52] Dr. Roberts did not specify in his report what these questions would be.

---

[48] Roberts Report, at pp. 9, 13.

[49] Roberts Report, at p. 13.

[50] Roberts Report, at p. 9. Dr. Roberts proposes to present information on "Terminology (e.g., comedogenic, oil-free meaning, other concepts we learn about from [the] qualitative study." Roberts Report, at p. 13.

[51] In deposition, Dr. Roberts testified that he has not determined what information to present or how to present that information, but stated that it would be introduced in a way that is "neutral but factual." Roberts Deposition, at pp. 216-218.

[52] Roberts Report, at pp. 12-13.

- **Repeated Van Westendorp pricing exercise:** The survey would repeat the Van Westendorp pricing exercise in order to measure how consumers' WTP has changed based on the new information presented.[53] The survey would also repeat the same open-ended questions as described above.[54] Dr. Roberts likewise did not specify in his report what these questions would be.

26.     Dr. Roberts recommends a sample size of 3,000 consumers "to produce a sample size that is associated with the smallest/tightest margin of error."[55] In deposition, Dr. Roberts testified that he has never conducted a survey of this scale in the U.S.[56] and has not done any studies to assess the feasibility of finding this many respondents meeting his proposed screening criteria.[57]

### 3.     Proposed Damages Analysis

27.     Dr. Roberts proposes analyzing the results of the Van Westendorp pricing exercise to determine "the impact of falsely made 'oil-free' claims on the willingness to pay by consumers."[58] According to Dr. Roberts, the results of his proposed survey will "provide prices that consumers are most likely to regard as the price identified to be a 'good value' under both conditions: oil-free claim perceived to be true and oil-free claim perceived to be false."[59] Dr. Roberts claims that "damages can then be assessed by comparing the class wide economic value obtained from the currently available set of products verses the counterfactual class wide economic

---

[53]  Roberts Report, at pp. 9, 13.
[54]  Roberts Report, at p. 13.
[55]  Roberts Report, at p. 14. Dr. Roberts noted in deposition that "statistical relevance" declines as the sample size "start[s] getting below a thousand." Roberts Deposition, at pp. 205-206.
[56]  Roberts Deposition, at p. 206.
[57]  Dr. Roberts testified that he has spoken with Customer Lifecycle about their availability but does not discuss the feasibility of finding the number of qualified respondents. Roberts Deposition, at pp. 230-232.
[58]  Roberts Report, at p. 9. *See also*, Roberts Report, at pp. 2-3.
[59]  Roberts Report, at p. 10.

value that would have been obtained with the 'oil-free' attribute removed from the packaging."[60]

Dr. Roberts suggests that he would interpret damages as the difference between these two values—

that is, the "quantitative amount (in dollars) that a consumer is willing to pay (and would therefore

need to be compensated) for the value she associated with the specific product attribute related to

the claim (oil-free)."[61] Dr. Roberts also proposes using responses regarding the likelihood of

repurchasing the product to determine the "magnitude of reduced repurchasing intent" when

consumers perceive the oil-free claim to be false.[62] Dr. Roberts claims that these results would be

relevant to calculating damages, but does not explain how these results would be used in such a

damages quantification:

> Each of these findings contributes to the description of damages consumers
> may experience if they perceive the Neutrogena product is not oil-free as
> advertised. Consumers will have incurred damages (financial losses)
> directly measurable from changes in the perceived value of the product.
> Consumers are also likely to repurchase the product less frequently,
> incurring inconvenience of having to find another brand that meets their
> expectations of being oil-free.[63]

28.     Though not discussed in his report, Dr. Roberts testified in deposition that he would

use regression analysis to estimate "what percent of the product's overall price is connected to [the

oil-free claim]."[64]  Dr. Roberts did not describe the specification of this regression model. Dr.

Roberts stated that these results would be "multiplied against historical prices in order to know

how inflated the price was when the oil free claim was connected to [the product]," which would

---

[60]   Roberts Report, at p. 4. While Dr. Roberts characterizes his methodology as measuring the "class wide
economic value that would have been obtained with the 'oil-free' attribute *removed from the packaging*"
(emphasis added), this is inconsistent with his proposed design which, as described above, contemplates a
situation in which additional information is presented "challenging the 'oil-free' nature of the product." *See*
Roberts Report, at p. 9.
[61]   Roberts Report, at p. 4.
[62]   Roberts Report, at p. 10.
[63]   Roberts Report, at p. 11.
[64]   Roberts Deposition, at p. 198.

then be used to calculate damages to the class as a whole.[65] The logic here is unclear and certainly unspecified.

29.     Finally, Dr. Roberts proposes using paired-sample t-tests to analyze the differences in respondents' perceptions of the product before and after exposure to information challenging the oil-free claim.[66] Dr. Roberts claims that "ratings on all key metrics (willingness to recommend, overall satisfaction, trust in Neutrogena) are expected to perform significantly lower if the product is perceived as not oil-free."[67] According to Dr. Roberts,  these results will "illustrate the potential 'soft-side' of damages consumers may experience in a more quantitative way."[68]

### D.     Overview of Van Westendorp Price Elasticity Method

30.     Dr. Roberts' proposed survey methodology relies on the "Van Westendorp price elasticity" method to measure WTP. The Van Westendorp price elasticity method appears to have first been introduced in 1976 by Peter Van Westendorp at a conference held by the European Society for Opinion and Marketing Research ("ESOMAR"), an industry organization described as a "global business community for every insights and analytics professional."[69] While not widely discussed in the marketing literature, it appears that the Van Westendorp methodology attempts to determine consumers' WTP by assessing a range of prices rather than asking consumers to identify just one price point at which they would purchase a given product.[70] To do so, the methodology asks respondents to directly identify prices for each of four hypothetical conditions:[71]

---

[65]   Roberts Deposition, at pp. 198-200.
[66]   Roberts Report, at pp. 11-13.
[67]   Roberts Report, at p. 12.
[68]   Roberts Report, at pp. 11-13.
[69]   *See* https://archive.researchworld.com/a-new-approach-to-study-consumer-perception-of-price/ (viewed 6/2/2022); https://esomar.org/about-esomar (viewed 6/16/2022).
[70]   https://www.forbes.com/sites/rebeccasadwick/2020/06/22/how-to-price-products/?sh=81b05455c752 (viewed 6/2/2022).
[71]   The exact wording of each question appears to vary across implementations. *See*, *e.g.*, Chhabra, S., "Determining the Optimal Price Point: Using Van Westendorp's Price Sensitivity Meter," in *Managing in*

1. "At what price would you consider this product so expensive that you would
   not consider buying it?" (Too expensive)

2. "At what price would you consider the price of this product so low that you'd
   question its quality?" (Too cheap)

3. "At what price would you consider the product starting to get expensive -- not
   out of the question, but you'd need to give some thought to buying it?"
   (Expensive)

4. "At what price would you consider the product to be a bargain -- a great buy
   for the money?" (Inexpensive / Good Value)[72]

31.     After plotting the cumulative distribution of responses for each of the four
questions, the intersections of various lines can be interpreted as providing estimates of several
potentially relevant price points. This technique allegedly yields a range of potential prices for the
product of interest.[73]

## III.   ANALYSIS OF ROBERTS REPORT

### A.   Dr. Roberts Fails to Articulate a Valid Damages Methodology

32.     According to his report, Dr. Roberts was asked to "determine the most appropriate
methodology, if any, for evaluating economic damages relating to this matter."[74] Plaintiff claims

---

*Recovering Markets*, Eds. Chatterjee, S., et al., Springer India (2015), pp. 257-270 ("Chhabra (2015)"), at p.
261; https://www.forbes.com/sites/rebeccasadwick/2020/06/22/how-to-price-products/?sh=81b05455c752
(viewed 6/2/2022); https://archive.researchworld.com/a-new-approach-to-study-consumer-perception-of-price/
(viewed 6/2/2022); Ceylana, H. H., et al., "Value Based Pricing: A Research on Service Sector using Van
Westendorp Price Sensitivity Scale," *Procedia - Social and Behavioral Sciences*, Vol. 148 (2014), pp. 1-6
("Ceylana (2014)"), at p. 3.

[72] Ceylana (2014), at p. 3.

[73] https://www.forbes.com/sites/rebeccasadwick/2020/06/22/how-to-price-products/?sh=81b05455c752 (viewed
6/2/2022). *See also*, Ceylana (2014), at pp. 4-5; Chhabra (2015), at pp. 262-263;
https://archive.researchworld.com/a-new-approach-to-study-consumer-perception-of-price/ (viewed 6/2/2022).

[74] Roberts Report, at p. 2. *See also*, Motion for Class Certification, at p. 13.

that Dr. Roberts fulfills this assignment by "present[ing] a reliable damages model based on a market approach, using accepted and economically viable modeling…[that] will allow consumers to recover the 'benefit of the bargain,' through a monetary payout that would put consumers in the position they would have been 'but for' the false advertisement."[75] Plaintiff also characterizes Dr. Roberts' proposed analysis as "determining the counterfactual purchase price of the product but for the misrepresentation...[to] resolve this issue for every Class Member."[76]

33.    Contrary to Plaintiff's claims, Dr. Roberts fails to articulate a methodology for calculating alleged damages suffered by the proposed class. Dr. Roberts proposes using a Van Westendorp pricing exercise (which, as discussed in the sections below, is not a valid or accepted method for measuring WTP) to assess respondents' perceptions of the price at which the product is "too inexpensive, a good value, expensive but still worth considering, and…too expensive to be considered," both before and after exposure to the information challenging the oil-free claim.[77] Dr. Roberts suggests that his survey data will allow him to calculate average prices for each of these conditions, as illustrated in the below chart of hypothetical results that could be generated by his survey.[78] However, it is not clear from this chart or any other discussion in his report *exactly how* Dr. Roberts would apply these four average prices to calculate damages. Instead, Dr. Roberts vaguely claims that these findings will "contribute[] to the description of damages consumers may experience."[79]

---

[75]   Motion for Class Certification, at p. 3.
[76]   Motion for Class Certification, at p. 17.
[77]   Roberts Report, at p. 9.
[78]   Roberts Report, at pp. 10-11.
[79]   Roberts Report, at p. 11.



**Figure 1. Roberts Report: Illustrative Results of Van Westendorp Pricing Exercise[80]**

34.      In deposition, Dr. Roberts provided a different, though still incomplete, explanation of how he would analyze the results of the Van Westendorp pricing exercise. Specifically, Dr. Roberts testified that he would use regression analysis to determine the share of the product's total price associated with the oil-free claim.[81] This regression analysis is not discussed anywhere in Dr. Roberts' report.[82] This inconsistency between Dr. Roberts' report and deposition is concerning and unusual. How Dr. Roberts intends to analyze the results of his proposed survey is a critical element of his proposed approach and those details should be set forth in his report, as part of Dr. Roberts' self-described "detailed description of the proposed methodologies…[and] steps necessary to achieve statistically significant results."[83] Regardless, even in deposition, Dr. Roberts did not describe how this regression model would be constructed (*e.g.*, what variables would be included). Without further information, it is unclear how such a regression would use the raw data generated by his survey to produce the results he claims it would.

---

80  Roberts Report, at p. 11.
81  Roberts Deposition, at pp. 197-200.
82  Dr. Roberts' report uses the word "regression" only once, in describing his qualifications. Roberts Report, at p. 17.
83  Roberts Report, at pp. 3-4.

35.     In addition, Dr. Roberts proposes measuring respondents' likelihood of repurchasing the product before and after exposure to information challenging the oil-free claim. Though not explicitly stated in his report, the above chart suggests that Dr. Roberts would measure a respondent's repurchase intentions at each price provided in response to the situations posed in the Van Westendorp pricing exercise.[84] Dr. Roberts suggests that this information would also be used to calculate damages, but provides no explanation of how this would be accomplished beyond generally stating that "negative changes…will demonstrate damages related to the 'oil-free' claim" and alluding to the notion that consumers would suffer "the inconvenience of having to find another brand that meets their expectations of being oil-free."[85]

36.     Further, Dr. Roberts proposes to include survey questions regarding "key metrics" such as "overall product satisfaction, likelihood of recommending the product, likelihood of repurchasing or reusing the product, and feelings of brand loyalty" both before and after exposure to information challenging the oil-free claim.[86] Dr. Roberts provides the chart shown below to illustrate hypothetical results that could be obtained through these questions.[87] Dr. Roberts asserts that changes in these metrics after exposure to information challenging the oil-free claim "help to illustrate the potential 'soft-side' of damages consumers may experience in a more quantitative way," but provides no further explanation as to how, if at all, these results would be used in a quantitative damages calculation.[88] Moreover, while changes in metrics such as "willingness to recommend" and "loyalty to Neutrogena" may adversely affect Neutrogena, it is not clear how they suggest harm to *consumers* in the marketplace.

---

[84]   Dr. Roberts notes that "[e]ach of the key metrics in the study will have an interaction component with the price of the product." Dr. Roberts does not explain how he would implement this. Roberts Report, at pp. 9, 11.
[85]   *See* Roberts Report, at pp. 9, 11.
[86]   Roberts Report, at p. 9.
[87]   Roberts Report, at p. 12.
[88]   Roberts Report, at pp. 12-13.



**Figure 2. Roberts Report: Illustrative Results from Questions Regarding "Key Metrics"[89]**

37.    Thus, while Dr. Roberts generally suggests that his survey results can help
"illustrate,"[90] "demonstrate,"[91] "contribute to,"[92] and "facilitate[] the measurement of"[93] damages
in this matter, he ultimately does not describe *any* implementable methodology for quantifying
damages, let alone one that is "reliable" and based on "accepted and economically viable
modeling" as claimed by Plaintiff.[94]

38.    Moreover, contrary to providing "specific details regarding the implementation of
these methodologies" as claimed in his report, Dr. Roberts testified in deposition that even the
limited information provided in his report is "tentative," "preliminary," "hypothetical," and subject
to change.[95] According to Dr. Roberts, "it's not really possible for me to spell all the details of
what will be done at every step until the first step is taken."[96] Thus, even if Dr. Roberts sufficiently

---

[89]    Roberts Report, at p. 12.
[90]    Roberts Report, at p. 12.
[91]    Roberts Report, at p. 9.
[92]    Roberts Report, at p. 11.
[93]    Roberts Report, at p. 4.
[94]    Motion for Class Certification, at p. 3.
[95]    Roberts Report, at p. 3; Roberts Deposition, at pp. 82-83, 117, 151-152, 215-216.
[96]    Roberts Deposition, at p. 152.

explained a damages methodology in his report, it would not be informative as to whether his
ultimate damages approach would be viable and valid, as he may or may not actually implement
the approach as described.

**B.      Dr. Roberts' Proposed Survey Relies on the Van Westendorp Price Elasticity
Method, which is Not an Accepted or Valid Method for Measuring WTP**

39.      Dr. Roberts' proposed survey design relies on the Van Westendorp price elasticity
method to measure consumers' WTP for the Neutrogena Oil-Free Moisturizer before and after
exposure to information challenging the oil-free claim. Dr. Roberts claims that the Van
Westendorp method will provide "excellent information on the more concrete types of financial
damages consumers may experience."[97] However, contrary to Dr. Roberts' claim, the Van
Westendorp method is not an accepted method for measuring WTP in academic research or
litigation matters. Moreover, the Van Westendorp method relies on hypothetical questions that
directly ask respondents to state their WTP, an approach that is widely recognized to produce
invalid estimates of WTP.

40.      The Van Westendorp methodology is not widely accepted in academic research or
litigation matters and has not withstood critical review. While Dr. Roberts claimed in deposition
that his dissertation relied on the Van Westendorp method,[98] I have not seen any indication that
this work was published in an academic journal where it was subject to peer review.[99] As noted
above, the Van Westendorp methodology was first introduced by Peter Van Westendorp at a non-
academic conference in 1976. In proposing the methodology, Van Westendorp warned that "much
work needs yet to be done" to validate the methodology, "especially of a theoretical nature and in

---

[97]   Roberts Report, at p. 11.
[98]   Roberts Deposition, at p. 165.
[99]   The only published article listed on Dr. Roberts' CV does not use the Van Westendorp method. *See* Roberts, W.
and C. Bilginsoy, "Risking life and limb in the global economy: Scrap metal price and landmine/UXO incidents
in Cambodia," *World Development Perspectives*, Vol. 1 (2016), pp. 15-22.

the field of the relation between perception and behavior."[100] Concerns over the method's validity persist today. As one *Marketing Research* article cautions, the Van Westendorp method is "used far more widely, and its results taken far more literally, than it should be." The article states that "[g]iven the bias inherent in the question, [the method] only makes sense as an initial exploratory step when there is genuine uncertainty as to what price range is appropriate" and notes that the methodology frequently generates nonsensical results as "a surprisingly high number of respondents give four answers that don't show the expected relationships (e.g., their 'too inexpensive' price is higher than their 'inexpensive' price)."[101] Other researchers have observed that the Van Westendorp method can produce both invalid and unreliable results: respondents tend to overstate their price sensitivity, the results can be sensitive to small changes in the sample, and the range of acceptable prices implied by the methodology can be large.[102]

41.     Consistent with its lack of support in the academic research, I have not seen any evidence that the Van Westendorp methodology is commonly used in litigation matters or endorsed by Courts as a suitable method for measuring consumer WTP. Dr. Roberts could not provide any examples of using the Van Westendorp method in a legal case where it had to withstand scrutiny.[103]

42.     More generally, the Van Westendorp method relies on directly asking consumers to state the prices at which they believe the product in question is "too cheap," "inexpensive" or a "good value," "expensive," and "too expensive." In essence, this approach amounts to directly

---

[100]   https://archive.researchworld.com/a-new-approach-to-study-consumer-perception-of-price/ (viewed 6/2/2022).
[101]   Lyon, D., "The Price is Right (Or is It?)," *Marketing Research*, (Winter 2002) pp. 9-13, at p. 10.
[102]   Chhabra (2015), at p. 262.
[103]   Dr. Roberts testified that he used the Van Westendorp price elasticity method in a case involving mink ranchers (listed on his CV as *Keith Jonsson, Michael Jonsson, and Cedar Valley Fur Farm v. National Feeds, Inc.*), but subsequently clarified that that case did not involve designing and implementing a quantitative survey. Roberts Deposition, at pp. 166-167, 206-208, 235. Dr. Roberts' trial testimony from the *Jonsson v. National Feeds* did not mention the Van Westendorp method. *See Keith Jonsson, Michael Jonsson, Cedar Valley Fur Farm vs. National Feeds, Inc.*, Case No. 2:11-cv-140 (D. Utah), Trial Transcript, January 15, 2014, at pp. 504-577.

asking consumers to identify the range of prices they would be willing to pay for the product. Such

"direct elicitation" approaches suffer from several flaws that result in invalid estimates of WTP.

43.     First, directly asking consumers to state their WTP for a particular product does not

reflect how consumers make decisions in the marketplace. In the actual purchasing environment,

consumers are typically faced with multiple different products and choose between the available

options based on their differing features and prices. As described by one researcher, "Asking

respondents to indicate choices from realistic sets of alternatives most closely resembles the market

problem."[104] In contrast, consumers are not often asked to think about their precise WTP for a

particular product in the real-world marketplace. As one researcher describes, "[v]ery early in the

development of survey techniques for marketing, researchers learned that it was futile to ask

consumers [to state their WTP] outright… the results of such studies are at best useless and are

potentially highly misleading."[105]

44.     Further, many direct elicitation approaches, including the Van Westendorp method

suggested by Dr. Roberts, ask respondents to state their WTP in hypothetical scenarios without

any consequences for their responses. Results to such hypothetical questions regarding WTP are

often unreliable, as respondents may not think very carefully about their responses if they are not

required to actually make a payment using their own money to receive the good. As described in

one study, "[a] rich literature in experimental economics argues that such data can be inconsistent,

erratic, and, in many cases, untrustworthy."[106] Further, research suggests that respondents tend to

systematically *overstate* their WTP in response to hypothetical questions when their own money

---

[104]  McFadden, D., "The Choice Theory Approach to Market Research," *Marketing Science*, Vol. 5, No. 4 (1986),
pp. 275-297, at p. 289.
[105]  Nagle, T. and G. Muller, "Measurement of Price Sensitivity," in *The Strategy and Tactics of Pricing: A Guide
to Growing More Profitably*, Sixth Edition, Routledge (2018), at p. 186.
[106]  Ding, M., R. Grewal, and J. Liechty, "Incentive-Aligned Conjoint Analysis," *Journal of Marketing Research*,
Vol. 42, No. 1 (2005), pp. 67-82, at p. 68.

is not on the line, a phenomenon known as "hypothetical bias."[107] Stated preferences tend to differ systematically from revealed preferences and, as such, stated preferences often provide poor predictions of actual behavior.

45.     Respondents' tendency to overstate their WTP in response to hypothetical questions has been widely studied in the academic literature. For example, List & Gallet (2001) conducted a meta-analysis of 29 experimental studies and found that, on average, subjects overstate the amount they are willing to pay "by a factor of about 3 in hypothetical settings."[108] The authors noted that this effect was persistent across a variety of circumstances, observing that "the average person seems to exaggerate his or her actual WTP across a broad spectrum of goods with vastly different experimental protocol."[109] Similarly, Murphy et al. (2005) conducted a meta-analysis of 28 stated preference valuation studies and found that, on average, individuals overstate the amount they are willing to pay by 2.6.[110]   Based on a review of these two meta-analyses, Loomis (2011) estimated that hypothetical WTP typically exceeds the actual value by a factor of two to three.[111] Additional studies have also found the results of hypothetical questions about WTP

---

[107]   Loomis, J., "What's to Know About Hypothetical Bias in Stated Preference Valuation Studies?" *Journal of Economic Surveys*, Vol. 25, No. 2 (2011), pp. 363-370, at pp. 363, 366. *See also*, Ding, M., R. Grewal, and J. Liechty, "Incentive-Aligned Conjoint Analysis," *Journal of Marketing Research*, Vol. 42, No. 1 (2005), pp. 67-82, at p. 68; Carlsson, F., et al., "Using Cheap-Talk as a Test of Validity in Choice Experiments," *Economic Letters*, Vol. 89, No. 2 (2005), pp. 147-152, at pp. 148, 152; List, J. and C. Gallet, "What Experimental Protocol Influence Disparities Between Actual and Hypothetical Stated Values? Evidence from a Meta-Analysis," *Environmental and Resource Economics*, Vol. 20 (2001), pp. 241-254.

[108]   List, J. and C. Gallet, "What Experimental Protocol Influence Disparities Between Actual and Hypothetical Stated Values? Evidence from a Meta-Analysis," *Environmental and Resource Economics*, Vol. 20 (2001), pp. 241-254, at pp. 241, 246.

[109]   List, J. and C. Gallet, "What Experimental Protocol Influence Disparities Between Actual and Hypothetical Stated Values? Evidence from a Meta-Analysis," *Environmental and Resource Economics*, Vol. 20 (2001), pp. 241-254, at p. 243.

[110]   Murphy, J. J., Allen, P. G., Stevens, T. H. and Weatherhead, D, "A meta-analysis of hypothetical bias in stated preference valuation," *Environmental and Resource Economics*, Vol. 30 (2005), pp. 313–325. *See also*, Loomis, J., "What's to Know About Hypothetical Bias in Stated Preference Valuation Studies?" *Journal of Economic Surveys*, Vol. 25, No. 2 (2011), pp. 363-370, at pp. 363-364, 367.

[111]   Loomis, J., "What's to Know About Hypothetical Bias in Stated Preference Valuation Studies?" *Journal of Economic Surveys*, Vol. 25, No. 2 (2011), pp. 363-370, at pp. 363-364, 367.

to be upward-biased.[112] A 2009 study by Chang et al. evaluated the ability of responses to hypothetical purchase questions to predict actual retail shopping behavior and found that "willingness-to-pay elicited from hypothetical decision tasks almost always exceeds willingness-to-pay elicited from nonhypothetical decision tasks."[113] According to Chang et al., one interpretation of these findings is that "only those values that can be elicited in nonhypothetical settings […] are valid."[114] Although researchers have proposed various ex-ante and ex-post approaches that attempt to reduce hypothetical bias, each method suffers from significant limitations.[115]

46.    In sum, Dr. Roberts proposes using a survey methodology that is not well accepted and that relies on direct questioning techniques recognized to produce invalid WTP estimates. According to Dr. Roberts' report, these invalid WTP estimates would be used to calculate damages to the proposed class, resulting in invalid damages estimates that cannot be relied upon.

### C.    Dr. Roberts' Proposed Survey Design Would Artificially Inflate the Value of the Challenged Oil-Free Claim

47.    Dr. Roberts' proposed survey methodology purports to measure the "the impact of falsely made 'oil-free' claims on the willingness to pay by consumers"[116] by comparing

---

[112]  *See* Hausman, J., "Contingent Valuation: From Dubious to Hopeless," *Journal of Economic Perspectives*, Vol. 26, No. 4 (2012), pp. 43-56, at pp. 44-45. The Report of the NOAA (National Oceanic and Atmospheric Administration) Panel on Contingent Valuation provides an assessment of the contingent valuation methodology, as well as guidelines for practitioners of contingent valuation. Arrow, K., et al., "Report of the NOAA Panel on Contingent Valuation," January 11, 1993, pp. 32-35.

[113]  Chang, J., J. Lusk and F. Norwood, "How Closely Do Hypothetical Surveys and Laboratory Experiments Predict Field Behavior," *American Journal of Agricultural Economics*, Vol. 91, No. 2 (2009), pp. 518-534, at p. 519.

[114]  Chang, J., J. Lusk and F. Norwood, "How Closely Do Hypothetical Surveys and Laboratory Experiments Predict Field Behavior," *American Journal of Agricultural Economics*, Vol. 91, No. 2 (2009), pp. 518-534, at p. 519.

[115]  Loomis, J., "What's to Know About Hypothetical Bias in Stated Preference Valuation Studies?" *Journal of Economic Surveys*, Vol. 25, No. 2 (2011), pp. 363-370, at pp. 364-366. *See also*, Hausman, J., "Contingent Valuation: From Dubious to Hopeless," *Journal of Economic Perspectives*, Vol. 26, No. 4 (2012), pp. 43-56, at pp. 44-45.

[116]  Roberts Report, at p. 9. *See also*, Roberts Report, at p. 3.

respondents' WTP for the Neutrogena Oil-Free Moisturizer before and after exposure to information challenging the oil-free claim.[117] However, as described in more detail in the sections below, Dr. Roberts' proposed survey design suffers from a number of flaws that lead respondents to place more weight on the oil-free claim than they otherwise would in reality, including (i) hypothetical bias, (ii) focalism bias, (iii) demand artifacts, and (iv) loss aversion. As a result of these flaws, Dr. Roberts' proposed methodology would generate overstated estimates of consumers' WTP for the challenged oil-free claim, which, in turn, would lead to exaggerated measures of damages to the putative class. Further, Dr. Roberts cannot disentangle the extent to which, if at all, changes in respondents' WTP for the Neutrogena Oil-Free Moisturizer are driven by preferences for the oil-free label or merely reflect the biases introduced by his flawed survey design, rendering his proposed survey unusable for purposes of assessing the materiality of the alleged misrepresentation to members of the proposed class.[118]

### 1.   Proposed Methodology Suffers from Hypothetical Bias, which Leads to Overstated Estimates of WTP

48.     As discussed above, academic research demonstrates that WTP estimates generated in response to hypothetical questions tend to exceed respondents' true WTP in non-hypothetical purchasing situations, often by a factor of two or three.[119] This suggests that Dr. Roberts' proposed survey design, which relies on hypothetical questions, would likely generate inflated estimates of respondents' WTP for the Neutrogena Oil-Free Moisturizer product both before and after exposure to information challenging the oil-free claim. In his report, Dr. Roberts suggests that he would calculate the WTP for the oil-free claim as the difference between these pre- and post-exposure

---

[117] Roberts Report, at pp. 9-10.
[118] Plaintiff suggests that Dr. Roberts' proposed analysis "will inform both whether the misrepresentation was material, as well as how material (in dollars) it was to the Class." *See* Motion for Class Certification, at p. 14.
[119] *See, e.g.*, Loomis, J., "What's to Know About Hypothetical Bias in Stated Preference Valuation Studies?" *Journal of Economic Surveys*, Vol. 25, No. 2 (2011), pp. 363-370, at pp. 363-364, 367.

WTPs.[120] To the extent that both pre- and post-exposure WTPs are inflated by a similar amount, this will also result in inflated estimates of WTP for the challenged claim.[121] If both pre- and post-exposure WTP estimates were inflated by a factor of roughly two, the difference between them (which Dr. Roberts suggests he would interpret as the WTP associated with the oil-free claim) would also be inflated by a factor of two. As an oversimplified example, if respondents' actual WTPs for the product pre- and post-exposure to information challenging the oil-free claim were $6 and $4 respectively, Dr. Roberts' methodology would suggest that the WTP for the oil-free claim is $2. Assuming, for purposes of illustration, that hypothetical bias increases these WTP values by a factor of two, the hypothetical WTPs pre- and post-exposure to information challenging the oil-free claim would be $12 and $8 respectively, resulting in an estimated WTP for the oil-free claim of $4. Thus, hypothetical bias causes the estimated WTP for the oil-free claim to be double what it otherwise would be. Therefore, Dr. Roberts' results would lead to excessive damages that overstate the harm, if any, suffered by the proposed class.

### 2. Proposed Survey Design Inappropriately Focuses Respondents on the Challenged Claim Over Other Product Features, Resulting in Focalism Bias

49. According to Dr. Roberts' proposed survey design, after completing the initial Van Westendorp pricing exercise, respondents would be given "an explanation…relating to the terms and conditions which challenge the 'oil-free' nature of the product."[122] Respondents would then be asked to complete the Van Westendorp pricing exercise again in order to measure "the specific impact of price related to the 'oil-free' claim."[123] Based on this survey design, respondents would

---

[120] *See*, *e.g.*, Roberts Report, at pp. 4, 11.
[121] The estimated WTP for the challenged claim would also be inflated due to hypothetical bias if the pre-exposure WTP estimate is inflated by a larger magnitude than the post-exposure WTP estimate.
[122] Roberts Report, at p. 9. Dr. Roberts proposes to present information on "Terminology (e.g., comedogenic, oil-free meaning, other concepts we learn about from the qualitative study." Roberts Report, at p. 13.
[123] Roberts Report, at p. 13.

be exposed to additional information relating to *only* the challenged claim, and not to any other product features, before completing the second Van Westendorp pricing exercise.

50.     This proposed survey design would force respondents to focus on the oil-free attribute over other attributes when they otherwise may not have done so in the marketplace. This phenomenon is known as "focalism bias"—a bias whereby people artificially magnify the importance of a single element of an experience or product to which their attention is drawn.[124] Researchers caution that "[s]imply mentioning an attribute increases its importance, raising the specter of attributes appearing important that otherwise would be ignored in the market choices."[125] Academic research has shown that omitting major product features and thereby focusing respondents' attention on the subset of features that are included in the survey results in inflated estimates of WTP for those included features, in part due to focalism bias.[126]

51.     Dr. Roberts' proposed survey design would focus respondents' attention solely on the oil-free claim to the exclusion of other product claims and attributes, thereby artificially increasing the impact of the oil-free claim on respondents' WTP for the Neutrogena Oil-Free Moisturizer. While JJCI prominently highlights the oil-free claim, it does not do so to the exclusion of many other features.  In reality, if information "challenging the 'oil-free' claim" were presented in the marketplace, consumers would likely encounter this information alongside a range of other information about the Neutrogena Oil-Free Moisturizer, including, for example, other attributes of the product that are advertised by JJCI (as discussed below). The Neutrogena Oil-Free Moisturizer

---

[124]   Research on focalism bias was pioneered by Nobel prize-winner Daniel Kahneman. *See*, *e.g*., Schkade, D. A. and D. Kahneman, "Does Living in California Make People Happy? A Focusing Illusion in Judgments of Life Satisfaction," *Psychological Science*, Vol. 9, No. 5 (1998), pp. 340–346.

[125]   Huber, J., "What We Have Learned from 20 Years of Conjoint Research: When to Use Self-Explicated, Graded Pairs, Full Profiles or Choice Experiments," *Sawtooth Software Research Paper Series* (1997), pp. 1-16, at p. 10.

[126]   Bedi, S. and D. Reibstein, "Damaged Damages: Errors in Patent and False Advertising Litigation," *Alabama Law Review*, Vol. 73, No. 2 (2021), pp. 385-436, at pp. 415-416, 428-429.

itself may also be presented alongside a range of other products with varying attributes and labels. Presented in this information-rich environment, consumers may not attend to the information challenging the oil-free claim, or even to the oil-free claim itself, over other aspects of the product or purchasing environment.

52.     In fact, there appear to be many other product features besides oil content that may be important to consumers when they are selecting a moisturizer. For example, in addition to the oil-free claim, JJCI also advertises the Neutrogena Oil-Free Moisturizer as "lightweight," "gentle," "non-comedogenic," "hypoallergenic," "fragrance-free," "dermatologist-tested," and "contain[ing] no drying alcohol, so it won't dry out your skin."[127] Several of these claims are included on the product packaging.[128] An internal JJCI presentation summarizing Neutrogena product platforms describes the "key claim" for Oil-Free Moisture products as "clinically proven to provide gentle yet effective moisturization for softer, smoother skin."[129] The presentation also emphasizes that, in addition to being oil-free, the product is "ultra gentle," "alcohol-, dye-, and fragrance-free" hypoallergenic, and non-comedogenic.[130] Informational sources also advise consumers to seek out other benefits in choosing a facial moisturizer. For example, an informational article on Neutrogena's website advises consumers with sensitive skin, for whom the Neutrogena Oil-Free Moisturizer is described as an ideal product,[131] to "look for moisturizers labeled hypoallergenic, dye free and fragrance free."[132] Another source providing "expert advice"

---

[127]   https://www.neutrogena.com/products/skincare/neutrogena-oil-free-face-moisturizer-for-sensitive-skin-fragrance-free-non-comedogenic/6805400.html (viewed 6/29/2022).

[128]   *See* https://www.neutrogena.com/products/skincare/neutrogena-oil-free-face-moisturizer-for-sensitive-skin-fragrance-free-non-comedogenic/6805400.html (viewed 6/29/2022).

[129]   JJCI-NOOHI_00014735, at PDF pp. 1, 20.

[130]   JJCI-NOOHI_00014735, at PDF pp. 20-21.

[131]   https://www.neutrogena.com/products/skincare/neutrogena-oil-free-face-moisturizer-for-sensitive-skin-fragrance-free-non-comedogenic/6805400.html (viewed 6/29/2022).

[132]   The article recommends oil-free products for customers with oily, combination, or acne-prone skin. https://www.neutrogena.com/the-bar/how-to-find-the-best-moisturizer-for-your-skin-type.html (viewed 6/13/2022).

for those with sensitive skin notes that "fragranced skin care products are among the most common causes of sensitizing, negative skin responses" and promises that "[f]ragrance-free products are better for skin's health overall."[133] Together, this evidence suggests that there are many other product features that might be attractive to consumers and influence their decision to purchase the at-issue product.[134]

53.     Dr. Roberts' proposed survey design ignores these other product features and instead focuses respondents *only* on the challenged claim, leading to overstated estimates of the extent to which the presented information challenging the oil-free claim affects respondents' WTP for the Neutrogena Oil-Free Moisturizer product.

### 3.     Within-Subjects Design Creates Demand Artifacts that Further Inflate the Importance of the Challenged Claim

54.     Not only does Dr. Roberts' proposed survey design elevate the importance of the challenged claim by selectively presenting information about that feature and that feature alone, it also exacerbates this issue by asking *the same respondents* to provide their WTP for the Neutrogena Oil-Free Moisturizer Product before and after exposure to that information. This "within-subjects" design leads to demand artifacts that would further inflate the importance of the oil-free claim.

55.     Demand artifacts "include all aspects of the experiment which cause the subject to perceive, interpret, and act upon what he believes is expected or desired of him by the experimenter."[135] Specifically, demand artifacts occur when the respondent feels he/she must

---

[133] https://www.paulaschoice.com/expert-advice/skincare-advice/sensitive-skin/why-fragrance-free-products-are-best-for-everyone.html (viewed 6/3/2022).

[134] In addition, other factors may also contribute to consumers' purchase decisions, such as online reviews and recommendations from doctors, family, and friends. *See, e.g.*, JJCI-NOOHI_00002068, at slide 22.

[135] Sawyer, A. G., "Demand Artifacts in Laboratory Experiments in Consumer Research," *Journal of Consumer Research*, Vol. 1, No. 4 (1975), pp. 20-30, at p. 20.

answer in a specific manner due to something in the survey. It is widely recognized in the literature that "[t]he effects of demand artifacts pose important threats to both internal and external validity."[136]

56.      In this case, asking respondents a series of questions, giving respondents information challenging the oil-free claim, and then repeating the series of questions previously asked creates demand artifacts by signaling to respondents that they *should* want to change their answers in response to the additional information. Upon recognizing the questions as identical to those they answered just moments before, respondents would naturally wonder why they are being asked to repeat themselves if they were not *expected* to change their answers and may be motivated to respond accordingly.

57.      Further, contrary to survey best practices, it would not be difficult for a respondent completing Dr. Roberts' survey to infer that the survey researcher was attempting to measure the value of the oil-free attribute—the only aspect that changed between the two identical sets of questions posed to respondents. To ensure respondents' objectivity and the reliability of results, a survey design should seek to make respondents "blind" to the sponsor and purpose of the survey, and to avoid any unintended biases or demand artifacts.[137] Here, because respondents are clued into the purpose of the study, they subconsciously (or consciously) change their answers to the questions based on the way they think they *should* answer.

58.      These demand artifacts bias respondents to further overweight the importance of the challenged claim to their WTP for the Neutrogena Oil-Free Moisturizer in ways that would not occur in the marketplace.

---

[136]  Sawyer, A. G., "Demand Artifacts in Laboratory Experiments in Consumer Research," *Journal of Consumer Research*, Vol. 1, No. 4 (1975), pp. 20-30, at p. 20.

[137]  Diamond, S. S., "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence*, Third Edition, The National Academies Press (2011), pp. 359-423, at pp. 410-411.

### 4. Proposed "But-for World" is Unrealistic and Loss Aversion Leads Respondents to Put More Weight on the Challenged Claim

59. Dr. Roberts' proposed survey would test a "but-for world" in which the Neutrogena Oil-Free Moisturizer product still includes the challenged oil-free label, but consumers are also provided with additional information challenging the oil-free nature of the product. As Dr. Roberts described in deposition, "the but for here…has to be information about the fact that [the oil-free nature of the product] is at least in dispute."[138] This assumption suffers from several flaws.

60. First, Dr. Roberts' assumed "but-for world" is unrealistic. My understanding is that the "but-for" framework involves constructing a counterfactual world in which the alleged wrongdoing has not occurred and assessing what actions each party likely would have taken in that counterfactual world.[139] Here, JJCI could have avoided use of the allegedly misleading claim in a number of different ways. For example, JJCI could have replaced the oil-free claim with a more specific claim that the product is free of certain types of oils that are not asserted by Plaintiff. Alternatively, JJCI could have substituted a different claim unrelated to oil content, or could have chosen to remove the oil-free claim without replacing it. As designed, Dr. Roberts' proposed methodology does not provide an estimate of what would have happened in any of these more realistic counterfactual worlds.

61. Further, due to this flawed construction of the "but-for" world, Dr. Roberts' proposed survey design creates a situation in which respondents are being asked to give something

---

[138] Roberts Deposition, at pp. 189-190. Dr. Roberts' description of the counterfactual world assessed by his proposed survey is not consistent with Plaintiff's characterization of his analysis. Plaintiff notes that Dr. Roberts' proposed methodology would assess "the counterfactual class wide economic value that would have been obtained with the 'oil-free' attribute removed from the packaging." Motion for Class Certification, at p. 14.

[139] Dr. Roberts appears to believe that because the Neutrogena Oil-Free Moisturizer product currently includes the oil-free claim, the "but-for" world has to "start from the reality" and "can't actually go into a situation where the product was never produced with the oil free claim on it." Roberts Deposition, at p. 189. This belief is at odds with the very concept of a counterfactual "but-for world."

up—respondents are first told that the tested product is oil-free and are then exposed to information
suggesting that it is not oil-free. This design will tend to result in overstated WTPs due to a bias
known as "loss aversion." When respondents are asked to give up something, their valuation of
what they are losing tends to be higher than if they were receiving the same thing (*i.e.*, consumers
weight prospective losses more heavily than equivalent gains).[140] Academic research suggests that
the magnitude of this overstatement can be substantial. For example, Kahneman, Knetsch, and
Thaler (1990) find that, across studies, average willingness to accept (as compensation for a loss)
varies from between 2.6 and 16.5 times that of average WTP (for a gain).[141] Thus, by framing the
change to the oil-free feature as a loss rather than a gain, Dr. Roberts' proposed survey would
overstate the value consumers place on the feature and produce inaccurate results.

62.     In addition, Dr. Roberts' "but-for" world creates a situation in which respondents
are made to believe that they were being deceived by the oil-free claim initially presented with the
product. This may generate an emotional response that would lead respondents to react more
strongly to the information challenging the oil-free nature of the at-issue product than if this change
were presented in a more neutral manner.[142]

### D.     Dr. Roberts' Proposed Methodology Fails to Account for Competition and Supply-Side Factors

63.     Other flaws notwithstanding, Dr. Roberts' survey can, at best, provide an estimate
of the amount that consumers would hypothetically be willing to pay for the challenged oil-free

---

[140] Hausman, J., "Contingent Valuation: From Dubious to Hopeless," *Journal of Economic Perspectives*, Vol. 26, No. 4 (2012), pp. 43-56, at p. 46.

[141] Kahneman, D., J. L. Knetsch, and R. H. Thaler, "Experimental Tests of the Endowment Effect and the Coase Theorem," *Journal of Political Economy*, Vol. 98, No. 6 (1990), pp. 1325-1348, at p. 1327.

[142] *See*, *e.g.*, Xie, G., R. Madrigal, and D. M. Bousch, "Disentangling the Effects of Perceived Deception and Anticipated Harm on Consumer Responses to Deceptive Advertising," *Journal of Business Ethics*, Vol. 129, No. 2 (2015), pp. 281-293, at pp. 282-283; Darke, P. R. and R. J. B. Ritchie, "The Defensive Consumer: Advertising Deception, Defensive Processing, and Distrust," *Journal of Marketing Research*, Vol. 44, No. 1 (2007), pp. 114-127.

claim. Dr. Roberts describes his proposed survey methodology as "elicit[ing] the impact of falsely made 'oil-free' claims on the *willingness to pay* by consumers."[143] While, as discussed above, Dr. Roberts' damages methodology is not clearly articulated, he appears to suggest that applying this change in consumer WTP will enable him to calculate the economic damages to the class. However, Dr. Roberts inappropriately conflates changes in consumer WTP with changes in market prices, entirely ignoring the role of competition and other supply-side factors in shaping market equilibrium prices. This flaw renders Dr. Roberts' proposed methodology unusable for purposes of calculating damages in this matter.

64.     It is my understanding that, for purposes of assessing damages in a class action related to false advertising, it is important to consider the difference between the prices proposed class members actually paid for the relevant product and the prices that would have occurred in the "but-for" marketplace. This difference can be thought of as the "price premium" paid for the challenged claims. Based on this framework, it is necessary to determine "but-for" market prices, which are hypothetical and, therefore, must be estimated. Here, in order to ascertain how prices for Neutrogena Oil-Free Moisturizer would have differed in the "but-for" marketplace, it is essential to assess how the market for Neutrogena Oil-Free Moisturizer would have evolved had the challenged claims not been included with the product. As market prices are determined by the intersection of supply and demand, a proper analysis of this "but-for" market price must consider the impact of the challenged claims not only on consumer demand for the product, but also on supply-side factors in the "but-for" marketplace. Consistent with this, courts have emphasized that "[i]n order to prove market value…a party must present evidence of *both* willingness to pay and

---

[143]   Roberts Report, at p. 9 (emphasis added).

willingness to sell."[144] In deposition, Dr. Roberts also agreed that market prices reflect the
intersection between supply and demand, which he does not account for in his proposed
analysis.[145]

65.     To illustrate this point, consider the following hypothetical example. In this
example, assume that consumers in the hypothetical marketplace are willing to pay between $2.80
and $6.80 per ounce for Neutrogena Oil-Free Moisturizer with the challenged claims and their
individual WTP values follow the distribution shown in column [B] of Table 1 below, with a
median WTP of $4.80 per ounce. For purposes of illustration, assume that if the challenged claims
are removed from the label, the distribution of consumers' WTP changes and shifts downward as
shown in column [C] below, such that the median WTP decreases to $3.80 per ounce.

### Table 1. Illustrative Distribution of Consumer WTP

|  | With Challenged Claims | Without Challenged Claims |
| --- | --- | --- |
| WTP<br>[A] | # Consumers<br>[B] | # Consumers<br>[C] |
| $2.80 | 10 | 15 |
| $3.80 | 15 | 25 |
| $4.80 | 20 | 10 |
| $5.80 | 15 | 10 |
| $6.80 | 10 | 10 |
| Median | $4.80 | $3.80 |

66.     Just because the median consumer WTP has decreased, however, does not
necessarily mean that JJCI (the supplier) would be willing to sell the product at this lower price.
JJCI may prefer to sell less of the product at a higher price, choosing to sacrifice market share in

---

[144]   *In Re: General Motors LLC Ignition Switch Litigation*, 427 F. Supp. 3d 374, 383 (D.N.Y. 2019) The decision
also notes that "the diminution in value caused by a vehicle's alleged hidden defect is calculated as the
difference between the *market* value of a non-defective vehicle for which the plaintiff bargained and the *market*
value of the vehicle had the defect been disclosed. Market value, in turn, is the price associated with the
intersection of the demand curve (which reflects consumers' willingness to pay) and the supply curve (which
reflects producers' willingness to sell)."

[145]   Roberts Deposition, at p. 191.

order to maximize its profits. This depends on the distribution of consumer WTP as well as JJCI's unit cost of supplying Neutrogena Oil-Free Moisturizer. Table 2 below illustrates JJCI's hypothetical profits at various price points (as shown in column [A]), assuming a constant unit cost of $3.00 per ounce (as shown in column [B]). For each price point, Table 2 calculates the quantity that would be sold (columns [C] and [E]), which reflects the number of consumers willing to pay that price or higher from Table 1, and JJCI's total profits (columns [D] and [F]) for that quantity of sales and price point. As shown, in a world in which Neutrogena Oil-Free Moisturizer includes the challenged claim, JJCI maximizes its profits by selling 45 units at a price of $4.80 per ounce. Without the challenged claim, JJCI maximizes its profits by *raising* its price to $5.80 per ounce and selling only 20 units. In this illustrative example, the median consumer WTP decreases to $3.80 per ounce in the "but-for" world, but JJCI would not lower its price to that value as doing so would reduce its profits below what it could have earned by raising prices to $5.80 per ounce, or even by keeping prices constant at $4.80 per ounce.

**Table 2. Illustrative Calculation of JJCI Profits at Different Price Points**

| Price [A] | Unit Cost [B] | With Challenged Claims | | Without Challenged Claims | |
|---|---|---|---|---|---|
| | | Quantity Sold [C] | Profits [D] | Quantity Sold [E] | Profits [F] |
| $2.80 | $3.00 | 70 | ($14.00) | 70 | ($14.00) |
| $3.80 | $3.00 | 60 | $48.00 | 55 | $44.00 |
| $4.80 | $3.00 | 45 | $81.00 | 30 | $54.00 |
| $5.80 | $3.00 | 25 | $70.00 | 20 | $56.00 |
| $6.80 | $3.00 | 10 | $38.00 | 10 | $38.00 |

Notes & Sources:

[C] Reflects number of consumers from Table 1, column [B] with WTP greater than or equal to price in [A].
[D] = ([A] - [B]) * [C].
[E] Reflects number of consumers from Table 1, column [C] with WTP greater than or equal to price in [A].
[F] = ([A] - [B]) * [E].

67.     As this exercise makes clear, consumer WTP for Neutrogena Oil-Free Moisturizer
without the challenged claim does not equate to the market price in the "but-for" world.[146] It is
necessary to take into consideration the supply side of the equation in order to determine the "but-
for" price.

68.     Further, suppliers could also change their behavior in other ways in the "but-for"
marketplace. For instance, JJCI could react to the reduction in consumer demand for Neutrogena
Oil-Free Moisturizer by substituting other non-challenged claims on the belief that this would
compensate for the removal of the challenged claim. JJCI could choose to adjust the price of
Neutrogena Oil-Free Moisturizer or maintain the same prices. Retailers also could play a role.
With the decrease in demand or possible decrease in their margin dollars, they could opt to reduce
the shelf space allocated to Neutrogena Oil-Free Moisturizer or possibly remove it from the shelf
altogether. Competitors could change their behavior in response to the change in consumer demand
for Neutrogena Oil-Free Moisturizer and JJCI's reaction. For example, competing firms could
increase their prices to capitalize on the fact that their relative advantage has increased as demand
for Neutrogena Oil-Free Moisturizer has fallen and, presumably, demand for competing products
has increased. Alternatively, competitors could maintain or lower their pricing in response to
JJCI's actions. Under Dr. Roberts' "but-for" world in which consumers receive additional
information challenging the oil-free claim on the Neutrogena Oil-Free Moisturizer, the demand
for competing products could also be affected due to heightened consumer awareness of allegedly
misleading oil-free claims and/or ingredients that allegedly constitute oils.[147] All of these

---

[146]   To further illustrate this point, consider an extreme case in which all consumers were willing to pay less than
the unit cost of supplying the product. A company wishing to maximize its profits would choose not to sell *any*
of the product rather than lower its price to meet consumer WTP, as it would lose money on every sale.

[147]   For example, Equate Beauty Oil-Free Facial Moisturizer for Sensitive Skin, Alba Botanica Hawaiian Aloe &
Green Tea Oil-Free Moisturizer, and Skin Resource MD Oil Free Antioxidant Facial Moisturizer are also

marketplace dynamics influence the "but-for" market price for Neutrogena Oil-Free Moisturizer, and one cannot assess "but-for" prices without considering what would have unfolded in the "but-for" marketplace in which JJCI did not use the challenged claims.

69.     While a well-designed survey can provide an estimate of changes in demand (consumer WTP), it alone cannot account for supplier responses (manufacturer decisions, retailer decisions, and/or competitive response).[148] Academic researchers have emphasized that well-designed surveys must be supplemented with "information on competitive offerings and cost" if they are to assess changes in equilibrium prices and profits.[149] Researchers have explicitly cautioned that WTP measures derived from surveys should not be conflated with equilibrium prices:

> Neither WTP [willingness to pay] nor WTB [willingness to buy] take into account equilibrium adjustments in the market as one of the products is enhanced by the addition of a feature. For this reason, we cannot view WTP as what a firm can charge for a feature-enhanced product… In many cases, WTP will overstate the price premium afforded by feature enhancement…[150]

70.     Thus, without further information and analysis, an estimate of consumer WTP for a particular feature cannot be interpreted as the market price premium a firm could charge for

---

[148] Consistent with this, the Court in *In Re: General Motors LLC Ignition Switch Litigation* held that the analysis presented in that case was "insufficient evidence of diminution in value because it focuses entirely on consumers' willingness to pay and ignores producers' willingness to sell. Without any evidence of the shape of the supply curve…no reasonable jury could determine the price at which the supply and demand for vehicles with a known defect intersect – let alone conclude that the price would be lower than the one Plaintiffs paid, resulting in damages." *In Re: General Motors LLC Ignition Switch Litigation*, 427 F. Supp. 3d 374, 384 (D.N.Y. 2019).

labeled "oil-free" and contain ingredients challenged by Plaintiff as oils (*i.e.*, ethylhexyl palmitate (also referred to as octyl palmitate) and/or soybean sterols). *See* Motion for Class Certification, at p. 6; https://www.walmart.com/ip/Equate-Beauty-Oil-Free-Facial-Moisturizer-for-Sensitive-Skin-4-fl-oz/752495725?wmlspartner=wlpa&selectedSellerId=0 (viewed 6/20/2022); https://www.amazon.com/Alba-Botanica-Hawaiian-Oil-Free-Moisturizer/dp/B001ET7BPS?th=1 (viewed 6/20/2022); https://skinresourcemd.com/products/oil-free-facial-antioxidant-moisturizer (viewed 6/20/2022).

[149] Allenby, G., J. Brazell, J. Howell, and P. Rossi, "Economic Valuation of Product Features," *Quantitative Marketing Economics*, Vol. 12 (2014), pp. 421-456, at pp. 421, 422, 424.

[150] Allenby, G., J. Brazell, J. Howell, and P. Rossi, "Valuation of Patented Product Features," *Journal of Law and Economics*, Vol. 57, No. 3 (2014), pp. 629-663, at p. 649.

incorporating that feature in its product. Yet, this is precisely how Dr. Roberts would interpret his survey results. Dr. Roberts describes his survey as measuring "the specific impact of price related to an 'oil-free' claim," and claims that his proposed measure of damages would "incorporate a price premium associated with this product attribute to determine the overall economic damages associated with this false claim."[151] Similarly, Plaintiff characterizes Dr. Roberts' proposed methodology as determining the "counterfactual purchase price of the product but for the misrepresentation."[152] However, Dr. Roberts' proposed methodology only attempts to measure consumer WTP and entirely disregards the role of supply side factors, such as competition and production costs, in shaping market prices in a hypothetical "but-for" world without the challenged claim. In deposition, Dr. Roberts acknowledged that his proposed analysis is a "consumer centric model" that is "not looking directly [at] what is the impact for the firm and their decision making" and does not consider competitive responses by firms, availability of alternatives in the marketplace, or JJCI's willingness to sell the product at lower prices.[153] Without adequately accounting for supply-side factors, Dr. Roberts' proposed methodology cannot ascertain the market price of the product without the challenged claim, and thus cannot provide a valid measure of economic damages to the class.

### E.    Dr. Roberts' Proposed Methodology Ignores Heterogeneity Across Class Members and Does Not Provide a Way to Measure Individual Damages

71.    Even if Dr. Roberts' proposed methodology could provide a valid measure of aggregate damages for the class as a whole (which, as discussed above, it cannot), it cannot be

---

[151]   Roberts Report, at pp. 9, 15-16.
[152]   Motion for Class Certification, at p. 17. *See also*, Motion for Class Certification, at p. 14 ("Dr. Roberts opines that if the 'oil-free' attribute associated with the product turns out to be a significant product attribute in the eyes of the consumer, the willingness to pay for the product will decrease significantly when this product attribute is absent. Accordingly, prices will be significantly impacted when the 'oil-free' claim is does not hold.")
[153]   Roberts Deposition, at pp. 190-194.

used to measure the alleged harm, if any, experienced by each individual class member. Plaintiff claims that Dr. Roberts' approach will yield "[a] single remedy…calculated by determining the counterfactual purchase price of the product but for the misrepresentation…[which] will resolve this issue for every Class Member."[154] However, application of a "single remedy" ignores heterogeneity in the proposed class that suggests that any alleged harm caused by the inclusion of the challenged oil-free claim varies substantially across individual class members.

72.     Not all consumers have the same preferences with respect to oil in skincare products, and therefore not all class members would be affected by the allegedly misleading label in the same way or to the same extent. For example, some consumers may be indifferent to whether their facial moisturizer contains oil, suggesting that their decision to purchase the Neutrogena Oil-Free Moisturizer and their WTP for the product was not materially affected by the oil-free claim. Other consumers may *prefer* skincare products that contain oil. As suggested by Dr. Roberts, "consumers with dry skin [may] find a cosmetic containing oil is a welcomed surprise."[155] Public sources similarly suggest that skincare products with oil offer other benefits that may appeal to some consumers. For example, using oil in skincare may have anti-aging effects, help protect and repair the skin, and reduce excess production of natural skin oils.[156] Skincare products with oil can

---

[154]   Motion for Class Certification, at pp. 17-18.

[155]   Roberts Report, at p. 5 ("Qualitative marketing research may discover that a cosmetic containing oil is undesirable in some circumstances but desirable in others. Results may indicate that consumers with dry skin find a cosmetic containing oil is a welcomed surprise."). *See also*, Roberts Deposition, at p. 186 ("Q Do you think that consumers will have different preferences with respect to the oil free claim? A I know they will."), 140 ("Q Do you think consumers have variable views about what oil free means? … A It's very likely they do.").

[156]   https://www.verywellhealth.com/best-oils-for-skin-5088968 (viewed 6/12/2022); https://www.jivome.com/articles/the-importance-of-oils-for-our-skin#:~:text=The%20sebaceous%20glands%20(oil%2Dproducing,the%20skin%20to%20function%20properly. (viewed 6/12/2022); https://www.lorealparisusa.com/beauty-magazine/skin-care/skin-care-essentials/face-oil-reasons (viewed 6/12/2022); https://www.totalbeauty.com/content/gallery/skin-rule-break/p97162/page5 (viewed 6/12/2022).

also prevent acne and treat acne scarring.[157] To the extent that the Neutrogena Oil-Free Moisturizer does contain oil, those consumers who find it to be a "welcomed" benefit, as Dr. Roberts describes, were not harmed by the allegedly misleading oil-free claim.

73.    Even among consumers who may prefer oil-free skincare products, the strength of those preferences—and therefore the extent of the alleged harm, if any, associated with the inclusion of the oil-free claim—likely varies across individuals. For some consumers, the "oil-free" label may be the most important factor in their purchase decision; for others, it may be considered only a minor benefit compared to the product's other features and may not materially impact their purchase decision. Dr. Roberts' proposed survey will likely reveal different WTPs for the Neutrogena Oil-Free Moisturizer across respondents, which, according to his proposed methodology, would suggest different amounts of harm.[158]

74.    In addition, consumers may have different levels of awareness of the ingredients that Plaintiff alleges constitute oils. For example, research conducted by JJCI suggests that young adult consumers tend to "really do their research" and scrutinize product ingredients.[159] According to the presentation, "[o]ne of the first things many [consumers] do when assessing if a facial cleanser will work is look at the ingredient list."[160] To the extent that some consumers were already aware of the Neutrogena Oil-Free Moisturizer's ingredients, including those alleged to be oils, and still chose to purchase the product, this suggests that they were not harmed by the allegedly misleading oil-free claim.

---

[157]  https://www.essence.com/beauty/skin/beauty-myth-debunked-oil-bad-your-face/ (viewed 6/12/2022);
       https://www.totalbeauty.com/content/gallery/skin-rule-break/p97162/page5 (viewed 6/12/2022). Dr. Roberts
       appears to agree that respondents will respond to his proposed survey in different ways. Roberts Deposition, at
       p. 186.
[158]  Roberts Report, at p. 4.
[159]  JJCI-NOOHI_00002068, at slide 12.
[160]  JJCI-NOOHI_00002068, at slide 5.

75.     Further, consumers may have different experiences with the Neutrogena Oil-Free Moisturizer upon trying the product, which also affects the extent to which they were harmed by the allegedly misleading oil-free claim. Some consumers may prefer oil-free products because of certain beliefs about how the product will perform, rather than any preferences for specific ingredients. As described above in Section II.B, many of the perceived benefits of a skincare product being oil-free relate to controlling oily skin and avoiding clogged pores or acne breakouts. Consistent with this, Kathryn Drehs Sauers, Associate Director of Market Research at Neutrogena, explained that "[f]or those consumers where [the oil-free claim] is motivating, it's because it helps provide that reassurance that it's safe for their skin... it won't clog their pores" or cause other skin problems.[161] Each of these perceived oil-free benefits (or the lack of such benefits) can be directly observed by the consumer while using the product.[162] Indeed, in her Motion for Class Certification, Plaintiff claims that some purchasers of the Neutrogena Oil-Free Moisturizer complained that the product was "greasy" and "oily."[163] However, many other consumers report positive experiences with the product. For example, one customer review for the Neutrogena Oil-Free Moisturizer emphasizes that it is "the ONLY product that works. It doesn't cause any irritation, breakouts, or any of the other problems I've faced over the last 30 years. I don't know what I would do without this AWESOME product!!!".[164] Other customer reviews describe the product as "the only moisturizer that does not make my skin feel heavy or irritated," "perfect for my skin," "[l]eaves my skin feeling moisturized without making me break out," "the only moisturizer that does not

---

[161]  Drehs Sauers Deposition, at p. 28. *See also*, Drehs Sauers Deposition, at p. 39 (noting that consumers care about the oil-free claim because it provides reassurance that it won't clog pores or cause unnecessary breakouts).

[162]  Research conducted by JJCI suggests that some consumers closely analyze their skin's performance with various products, including by tracking their skin with photos to analyze before and after results. *See* JJCI-NOOHI_00002068, at slides 15, 24.

[163]  Motion for Class Certification, at p. 9.

[164]  https://www.neutrogena.com/products/skincare/neutrogena-oil-free-face-moisturizer-for-sensitive-skin-fragrance-free-non-comedogenic/6805400.html?cgid=skin-moisturizers-moisturizers&tilePosition=5#BVReviewsContainer (viewed 6/16/2022).

make my skin break out," "[n]on-greasy - feels great," and "feels good on my face."[165] Ms. Noohi, named Plaintiff in this matter, also testified that, based on her experience, the product was gentle, lightweight, and non-drying, and did not feel greasy, cause clogged pores, or make her skin shiny.[166] Consistent with this evidence of customer experiences, a study conducted for Neutrogena Research & Development similarly found that out of 140 total participants using the Neutrogena Oil-Free Moisturizer for one week, 75 percent of participants agreed that the product "[d]oes not leave my skin shiny," 88 percent agreed that the product "[m]akes my skin feel soft and smooth," and 89 percent agreed that the product "[f]eels lightweight on skin."[167] Consumers who associate the oil-free claim with certain performance benefits and experience those benefits with the Neutrogena Oil-Free Moisturizer product were not harmed by the allegedly misleading oil-free claim.

76.     In fact, many Neutrogena Oil-Free Moisturizer sales are repeat purchases, suggesting that many consumers have positive experiences with the product. Repurchase intentions are largely driven by a consumer's satisfaction with the product and perception of whether the product met expectations.[168] A consumer's decision to repurchase the Neutrogena Oil-Free Moisturizer after experiencing its effects first-hand implies that he/she was satisfied with the product and, presumably, did not experience potential unwanted effects associated with the presence of oil. According to Plaintiff's Motion for Class Certification, the Neutrogena Oil-Free

---

[165]   https://www.neutrogena.com/products/skincare/neutrogena-oil-free-face-moisturizer-for-sensitive-skin-fragrance-free-non-comedogenic/6805400.html?cgid=skin-moisturizers-moisturizers&tilePosition=5#BVReviewsContainer (viewed 6/16/2022).
[166]   Deposition of Narguess Noohi, December 13, 2021, at pp. 60-61, 84-87.
[167]   JJCI-NOOHI_00025237-240, at 240.
[168]   Pokryshevskaya, E. B. and E. A. Antipov, "The strategic analysis of online customers' repeat purchase intentions," *Journal of Targeting, Measurement and Analysis for Marketing*, Vol. 20, No. 3/4 (2012), pp. 203-211, at pp. 208-210; Widodo, J. S., "Literature Review of Consumer Behavior: Customer Loyalty, Repeat Purchase and Purchase Interest," *Dinasti International Journal of Economics, Finance and Accounting,* Vol. 2, No. 2 (2021), pp. 242-250, at p. 244.

Moisturizer "is considered to have a loyal following with little to no marketing support to generate high repeat purchases."[169] Similarly, numerous customer reviews describe a long history with the product.[170] Even if the oil-free claim contributed to these repeat purchasers' initial decision to try the product, the decision to repurchase the product (sometimes many times over) suggests that these consumers were satisfied with its performance, and therefore, were not harmed by the inclusion of the oil-free claim.

77.     The heterogeneity in preferences for oil-free skincare products and experiences with the Neutrogena Oil-Free Moisturizer suggested above indicates that any alleged harm caused by the inclusion of the oil-free claims varies substantially across proposed class members, rendering a uniform "single remedy" inappropriate for purposes of calculating individual damages. Instead, determining whether and to what extent members of the proposed class were harmed by the alleged misrepresentation requires individualized inquiry. Dr. Roberts' proposed methodology does not identify any way of distinguishing differing levels of harm among proposed class members and, as such, cannot be used to determine individual damages.[171]

78.     In addition, Plaintiff contends that the materiality of the alleged misrepresentation to consumers' purchase decisions can be assessed on a common basis because "the same or substantively similar language was present on all Class Products, and their packaging" and thus

---

[169]   Motion for Class Certification, at pp. 4-5.

[170]   https://www.neutrogena.com/products/skincare/neutrogena-oil-free-face-moisturizer-for-sensitive-skin-fragrance-free-non-comedogenic/6805400.html?cgid=skin-moisturizers-moisturizers&tilePosition=5#BVReviewsContainer (viewed 6/16/2022) (*see, e.g.*, reviews noting "I have been using Neutrogena's Oil-Free Moisture for Sensitive Skin for years," "I have sensitive skin and have been using this product for a long time," "I've been using Neutrogena® Oil-Free Face Moisturizer for Sensitive Skin daily for over 25 years," "I have used this product for years and years," "I have been using it for over forty years," "I have used this product for YEARS!").

[171]   Dr. Roberts claimed in deposition that his analysis would allow him to evaluate damages for different demographic groups. Roberts Deposition, at pp. 200, 202-205. This does not account for heterogeneous preferences and experiences across individual consumers.

all proposed class members were exposed to the alleged misrepresentation in the same way.[172] However, as discussed above, the extent to which the alleged misrepresentation materially influenced a consumer's purchase decision depends on numerous individualized factors, including his/her preferences for oil-free skincare products (or for skincare products containing oil), the importance he/she places on the oil-free feature relative to other product features, his/her awareness of the product ingredients, his/her interpretation of the oil-free claim, and his/her previous experiences with the product, among other factors. Thus, determining materiality also requires individualized inquiry into these customer-specific facts.

### F.   Dr. Roberts' Assumption of a Price Premium Associated with the Challenged Oil-Free Claim is Inconsistent with Real-world Evidence

79.   Although Dr. Roberts has not yet conducted his proposed analysis, he appears to assume, without basis, that the inclusion of the oil-free claim significantly impacts consumers' WTP for the Neutrogena Oil-Free Moisturizer and enables the product to command a premium price in the marketplace; that is, consumers are paying more for the fact that the product is oil-free. Dr. Roberts claims that "standard economic theory suggests that consumers' willingness to pay will be significantly diminished upon realizing that the product contains oil."[173] Dr. Roberts further concludes that "[i]t is likely…that removing the 'oil-free' attribute associated with Defendants' product will negatively impact both the price they are able to charge and the existing demand for their product."[174]

80.   While I have not attempted to quantify the price premium, if any, associated with the oil-free claim, I conducted an illustrative analysis of the prices of facial moisturizers currently listed on the Neutrogena website to evaluate whether marketplace evidence supports Dr. Roberts'

---

[172]   Motion for Class Certification, at pp. 21-22.
[173]   Roberts Report, at p. 15.
[174]   Roberts Report, at p. 15.

assumption that the oil-free claim is associated with a price premium. In Exhibit 3, I summarize prices for all facial moisturizers currently listed on the Neutrogena website, categorized by those tagged as oil-free vs. those not tagged as oil-free.[175] As shown in the exhibit, prices per ounce for oil-free products range from $2.37 to $14.11. Prices per ounce for non-oil-free products tend to be higher, ranging from $5.00 to $39.99. The Neutrogena Oil-Free Moisturizer is priced at $3.62 per ounce, which is approximately $1.40 per ounce lower than even the least-expensive non-oil-free product. Across all oil-free products, the average price per ounce is $6.79. In comparison, the average price per ounce for non-oil-free products is $15.93, suggesting that oil-free products are over $9.00 *cheaper* per ounce than non-oil-free products on average.[176]

81.      In addition to their oil content, there are other potentially important differences between the Neutrogena facial moisturizers I examined. For example, JJCI advertises different benefits for different products on the Neutrogena website. As summarized on Exhibit 3, some products are advertised to offer anti-aging benefits, treat acne, contain hyaluronic acid, and/or be alcohol-free or fragrance-free. I have not attempted to control for all differences between these products. However, one notable source of variation appears to be whether the product offers anti-aging benefits (*e.g.*, treating wrinkles and/or improving skin firmness). Products offering anti-aging benefits tend to contain oil and appear to be associated with higher prices. Controlling for this difference by excluding products offering anti-aging benefits from the analysis suggests that oil-free products are priced $1.33 *less* per ounce than non-oil-free products, on average. This evidence is not supportive of the existence of a price premium associated with the oil-free claim.[177]

---

[175]   The Neutrogena website allows shoppers to filter for products that are oil-free vs. not oil-free. *See* https://www.neutrogena.com/skin/skin-moisturizers/skin-moisturizers-moisturizers?prefn1=oilFree&prefv1=Yes (viewed 6/2/2022).
[176]   Exhibit 3.
[177]   My illustrative analysis is also consistent with Neutrogena documents showing that Oil Free Moisture products, including the at-issue product, are priced at the "entry price point." *See* JJCI-NOOHI_00014735, at PDF p. 1.

## IV.    CONCLUSION

82.    My analysis may change before trial if additional information from any of the
parties-in-suit or their experts becomes available. I, therefore, reserve the right to supplement my
report accordingly.


_____
                David Reibstein, Ph.D.
                July 1, 2022

# EXHIBIT 1

July 2022

# DAVID J. REIBSTEIN

The Wharton School
University of Pennsylvania
Philadelphia, PA  19104
(215) 898-6643

---

## EDUCATION

Doctor of Philosophy in Industrial Administration, Herman C. Krannert Graduate School of Industrial Administration, Purdue University, West Lafayette, Indiana.

- Major Area:  Marketing – Major emphasis on the application of quantitative methods and econometric techniques to marketing problems, marketing research, model building, contemporary marketing theory and consumer behavior.
- Minor Area:  Behavioral Science – Course work in simulation models of decision making, experimental design, experimental laboratory methods for research in social behavior, uses of the laboratory method and decision theory.
- Research Methodology – Course work in multivariate statistics, multidimensional scaling, numerical taxonomy and nonparametric statistics.

Doctoral Dissertation:

   *An Empirical Study of Brand Choice and Switching Behavior*

Dissertation Chairman: Frank M. Bass

Honorary Master of Science, The Wharton School, University of Pennsylvania, Philadelphia, Pennsylvania.

Attended Masters of Business Administration Program, Graduate Business School, Tulane University, New Orleans, Louisiana.

Bachelor of Science in Business Administration, University of Kansas, Lawrence, Kansas.  Bachelor of Arts in Statistics and Political Science, University of Kansas.

## ACADEMIC EMPLOYMENT

The Wharton School, 1980-Present
   Diversity Advisor for Faculty hiring, 2019-2021
   The William S. Woodside Professor, 1992-Present
   The Julian Aresty Professor, 1988-1992
   Vice Dean and Director of the Wharton Graduate Division, University of Pennsylvania, 1987-1992
   Director of Wharton /PIMS Strategy Research Center, 1985-1989
   Numerous other committees
   Academic Director of Wharton Executive Seminars: Marketing Metrics, Competitive Marketing Strategy, New Research Techniques in Marketing; New Product Development and Management; and others.

Other Academic Appointments
   Visiting Professor at Stanford Business School, Palo Alto, California, 1987-1988.

Visiting Professor, INSEAD, Fontainebleau, France, Summer 1984, 1985.

Assistant Professor of Marketing, Harvard Business School, July 1975-June 1980.

Research Assistant for Professor Frank M. Bass, Purdue University, West Lafayette, Indiana, Spring 1974.

Graduate Instructor in Industrial Administration, Purdue University, September 1972-August 1974.

Research Assistant for Professor John O. Tollefson, Kansas University, Lawrence, Kansas, Summer 1972

Executive Director, The Marketing Science Institute, July 1999-2001

Academic Trustee, Marketing Science Institute, Cambridge Massachusetts, 1993-1999, 2001-2005.

Research Associate, Marketing Science Institute, Cambridge, Massachusetts, 1975-1980

Other

Indian School of Business (ISB), Hyderabad, Marketing Metrics, November-December 2005

Chinese European Business School (CEIBS), Shanghai, Beijing, and Shenzhen Competitive Marketing Strategy, Executive MBA (EMBA), 2003, 2004, 2005

Interdisciplinary Center (IDC), Herzalia, Israel, Competitive Marketing Strategy, June 2003, December 2005.

Singapore Management University (SMU), Singapore, Competitive Marketing Strategy, July 2003, 2004, 2005.

Member of Executive Committee, Marketing Science Institute, Cambridge, Massachusetts, 2001-2005.

Member of Executive Director Council, Marketing Science Institute, Cambridge Massachusetts, 2005-present

Member of Philadelphia Global Identity Partnership (PGIP) Leadership Council, 2019-Present

## TEACHING

The Wharton School, University of Pennsylvania, July 1980-present.

Marketing Management (MBA Program and Executive MBA Program)
Advanced Management Program (Executive Education Program, Faculty)
Marketing Research (MBA Program)
Research for Strategic Decisions in Marketing (MBA Program)
Pro-Seminar (Ph.D. Program)
Marketing Strategy (MBA Program and Executive MBA Program)
Core Marketing (MBA Program)
Marketing Metrics (MBA Program and Executive Education Program, Academic Director and Faculty)
Competitive Marketing Strategies (Executive Education Program, Academic Director and Faculty)
Essentials of Marketing (Executive Education Program, Faculty)
Pricing (Executive Education Program, Faculty)
CFO (Executive Education Program, Faculty)
Numerous Company Specific Programs

Stanford Business School, September 1987-January 1988

Marketing Research (MBA Program), September 1987-January 1988.
Senior Management Program (1988, 1989, 1990)

INSEAD, April 1984-June 1984, May-June 1985

Marketing Strategy (MBA Program), April 1984-June 1984, May-June 1985.
Advanced Industrial Marketing Strategy, most every year since 1985-2015 (Executive Program)

2

Harvard Business School, July 1975-June 1980.

First-Year Marketing (MBA Program)
Marketing Research and Information Systems (MBA Program)
Marketing Research Methodology (DBA Program)
Research Design and Data Collection Methods (DBA Program)

Purdue University, September 1972-August 1974.

Marketing Principles:  Undergraduate
Marketing Management:  Undergraduate
Advertising Effectiveness:  Undergraduate

Committee Work - Department and University

Ad hoc committee on WEMBA
Ad hoc committee on Cross-functional Integration
AMA and Early Career Hiring Committee, 2019-2020
MBA Curriculum Committee
MBA Executive Committee
MBA Graduation Committee
University Communications Committee
University Classroom Facilities Committee
X-Functional Committee
Committee on Academic Freedom and Responsibility
Vice Dean Search Committee
Future of Advertising Committee
Knowledge @ Wharton Committee
Marketing Curriculum Committee
Numerous other committees, too many to list

Conference Work

Co-hosted 2002 and 2003 CMO Summit at Wharton
Chair, AMA Winter Educators' Conference (2003, 2012)
Organizing Committee Member, Chair and Co-Chair, Marketing Meets Wall Street Conference (2013, 2015, 2017, 2019)
Honorary Co-Chair, Annual Conference of China Marketing Science (2013)
Session Chair, Theory + Practice in Marketing Conference (2015)
Host, Wharton Nation Brand Conference (2016)
and others

Doctoral Dissertation Committees:

| Candidate | Employer |
|---|---|
| Marjorie Adams | University of Virginia |
| John Bateson | London School of Business |
| Suneal Bedi | Indiana University |
| William Boulding | Duke University |
| Cynthia Fraser | Columbia University |
| Steve Goldberg | University of Texas |
| Louis Gutentag | American Hospital Supply |
| Yogesh Joshi | University of Maryland |
| Rowland Moriarty | Harvard Business School |
| William Moult | BASES |

3

| | |
|---|---|
| Erica Okada | University of Washington |
| Philip Parker | INSEAD |
| Edward Popper | Federal Trade Commission |
| Carsten Poulsen | Aalborg University |
| John Quelch | Harvard Business School |
| Venkat Ramaswamy | University of Michigan |
| Sanjay Rao | Synergic Resources Corporation |
| Dan Sarel | University of Miami of Florida |
| Emine Sarigollu | McGill University |
| Robert Young | Northeastern University |

**Honors/Awards:**

2021 PwC Finance Forum Best Paper Award for "Inalienable Customer Capital, Corporate Liquidity, and Stock Returns," with Weinstein Wei Dou, Yan Ji, and Wei Wu.
https://www.pwccn.com/zh/3535summit.html

SSRN Top Ten Download List 2020 for the 2020 working paper, "Drowning in Metrics: How Managers Select and Trade-off Metrics for Making Marketing Budgetary Decisions."

Inducted as a Fellow at the College of Physicians 2017

The Rodney L. White Center for Financial Research winner of the 2017 Marshall Blume Prizes in Financial Research for "Consumer Capital, Financial Constraints and Stock Returns" by Winston Wei Dou, Yan Ji, David Reibstein and Wei Wu

MSI Top Download Award 2015 for working paper "Marketing Return on Investment: Seeking Clarity for Concept and Measurement."

iSIG Fellow, 2014

Wharton Class of 2008, "*Goes above and beyond the call of duty*" Award

Wharton Class of 2007, "*Goes above and beyond the call of duty*" Award

Marketing Metrics:  50+ Metrics Every Executive Should Master (2006) was named as the "Best Business Book:  Marketing" by Strategy & Business in 2007.

John S. Day Distinguished Alumni Academic Service Award at Purdue University, 2005.

WEMBA Excellence in Teaching Award, 1995, 1996, 1997, 1998, 2020.

The Helen Kardon Moss Anvil Award for Excellence in Teaching in the Graduate Division, 1995.

Miller-Sherrerd MBA Core Teaching Award, 1993-1999, 2004, 2005, 2007, 2008

Named "The Pick of the B-school Crop," Business Week, 1993.

Selected by Fortune magazine as one of the nation's eight "Most Favorite Business School Professors" (the only one selected in marketing), January 22, 1982.

University of Pennsylvania Lindback Award Nominee (1981-82 – selected by faculty).

The Class of 1984 award (for the best teaching rating at Wharton for the preceding two years) 1987,1995

Wharton Excellence in Teaching Award, 1982, 1984 -1988, 1993-1999, 2006.

Wharton Anvil Award Finalist (1981, 1982, 1983, 1984, 1985, 1986, 1987 – selected by students).

The Outstanding Graduate Instructor at Purdue University, The Krannert School (1973-74 – selected by students).

An Outstanding Graduate Instructor at Purdue University, The Krannert School (1973-74 – selected by students and faculty).

And, numerous others.

## REVIEWING AND EDITING

Special Editor, *Administrative Science*

Co-editor, Chicago Case Research Journal, 2015

Co-Editor, special issue on B2B Research, *Marketing Letters,* Sept 2010; Vol. 21, No. 3.

Co-edited a special issue of *Marketing Science* on "Competitive Responsiveness" (Winter 2005)

Editorial Review Board
    International Journal of Internet Marketing and Advertising
    International Journal of Research in Marketing

      Marketing Management
      Marketing Letters
   Reviewing
      *Marketing Science*
      *Management Science*
      *Journal of Marketing*
      *Journal of Marketing Research*
      *International Journal of Marketing Research*
      *Marketing Letters*
      *Marketing Management*
   MSI
      Dissertation competition
      Special issue of *Journal of Marketing*

**RESEARCH PUBLICATIONS**

**Refereed Journal Articles:**

"Reflections," (2022), Dawn Iacobucci (ed.), Reflections of Eminent Marketing Scholars, Foundations and Trends® in Marketing: Vol. 16, No. 1-2, pp 1-307.

"The Branding of a Country," with Suneal Bedi, (under review, submitted to the Journal of Marketing Research, January 2022).

"Crypto-Marketing: How Non-Fungible Tokens (NFTs) Challenge Traditional Marketing," with Reto Hofstetter, Emanuel de Bellis, Leif Brandes, Melanie Clegg, Cait Lamberton, Felicia Rohlfsen, Bernd Schmitt and Z. John Zhang. (forthcoming, accepted for publication in *Marketing Letters*, June 2022).

"Why the Economics of Media Will Not Heal a Divided America," Editorial with Z. John Zhang, https://www.smerconish.com/exclusive-content/why-the-economics-of-media-will-not-heal-a-divided-america, November 13, 2021.

"Academia in Court: How Marketing Scholarship Informs The Law," with Christopher Borek, Robert Vigil and Suneal Bedi. (forthcoming, submitted to Impact at *Journal of Marketing Research*, October 2021).

"Hybrid BYO Conjoint with Boosting for Data Fusion: Estimating Context Effects for Marketing Dashboards," with Ofer Mintz, Yakov Bart and Peter Lenk, (forthcoming, submitted to *Marketing Science* September 2021, under review). SSRN, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3502600.

"Guest Editorial: Responsible Research in Marketing," with Michael Haenlein, Mary Jo Bitner, Ajay K. Kohli and Katherine N. Lemon, Journal of Academy of Marketing Science 50, 8-12 (2022). (Published online, https://link.springer.com/article/10.1007%2Fs11747-021-00812-z, September 2021.)

"Damaged Damages: Errors in Patent and False Advertising Litigation," with Suneal Bedi, *Alabama Law Review* (2021), Vol. 73, No. 2, 385-436.

"Inalienable Customer Capital, Corporate Liquidity, and Stock Returns," with Winston Wei Dou, Yan Ji and Wei Wu, *Journal of Finance*, February 2021 Issue (76:1).

"Encouraging Business Scholars to Address Issues Facing Society," with Leonard L. Berry, Frank Wijen, Luk Van Wassenhove, Chris Voss, Anders Gustafsson, Ann Vereecke and Ruth Bolton, AACSB,

https://aacsb.edu/blog/2021/february/encouraging-business-scholars-to-address-societal-impact, February 8, 2021.

"Measuring Trademark Dilution by Tarnishment," with Suneal Bedi, *Indiana Law Journal*, Vol. 95(3), (Summer 2020). (Lead Article) (Kelley School of Business Research Paper No. 19-36; SSRN Top Download List, May & June 2020 for SSRN's Top Ten download list for: Intellectual Property: Trademark Law – Student Authors eJournal.).

"Inalienable Customer Capital, Corporate Liquidity, and Stock Returns," with Winston Wei Dou, Yan Ji and Wei Wu, Wiley.com, https://onlinelibrary.wiley.com/doi/10.1111/jofi.12960, July 10, 2020.

"The Past, Present, and Future of Brands and Branding Research," with Kevin Keller, Scott Neslin, Travis Oh and Donald Lehmann, *Marketing Letters* (2020) 31:151-162, http://link.springer.com/article/10.1007/s11002-020-09524-w

"World Leaders and Nation Brands," with Suneal Bedi in Mind Your Marketing 2018: Journal of World Marketing Summit Group," World Marketing Summit Group, https://www.amazon.com/MIND-YOUR-MARKETING-2018-JOURNAL-ebook/dp/B07JH3XPN2/ref=cm_sw_em_r_dp_dz_v_U_8jk3Bb8WJQJA1_lm, November 2018.

"Die Marke Deutschland," with Denise Dahlhoff, *Global Investor* (January-March 2017) No. 3, pp. 69-72.

"Improving Economic Prosperity through Nation Branding," *Mind Your Marketing*, The Journal Of World Marketing Summit (October 2016) Vol 2 No. 1, pp. 100-106.

"Turf Wars:  Product Line Strategies in Competitive Markets," with Yogesh Joshi and John Zhang, *Marketing Science*, January-February 2016, Vol. 35, No. 1, pp. 128-141.

"Closing the Gap between Marketing and Finance:  The Link to Driving Wise Marketing Investment," GfK Marketing Intelligence Review Journal Online, http://www.degruyter.com/view/j/gfkmir.2015.7.issue-1/gfkmir-2015-0003/gfkmir-2015-0003.xml, Vol. 7, Issue 1 (May 2015)

"Marketing Return on Investment:  Seeking Clarity for Concept and Measurement," with Paul W. Farris, Dominique M. Hanssens and James D. Lenskold, *Applied Marketing Analytics* (2015), Vol. 1, No. 3, pp 267-282.

"Crisis Diagnostics:  Assessing Brand Damage, Restoring Brand Equity," with James R. Gregory and Richard S. Levick, *Marketing Management* (2012), Vol. 21, Issue 1, pp. 29-33.

"Introduction to the Special Issue on B2B Research" with Sandy Jap, *#Springer Science+Business Media*, LLC 2010.  Published on-line 16 March 2010, Vol. 21, Issue 3, pp. 207-209.

"Metrics that Matter – to Marketing Managers," with Neil Bendle, Paul Farris and Phillip Pfeifer, *Journal of Research and Management*, 2010, Vol. 6, Issue 1, pp. 18-23.

"Dashboards as a Service: Why, What, How and What Research is Needed?" with Koen Pauwels, Tim Ambler, Bruce H. Clark, Pat LaPointe, David Reibstein, Bernd Skiera, Berend Wierenga and Thorsten Wiesel, *Journal of Service Research*, 2009**,** Vol. 12. No. 2, pp. 175-189.

"Is this Marketing Academia Losing Its Way?" with George Day and Jerry Wind, *Journal of Marketing*, July 2009, Vol. 73, No. 4, pp. 1-3 (Guest Editorial).

6

"A Broader Perspective of Network Effect," *Journal of Marketing Research,* April 2009, Vol. 46, Issue 2, pp. 154-156.

"Optimal Entry Timing in Markets with Social Influence," with Yogesh Joshi and John Zhang, *Management Science,* June 2009, Vol. 55, No. 6, pp. 926-939.  Backlash:  How Early Adopters React When the Mass Market Embraces a New Brand

 "Choosing the Right Metrics to Maximize Profitability and Shareholder Value", with J. Andrew Petersen, Leigh McAlister, Russell S. Winer, V. Kumar and Geoff Atkinson, *Journal of Retailing*, Volume 85, Issue 1, 2009, pp 95-111.

"Competitor See, Competitor Do: Incumbent Entry in New Market Niches," with M. Debruyne, *Marketing Science*, Winter 2005, Vol. 24, No. 1, pp. 55-66.

"Learning by Doing" *International Journal of Marketing Education*, 2005, Vol. 1, Issue 1, pp. 115-130.

"When Five is a Crowd in the Market Share Attraction Model," with P. Farris, P. Pfeifer and E. van Neirop, *Journal of Research and Management*, 2005, Vol. 1, Issue 1, pp. 41-56.

 "Competitive Responsiveness," with Dick R. Wittink, *Marketing Science*, Winter 2005, Vol. 24, No. 1, pp. 8-11.

"House of Brands vs. Branded Houses," *Economist*, *Global Agenda*, Winter 2005, Vol. 3, pp. 175-177.

"Rational Exuberance: The Wireless Industry's Killer "B", with Venkatesh Shankar and Tony Driscoll, *Strategy +Business,* Summer 2003, Issue 31, pp. 68-77.

"What Attracts Customers to Online Stores, and What Keeps Them Coming Back?," *Journal of the Academy of Marketing Science*, Fall 2002, Vol. 30, No. 4, pages 465-473.

"Performance Measurement in Marketing," with Sven Reinecke, *Koshenrechnumgspraxis*, 46, Jg., 2002, H.1, 18-25.

"The Impact of Business Objectives and the Time Horizon of Performance Evaluation on Pricing Behavior," with Dick Wittink and S.K. Keil, *International Journal of Research in Marketing*, June 2001, Vol. 18, Nos. 1-2, 67-81.

"Putting the Lesson Before the Test:  Using Simulation to Analyze and Develop Competitive Strategies," with Mark J. Chussil, *Competitive Intelligence Review*, (1st Quart 1999) Vol. 10, Issue 1, pp. 34-48.

"Brand Equity and Vertical Product Line Extent," with Taylor Randall and Karl Ulrich, *Marketing Science*, November 1998, Vol. 17, No. 4, 1998, pp. 356-379.

"Brand Equity and Line Extension: How Long Can you Go?" with Taylor Randall and Karl Ulrich, The Financial Times, October 5, 1998.

"Virtual Competition" with Mark Chussil, *Marketing Research,* Special Issue, Winter 1997, pp. 44 – 51.

"Dynamic Competitive Strategies," with George S. Day, *Financial Times Guide to Management*, 1996.

"Market Share and Distribution: A Generalization, a Speculation, and Some Implications," with Paul Farris, Special Issue *Marketing Science*, Vol 14, No. 3 (Summer 1995), pp. 190-202.

"Do Marketing Expenditures to Gain Distribution Cost the Customer?" with Paul Farris, *European Management Journal*, March 1995, Vol. 13, Issue 1, pp. 31-38.

"Competitive Marketing Behavior in Industrial Markets," with Venkatram Ramaswamy and Hubert Gatignon, *Journal of Marketing*, April 1994, Vol. 58, No. 2, pp. 45-55.

"Effectiveness of Brand-Related 15-Second Commercials," with Scott Ward and Terence A. Oliva, *Journal of Consumer Marketing*, Vol. 11 (2), 1994, pp. 38-44.

"An Empirical Pooling Approach for Estimating Marketing Mix Elasticities with PIMS Data" with Venkatram Ramaswamy, Wayne S. DeSarbo, and William T. Robinson, *Marketing Science*, Winter 1993, Vol. 12, No. 1, pp. 103-124.

"The Effect of Differences in the Number of Attribute Levels on Conjoint Results," with Dick R. Wittink, Lakshman Krishnamurthi, *Marketing Letters*, June 1990, Vol. 1, No. 2, pp. 113-123.

"Conjoint Reliability Measures," with Dick Wittink, William Boulding, John E. G. Bateson, and John W. Walsh, *Marketing Science*, Fall 1989, Vol. 8, No. 4, pp. 371-374.

"Conjoint Analysis Reliability:  Empirical Findings," with John Bateson and William Boulding, *Marketing Science*, Summer 1988, Vol. 7, No. 3, pp. 271-286.

"Pooling Logit Models," with Hubert Gatignon, *Journal of Marketing Research*, Vol. 23, August 1986, pp. 281-285.

"New Goldmines and Minefields for Market Researchers," with Leonard Lodish, *Harvard Business Review*, Jan.-Feb. 1986, Vol. 64, Issue 1, pp. 168-182.

"Benefit Segmentation in Industrial Markets," with Rowland T. Moriarty, *Journal of Business Research*, December 1986, Vol. 14, Issue 6, pp. 463-486.

"Forecasting the Impact of Socio Economic and Demographic Change on Product Demand," with John M. McCann, *Journal of Marketing Research*, November 1985, Vol. 22, Issue 4, pp. 415-423.

"An Investigation into the Order of the Brand Choice Process," with Frank M. Bass, Moshe Givon, Manu Kalwani, and Gordon Wright, *Marketing Science*, Fall 1984, Vol. 3, No. 4, pp. 267-287.

"Optimal Product Line Pricing: The Influence of Elasticities and Cross-Elasticities," with Hubert Gatignon, *Journal of Marketing Research*, August 1984, Vol. 21, Issue 3, pp. 259-267.

"Overcontrol in Advertising Experiments," with Paul W. Farris, *Journal of Advertising Research*, June/July 1984, Vol. 24, Issue 3, pp. 37-47.

"Robustness of Linear Models in Dynamic Multivariate Predictions," with Herbert Moskowitz, Doyle Weiss, and Kah Kee Cheng, *Omega*, 1982, Vol. 10, Issue 6, pp. 647-61.

"Factors Affecting Coupon Redemption Rates," with Phyllis A. Traver, *Journal of Marketing*, Fall 1982, Vol. 46, No. 4, pp. 102-113.

"An Analysis of Interdependent Decisions," with Herbert Moskowitz, *Omega*, Vol. 9, No. 3, 1981, pp. 267-79.

"The Direction of Causality Between Perception, Affect, and Behavior: An Application to Travel Behavior," with Christopher H. Lovelock and Ricardo de P. Dobson, *Journal of Consumer Research*, March 1980, Vol. 6, No. 4, pp. 370-6.

8

"How Prices, Ad Expenditures, and Profits Are Linked," with Paul W. Farris, *Harvard Business Review*, November-December, 1979, pp. 173-84.

"Structural Models for the Analysis of Traveler Attitude-Behavior Relationship," with R. Dobson, F. Dunbar, C. Lovelock, and C. Smith, *Transportation*, December 1978, Vol. 7, pp. 351-63.

"Market Research Corporation of America's Market Share Data," *Antitrust Law Journal*, American Bar Association, Vol. 47, Issue 3, August 1978, pp. 1041-1048.

"The Prediction of Individual Probabilities of Brand Choice," *Journal of Consumer Research*, December 1978, Vol. 5, No. 3, pp. 163-168.

"Number of Choices and Perceived Decision Freedom as a Determinant of Satisfaction and Consumer Behavior," with Stuart Youngblood and Howard Fromkin, *Journal of Applied Psychology*, August 1975, Vol. 60, Issue 4, pp. 434-437.


**Books and Chapters in Books:**

"How Marketing Can Save Democracy" with Windy, Y. (2020), Iacobucci, D. (Ed.) Continuing to Broaden the Marketing Concept (Review of Marketing Research, Vol. 17), Emerald Publishing Limited, pp. 29-51. https://doi.org/10.1108/S1548-643520200000017004

"Marketing Metrics: The Manager's Guide to Measuring Marketing Performance (4th Edition)," with Neil T. Bendle, Paul W. Farris and Phillip E. Pfeifer. Pearson.

"Marketing's Search for a Common Language," with Paul Farris and Karen Scheller in Accountable Marketing:  Linking Marketing Actions to Financial Performance, David W. Stewart and Craig T. Gugel (eds.), (pp. 45-51). Routledge:  Taylor & Francis Group, 2016.

"Marketing Return on Investment:  Seeking Clarity for Concept and Measurement," Marketing Accountability Standards Board (MASB) Book, Forthcoming.

"Marketing in the Firm and Society," Legends in Marketing: George S. Day, Volume 7 (2016).

"Best Countries, Defining Success and Leadership in The Twenty-First Century," John Gerzema and David Reibstein (2015).

"Marketing Metrics:  The Manager's Guide to Measuring Marketing Performance," 3rd ed. Neil T. Bendle, Paul W. Farris, Phillip E. Pfeifer and David J. Reibstein. *Pearson Education, Inc.*, September 2015.

"The Future of Marketing," Legends in Marketing: Yoram (Jerry) Wind, Vol. 8, edited by George S. Day, SAGE Publications, 2014.

"Marketing Strategy," Legends in Marketing: Yoram (Jerry) Wind, Vol. 4, edited by Jagdish N. Sheth, SAGE Publications, 2014.

"Domain 7: Marketing Organization & Competency," with Paul W. Farris and Robert M. Malcolm, *AMA CMM Study Guide*, American Marketing Association, 2013.

"Product Positioning," edited by Barry Bayus, *Wiley International Encyclopedia of Marketing*, John Wiley and Sons, West Sussex UK, 2011.

"Marketing Metrics The Definitive Guide to Measuring Marketing Performance," 2nd ed. Farris, Paul
W., Neil T. Bendle, Phillip E. Pfeifer and David J. Reibstein. *Wharton School Publishing*, February
2010.

"Challenges in Measuring Return on Marketing Investment:  Combining Research and Practice
Perspectives," with Koen Pauwels, REVIEW OF MARKETING RESEARCH,
edited by Ed Naresh Malhotra, M.E. Sharpe, Inc., (pp 107-124) Irvine, CA, 2009.

"Innovation Metrics," edited by Barry Bayus, *Wiley International Encyclopedia of Marketing*, John Wiley
and Sons, West Sussex UK, 2009.

*Marketing Management*, with Koen Pauwels, edited by Rajiv Grover and Naresh Malholtra, McGraw-
Hill, 2009.

"Marketing Metrics and Financial Performance," with Donald R. Lehmann*, Marketing Science Institute*,
2006.

*Fifty + Metrics Every Marketer Should Know*, with P. Farris, N. Bendle and P. Pfeifer, *Wharton School
Publishing*, 2006.

"Global Branding," with George Day, in *The Alliance on Globalizing*, Gatignon and Kimberly (eds.),
Cambridge University Press, 2005.

"Marketing Costs and Prices: An Expanded View," with Paul Farris and Yogesh Joshi, in *Profit Impact of
Marketing Strategy Project: Retrospect and Prospects*, Paul W. Farris and Michael J. Moore (eds.), (pp.
124-152).  Cambridge University Press, 2004.

*Measuring and Allocating Marcom Budgets: Seven Expert Points of View,* with Rajeev Batra, "MSI
Monograph, January 2003.

"The Internet Buyer," in J. Wind and V.J. Mahajan, *Digital Marketing*, (pp 201-225), New York, NY John
Wiley & Sons, Inc., 2001.

"Technology-Driven Demand: Implications for the Supply Chain," with Marshall Fisher, in J. Wind and
V.J. Mahajan, *Digital Marketing*, (pp 285-309), New York, NY, John Wiley & Sons, Inc., 2001.

"Marketing Performance Measurements," *Handbuch Marketing Controlling,* edited by Sven Reinecke and
David Reibstein, Universitat St. Gallen, 2001.

"Managing Product Variety:  A Study of the Bicycle Industry," with Karl Ulrich, Taylor Randall, and
Marshall Fisher, *Product Variety Management: Research Advances (International Series in Operations
Research & Management Science),* edited by Teck-Hua Ho and Christopher S. Tang, (pp. 177-205),
Kluwer Academic Publishers, 1998.

*Wharton on Dynamic Competitive Strategies*, edited with George Day; John Wiley & Sons, 1997.

"Formulating Competitive Strategies," with Hubert Gatignon, *Wharton on Dynamic Comptetitive
Strategies*, edited by George Day and David Reibstein; John Wiley & Sons, 1997.

"Simulating Competitive Strategies," with Mark J. Chussil, *Wharton on Dynamic Competitive Strategies*,
edited by George Day and David Reibstein; John Wiley & Sons, 1997.

"Managing Competitive Interactions Through Competitive Market Signaling," with Oliver Heil and
George S. Day, *Wharton on Dynamic Competitive Strategies*, edited by George Day and David
Reibstein; John Wiley & Sons, 1997.

"Manufacture Prices, Retail Prices, Relative Prices, Absolute Prices," with Paul Farris, *The Blackwell Encyclopedic Dictionary of Business Ethics*, edited by Edward Freeman and Patricia Werhane; Blackwell Publishers, 1996.

*Strategy Analysis with ValueWar*, with Mark J. Chussil, The Scientific Press, 1994.

"Conjoint Analysis Reliability and Validity:  A Framework for Future Research," with John Bateson and William Boulding, *Review of Marketing*, 1987, pp. 451-477.

*Marketing: Concepts, Strategies, and Decisions*, Prentice-Hall, Inc., 1985.

"Evidence on the Value of Strategic Planning in Marketing or How Much Planning Should a Marketing Planner Plan?" with J. Scott Armstrong, Chapter 2.1 in *Strategic Marketing and Management*, edited by H. Thomas and D. Gardner, John Wiley and Sons, Ltd., 1985, pp. 73-87.

*Cases in Marketing Research*, with F. Stewart DeBruicker, Prentice-Hall, 1983.

"Incorporating Marketing into Corporate Planning Models," with John M. McCann, in *Simulation in Business Planning and Decision Making*, edited by Thomas N. Naylor, Simulated Councils, Inc., Chapter 10, Volume 9, Number 1, 1981, pp. 89-98.

"Attitude Measures and Brand Choice Frequency – Some Pitfalls To Be Avoided," with Joel C. Huber, in *Attitude Research Plays for High Stakes*, edited by John C. Maloney and Bernard Silverman, 1977, pp. 148-164.

## Working Papers

"Drowning in Metrics: How Managers Select and Trade-off Metrics for Making Marketing Budgetary Decisions" with Mintz, Ofer, Yakov Bart and Peter Lenk (MSI Working Paper Series, 2019)

"Consumer Capital, Financial Constraints and Stock Returns" by Winston Wei Dou, Yan Ji, David Reibstein and Wei Wu (The Rodney L. White Center for Financial Research winner of the 2017 Marshall Blume Prizes in Financial Research).

"A Tale of Two Markets: Brand Capital, Liquidity and Asset Prices," Winston Wei Dou, Yan Ji, David Reibstein and Wei Wu (2017).

"How Managers Make Trade-offs Between Metrics When Making Marketing Budgetary Decisions," David J. Reibstein, Yakov Bart, Peter Lenk, and Ofer Mintz (2017).

"Marketing Return on Investment:  Seeking Clarity for Concept and Measurement," Paul W. Farris, Dominique M. Hanssens, James D. Lenskold, and David J. Reibstein, MSI Working Paper Series (2014), Report No. 14-108.

"Turf Wars:  Product Line Strategies in Markets With Preference Based Segmentation," with Yogesh Joshi and John Zhang, *Marketing Science* (2013).

"Reinventing Training for the Global Information Age," with Jerry Wind

"Incumbents' response to competitive innovation: The role of competitors' behavior in determining response time" with Marion Debruyne, October 2001.

"Mobile e-Business: Disruptive Technology or Untethered Extension of Business as Usual?" with Tony O'Driscoll and Venkatesh Shankar, under review, *Sloan Management Review.*

"Market Share and Distribution:  A Generalization, A Speculation, and Some Implications" with Paul Farris, April 1994.

"An Empirical Pooling Approach For Estimating Marketing Mix Elasticities With PIMS Data," with Venkatram Ramaswamy, Wayne S. DeSarbo, and William T. Robinson, University of Michigan, Working Paper, January 1992.

"Conjoint Analysis Reliability's Empirical Findings," with John Bateson and William Boulding, Wharton Working Paper.

"The Determinants of Strategic Marketing Rivalry:  An Empirical Investigation," with Hubert Gatignon and Venkatram Ramaswamy, Wharton Working Paper.

"Conjoint Analysis Reliability and Validity:  A Framework for Future Research," with John Bateson and William Boulding, Wharton Working Paper.

"Pooling Logit Models," with Hubert Gatignon, Wharton Working Paper No. 85-042, July 1985.

"Do Advertising Frequency Response Functions Differ by Brand and Segment," with Hubert Gatignon, Wharton Working Paper, August 1985.

"Marketing Shock or Marketing Schlock," with Leonard M. Lodish, Wharton Working Paper No. 84-008R, May 1985.

"Overcontrol in Advertising Experiments," with Paul W. Farris, Wharton Working Paper No. 83-024, July 1983.

"Benefit Segmentation: An Industrial Application," with Rowland T. Moriarity, Marketing Science Institute Working Paper, Report No. 82-110, November 1982.

"Do Traditional Forms of Segmentation Yield Benefit Segments - An Industrial Application," with Rowland Moriarty, MSI Working Paper, 1981.

"Using a Nonlinear Response Function in Estimating Advertising's Carry-Over Effects," with Paul W. Farris, Marketing Science Institute Technical Report, Cambridge, Massachusetts, August 1978.  Report #79-107.

"Incorporating Marketing into Corporate Planning Models," with John M. McCann, Marketing Science Institute Technical Report, Cambridge, Massachusetts, August 1978.  Report #79-111.

"The Prediction of Individual Probabilities of Brand Choice," Harvard Business School Working Paper, August 1976.

"On Analyzing Interdependent Decisions in Marketing," with Herbert Moskowitz, Harvard Business School Working Paper, July 1976.

"Linking Market Segments Based on Derived Importance Weights to Household Characteristics," with Dick R. Wittink, Working Paper, August 1976.

"Market Segmentation via Derived Importance Weights," with John M. McCann and Dick R. Wittink, Institute Paper No. 518, Institute for Research in the Behavioral, Economic and Management Sciences, Krannert Graduate School of Industrial Administration, Purdue University, June 1976.

## Other Publications

"Marketing Organization & Competency," *Certified Marketing Master (AMA CMM) Study Guide*, with Paul Farris, 2013, pp. 243-272. (Contributor)

12

"Innovation Metrics," *Wiley International Marketing Encyclopedia Product & Innovation Management,*
with Venkatesh Shankar, 2011, Vol 5, pp. 91-96.

"Product Positioning," *Wiley International Marketing Encyclopedia Product & Innovation Management,*
2011, Vol 5. P. 203-204.

"Metrics for Linking Marketing to Financial Performance," *Marketing Science Institute Special Report*,
with R. Srivastava, Winter 2005, p. 85-109.

"Roundtable Discussion: B2B Exchanges," with Sunil Gupta and John Paul MacDuffie, Antitrust
Magazine, Fall 2000, Vol. 15, No. 1, pp. 8-16.

"Putting the Lesson Before the Test," with Mark Chussil, *Competitive Intelligence Review,* 1998.

"Roundtable Discussion: Business Strategy and Decision Making" with Harry First, Brian R.
Henry, David J. Reibstein, Michael L. Weiner, Dennis A. Yao and Edward J. Zajac., 12:8, Antitrust
Magazine (ABA), Spring 1998.

**CONFERENCES AND PROCEEDINGS:**

Speaker, "Responsible Research in Business and Management," 17th Product and Service Innovation (PSI)
Conference, Newpark Resort, Park City, Utah, February 10-12, 2022.

MASB Fall Summit, New York, NY, November 11, 2021.

Speaker, "The Brand of a Nation," eWMS 2021, November 6-7, 2021.

Opening Plenary Session Participant, "Bridging Marketing Paradigms," AMA-Sheth Doctoral Consortium,
Indiana University, Bloomington, IN, August 9-11, 2021.

Co-chair, Virtual 2021 Responsible Research Roundtable, RRBM, June 28, 2021.

Co-chair, Virtual Theory + Practice in Marketing (TPM), June 9-10, 2021.

Moderator, "Connected Experiences," Virtual CMO Roundtable, Valtech, April 30, 2021.

Session participant, "Rigor and Relevance in Research," Virtual Society for Consumer Psychology (SCP)
Doctoral Colloquium, March 4, 2021.

Lecturer, "What Do You Know of Marketing Metrics?," Webinar, Virtual MSI Lunch Lecture,
https://www.msi.org/events/marketing-metrics-2/, December 10, 2020.

Panelist, "Brand Valuation," MASB Summer Summit 2020 Virtual Session 2020, August 6, 2020.

Attendee, 2020 AMA Winter Academic Conference, InterContinental, San Diego, CA, February 14-16,
2020.

Speaker, Marketing Seminar Series, IESE Business School, University of Navarra, Barcelona, Spain,
November 6-7, 2019.

Attendee, MASB Summer Summit 2019, The Blackstone Hotel, Chicago, IL, August 8-9, 2019.

Attendee, RRBM Summit 2019, Rotterdam School of Management, Rotterdam, Netherlands, June 30-July 1, 2019.

Paper presented, "Errors in Measuring Minor Attributes Using Choice Modeling," ISMS Marketing Science Conference 2019, University of Roma Tre, Rome, Italy, June 20-22, 2019.

Committee Organizer, Marketing Strategy Meets Wall Street VI Conference, INSEAD Fontainebleau, France, June 17-18, 2019.

Presenter, "Getting Brand Value into the Financial Statements," Proving The Value of The Brand, May 30-31, 2019.

Presenter, "The Future of Branding 2030-2040," Don Lehmann's 50th Anniversary, May 10-11, 2019.

Presenter, "Made In: How the country of origin effect impacts business performance," Brand Finance Global Forum 2019, April 2, 2019.

Paper Presented, "Errors in Measuring Patent Damages using Choice Modeling," with Suneal Bedi, WIPIP 2019, University of Houston Law Center, Houston, Texas, February 9, 2019.

Panelist, "The Future of Nation Branding in a Globally Connected World," The New York Times Travel Show 2019, Jacob K. Javits Center, New York, NY, January 25, 2019.

Presenter, "Branding of a Nation – connecting to the World," 2018 iBEGIN Conference, Temple University, Philadelphia, PA, October 26, 2018.

Presenter, "Improving Economic Prosperity through Nation Branding," Public Policy Initiative Session, The Wharton School, University of Pennsylvania, Washington, D.C., October 19, 2018.

Presenter, "Return on Nation Brands," Joe Talks Lifelong Learning Alumni Event, Palace Hotel Tokyo, Tokyo, Japan, October 7, 2018.

Moderator, "Executive Education Roundtable: The Path to ROI, Justifying Your Spending," "Roundtable: To Meme, or Not to Meme, Bringing your digital ad spend into the digital age, and beyond" and "Roundtable: How Optimizing for Voice Search Will Help Drive Foot Traffic," Digital Marketing Transformation Assembly, Four Seasons Las Colinas Dallas, Irving, TX, August 27-28, 2018.

AMA Summer Marketing Educators' Conference 2018, Boston Marriott Copley Place, Boston, MA, August 9-12, 2018.

MASB 2018 Summer Board Meeting and Summit, Colonnade Hotel, Boston, MA, August 9-10, 2018.

Paper presented, "Customer Capital, Financial Constraints and Stock Returns," China International Conference in Macroeconomics 2018, Beijing, China, June 23-25, 2018.

Moderator, "Editors' Panel: How Can We Increase Impact?" 2018 Translational Research Workshop, Temple University, Philadelphia, PA, March 12, 2018.

14

Paper presented, "Customer Capital, Financial Constraints and Stock Returns," Winston Wei Dou, Yan Ji, David Reibstein and Wei Wu, INSEAD, Fontainbleau, France, February 2018.

Presenter, "2018 Best Countries Report," Breakfast Panel, Davos, Switzerland, January 23, 2018.

Presenter, "The Composition Matters: Customer Capital, Talent Turnovers and Stock Returns," Winston Wei Dou, Yan Ji, David Reibstein and Wei Wu, 2018 Allied Social Science Association (ASSA) Annual Meeting, Loews Philadelphia, Philadelphia, PA January 6, 2018.

Paper presented, "Customer Capital, Financial Constraints and Stock Returns," Winston Wei Dou, Yan Ji, David Reibstein and Wei Wu, Federal Reserve Bank of Philadelphia, Philadelphia, PA, December 2017.

Paper presented, "Customer Capital, Financial Constraints and Stock Returns," Winston Wei Dou, Yan Ji, David Reibstein and Wei Wu, Rising Five-Star Workshop at Columbia Business School, New York City, NY, December 2017.

Paper presented, "Customer Capital, Financial Constraints and Stock Returns," Winston Wei Dou, Yan Ji, David Reibstein and Wei Wu, Auckland Finance Meeting, Queenstown, December 2017.

Paper presented, "Customer Capital, Financial Constraints and Stock Returns," Winston Wei Dou, Yan Ji, David Reibstein and Wei Wu, Australasian Finance and Banking Conference, Sydney, December 2017.

Paper presented, "Customer Capital, Financial Constraints and Stock Returns," Winston Wei Dou, Yan Ji, David Reibstein and Wei Wu, University of British Columbia, Sauder School of Business, Vancouver, BC, Canada, November 2017.

Paper presented, "Customer Capital, Financial Constraints and Stock Returns," Winston Wei Dou, Yan Ji, David Reibstein and Wei Wu, Conference on Financial Economics and Accounting (CFEA), Philadelphia, PA, November 2017.

Paper presented, "Customer Capital, Financial Constraints and Stock Returns," Winston Wei Dou, Yan Ji, David Reibstein and Wei Wu, Singapore Management University, Singapore, October 2017.

Paper presented, "Customer Capital, Financial Constraints and Stock Returns," Winston Wei Dou, Yan Ji, David Reibstein and Wei Wu, Nanyang Technological University, Singapore, October 2017.

Paper presented, "Customer Capital, Financial Constraints and Stock Returns," Winston Wei Dou, Yan Ji, David Reibstein and Wei Wu, Hong Kong University of Science and Technology, Hong Kong, October 2017.

Paper presented, "Bad Brands: Empirical studies in Trademark Tarnishment," Third Annual Texas A&M Intellectual Property Scholars Roundtable, Texas A&M University School of Law, Fort Worth, Texas, October 13-14, 2017.

Presenter, "Brand India," Penn India Research Symposium, University of Pennsylvania, Philadelphia, Pennsylvania, October 13, 2017.

15

Paper presented, "Customer Capital, Financial Constraints and Stock Returns," Winston Wei Dou, Yan Ji, David Reibstein and Wei Wu, Texas A&M University, College Station, TX, September 2017.

Paper presented, "Customer Capital, Financial Constraints and Stock Returns," Winston Wei Dou, Yan Ji, David Reibstein and Wei Wu, AMA Conference of Marketing Strategy Meets Wall Street, San Francisco, California, August 2017.

Paper presented, "Customer Capital, Financial Constraints and Stock Returns," Winston Wei Dou, Yan Ji, David Reibstein and Wei Wu, Hong Kong Joint Finance Research Workshop, Hong Kong, August 2017.

Co-Chair and presenter, "How Managers Make Trade-offs Between Metrics When Making Marketing Budgetary Decisions" and "A Tale of Two Markets: Brand Capital, Liquidity, and Asset Prices," Marketing Strategy Meets Wall Street, San Francisco, California, August 3-4, 2017.

Presenter, "Research for Impact," AMA-Sheth Foundation Doctoral Consortium, Tippie College of Business, The University of Iowa, Iowa City, IA, June 15-16, 2017.

Paper presented, "How Managers Make Trade-offs Between Metrics When Making Marketing Budgetary Decisions," 39th Annual ISMS Marketing Science Conference, University of Southern California, Los Angeles, California, June 6, 2017.

Paper presented, "Customer Capital, Financial Constraints and Stock Returns," Winston Wei Dou, Yan Ji, David Reibstein and Wei Wu, University of Hong Kong, May 2017.

Presenter, "The Branding of Nations," The Yale Customer Insights Conference 2017, Yale School of Management, New Haven, Connecticut, May 12-13, 2017.

Paper presented, "How Managers Make Trade-offs Between Metrics When Making Marketing Budgetary Decisions," The Yale Customer Insights Conference 2017, Yale School of Management, New Haven, Connecticut, May 12-13, 2017.

Paper presented, "How Managers Make Trade-offs Between Metrics When Making Marketing Budgetary Decisions," Theory + Practice in Marketing Conference, Darden School of Business, University of Virginia, Charlottesville, Virginia, May 10-12, 2017.

Presenter, "Return on Nation Brands," Baruch College IB Seminar Series, Baruch College, New York, New York, March 28, 2017.

Panelist, "Designing for Impact: The Innovator's Guide for Creating Effective Programs," and Presenter, "Nation Branding Israel," Jewish Funders Network Conference, Brand Hyatt Atlanta in Buckhead, Atlanta, GA, March 21, 2017.

Panelist, "Business Research that Matters: A Vision of the Future for Business School Research," 2017 Winter AMA Conference, Orlando, Florida, February 19, 2017.

Paper presented, "Bad Brands: Empirical studies in Trademark Tarnishment," Works in Progress Intellectual Property Conference, Boston University Law School, Boston, Massachusetts, February 10-11, 2017.

16

Keynote Speaker, "Innovation and Global Branding," 14th PSI Conference, Midway, Utah, February 9-11, 2017.

Panelist, "Generating More with Less: Lessons from 'Global South'," Philanthropreneurship Forum: 2017 Program Generation Impact Harnessing The Power of Giving, Vienna, Austria, January 16, 2017.

Presenter, "Linking Marketing Metrics to Financial Consequences," SAP Training Day, SAP, Newtown Square, PA, November 17, 2016.

Host and Presenter, Wharton Nation Brand Conference, The Wharton School, University of Pennsylvania, Philadelphia, PA October 28, 2016.

Co-host, "Why Nations Need to Brand: The Way Forward for India," Niti Aayog-ISB Leaders Round Table, Indian School Business, New Delhi, India, October 17, 2016.

Presenter, "Data Driven Marketing," 5th World Marketing Summit 2016 Japan, Tokyo, Japan, October 11-12, 2016.

Presenter, "Return on Nations Brands – What's It Really Going to Take…To Make America Great Again," Jewish Community Relations Council Private Lunch, Parker Poe Adams & Bernstein, Charlotte, North Carolina, September 8, 2016.

Presenter, "Return on Nations Brands – What's It Really Going to Take…To Make America Great Again," Wharton Club of Charlotte Event, University of North Carolina at Charlotte, Charlotte, North Carolina, September 7, 2016.

Presenter, "Nation Branding," Marketing Department, University of North Carolina at Charlotte, Charlotte, North Carolina, September 7, 2016.

Panelist, "Assessing Performance Outcomes in Marketing," AMA Strategy SIG Special Session, 2016 Summer AMA Conference, Atlanta Marriott Marquis, Atlanta, Georgia, August 5-7, 2016.

Speaker, "Return on Nation Brands" and "Sustainability: Will it Sustain Your Brand?," Global Forum Amsterdam 2016, Beurs van Berlage, Amsterdam, Netherlands, June 21-23, 2016.

Speaker, "Nation Branding," Best Countries Event, Shenkar College of Design, Ramat Gan, Israel, June 19, 2016.

Speaker, "The Herzilya Indices," 16th Annual Herzliya Conference, Interdisciplinary Center (IDC), Herzliya, Israel, June 14-17, 2016.

Presenter of Best Countries Rankings and Co-Host of CMO Discussion, "How the Fourth Industrial Revolution Changes Everything About Connecting with Customers," World Economic Forum, Davos, Switzerland, January 20-23, 2016.

Panel Moderator, "Designing Products that Build Loyalty," Wharton Marketing Conference 2015, Philadelphia, Pennsylvania, November 6, 2015.

Panel Moderator, 2015 CMO Insights Symposium:  Elevating the Consumer Experience, Leapfrog Marketing Institute, Chicago, Illinois, July 22-23, 2015.

17

Lecturer, GSE Education Entrepreneurship Master Class – Summer Cohort 2, Graduate School of Education, University of Pennsylvania, Philadelphia, Pennsylvania, July 22, 2015.

Attendee, 37th ISMS Marketing Science Conference, Baltimore, Maryland, June 18-20, 2015.

Session Chair and Moderator, 2015 Theory + Practice in Marketing Conference, Georgia State University, Atlanta, Georgia, June 11-12, 2015.

Speaker, "Is Your Marketing Worth It?" WPO Philadelphia's Mini University, LeBow School of Business, Drexel University, Philadelphia, Pennsylvania, May 5, 2015.

Speaker, 9th Annual Wharton Graduate Retail Conference 2015, Philadelphia, Pennsylvania, February 27, 2015.

Speaker, Wharton Fellows:  Master Classes and Networking for Senior Executives, Austin, Texas, February 13-15, 2015.

Presenter, University of Utah, Salt Lake City, Utah, January 22-23, 2015.

Co-Chair, Chair and Panelist, and presenter for 3 presentations, Marketing Meets Wall Street Conference, Singapore, January 8-10, 2015.

Panel Moderator, "Reaching Customers in a Diverse, Multicultural World," Wharton Marketing Conference 2014, November 7, 2014.

Governing Body Co-Chair, 2014 CMO Collective, New York, New York, November 3-4, 2014

Speaker on "Marketing:  Social Media, Brands and Reputation," Oxford Corporate Reputation Annual Symposium, Oxford University, Oxford England, September 3-5, 2014

Discussant for "Marketing Strategy III" and "Asking Managerially Relevant Research Questions" and a Speaker on "The Future of Marketing," 49th Annual AMA Sheth Foundation Doctoral Consortium, Northwestern University, Evanston, Illinois, June 26-29, 2014

2014 AMA-ECMI-EMAC Marketing & Innovation Symposium, Erasmus University, Rotterdam, Netherlands, May 27-29, 2014

Theory + Practice in Marketing Conference, Northwestern University, Evanston, Illinois, May 23, 2014

Facilitator and Host for "CEO Networking Session" and Lead Faculty for Lifelong Learning Master Classes, "Innovations for Social Good – The Case SodaStream" and "Big Data and Attribution," Wharton Global Forum 2014, Panama City, Panama, March 12-17, 2014

AMA 2014 Winter Educators' Meeting, Orlando, Florida, February 20-23, 2014

MASB Winter Board Meeting & Summit 2014, Orland, Florida, February 20-21, 2014

Discussant on "Business and New Media in China," New Media, The Internet, and A Changing China Conference, The Wharton School, Philadelphia, Pennsylvania, January 23-24, 2014

AMA Western Regional Retreat, San Diego, California, January 17-18, 2014

Governing Body Co-Chair, 2013 CMO Collective, New York, New York, November 6-7, 2013

Keynote Speaker on "Competitive Marketing Strategies," AMA Mexico City Chapter Event, Mexico City, Mexico, September 12, 2013

Key panelist, Digital Marketing Forum, Seoul, Korea, August 20, 2013

Honorary Co-Chair and Keynote Speaker, 2013 Annual Conference of China Marketing Science, Tsinghua University, Beijing, The People's Republic of China, August 17-18, 2013

Co-Chair and Keynote Speaker, 2013 JMS Doctoral Consortium Program, School of Economics and Management, Tsinghua University, Beijing, The People's Republic of China, August 16, 2013

AMA Thought Leader, Panel member to share thoughts on "MOOCS and the Changing Nature of the University," AMA summer Educators' Conference, Boston, Massachusetts, August 9-11, 2013

35th ISMS Marketing Science Conference, Istanbul, Turkey, July 11-13, 2013

Member of the Organizing Committee and Discussant for "Valuing Brand Strategies:  A Real Options Approach" paper, Marketing Strategy meets Wallstreet III Conference, Goethe-University Frankfurt, Frankfurt am Main, Germany, July 7-9, 2013

Presenter on "Effective Instruction" and Discussant, 48th AMA Sheth Foundation Doctoral Consortium, Ann Arbor, Michigan, June 6-9, 2013

Presenter on "A Marketer's Perspective on Emerging Growth Businesses," 2013 SGE CEO Summit, Bala Cynwyd, Pennsylvania, June 4, 2013

Speaker, "Cross Industry, What Works and Does Not?," MSI Marketing Resources Allocation Conference, Darden Consortium, Charlottesville, Virginia, May 21-22, 2013

AMA Marketing Summit, Chicago, Illinois, April 26-28, 2013

AMA 2013 Winter Marketing Educators' Conference, Las Vegas, Nevada, February 15-17, 2013

MASB Winter Board Meeting & Summit 2013, Las Vegas, Nevada, February 14, 2013

AMA Mid Atlantic Regional Retreat, Baltimore, Maryland, February 1-2, 2013

MSI Young Scholars Program, January 10-13, 2013

Governing Body Co-Chair, CMO Collective, New York, New York, December 17-18, 2012

Speaker, Presentation of Parlin Award, AMA 2012 Annual Marketing Research and Strategy Summit, Las Vegas, October 1-3, 2012

AMA 2012 Summer Marketing Educators' Conference, Chicago, Illinois, August 16-19, 2012

Speaker, "Chinese Brands in the Global Market," CEIBS, Beijing, China, July 27, 2012

Keynote Speaker, Teaching Plenary Session, 47th AMA Sheth Foundation Doctoral Consortium, University of Washington, Seattle, Washington, June 13-16, 2012

34th INFORMS Marketing Science Conference, Boston University, Boston, Massachusetts, June 6-9, 2012

Theory and Practice in Marketing, Harvard Business School, Boston, Massachusetts, May 4-7, 2012

AMA 2012 Leadership Summit, Chicago, Illinois, April 27-29, 2012

Expert Panelist, Session on "The Future of Branding and Intellectual Property in Marketing: A Panel Discussion," UNC Branding Conference, Chapel Hill, North Carolina, April 12-13, 2012

Chair, Expert Panel, AMA 2012 Winter Marketing Educator's Conference, St. Petersburg, Florida, February 17-19, 2012

Speaker, MASB Winter Board Meeting & Summit 2012, St. Petersburg, Florida, February 16-17, 2012

9th PSI Conference, Salt Lake City, Utah, February 2-5, 2012

Speaker, "Survive and Thrive in Today's Economy: Do You Have What it Takes?," Annual Toolbox Series, Main Center for Creativity, Portland, Maine, January 11-12, 2012

Main Center for Creativity, Portland, Maine, Innovation presentation, November 16, 2011

CMO Collective, New York, New York, November 7-9, 2011

AMA/Sheth Doctoral Consortium, Stillwater, Oklahoma, June 15-18, 2011

MSI: "Marketing Meets Wall Street II," Boston, Massachusetts, May 12-14, 2011

MSI: "Fifty Years Ahead," Boston, Massachusetts, April 25-27, 2011

AMA 2011 Winter Marketing Educator's Conference, Austin, Texas, February 18-21, 2011

MASB Winter Board Meeting & Summit, "The Next Three Years: Changing the Game," Austin, Texas, February 17-18, 2011

University of Utah 8th Annual Product and Service Innovation Conference, Salt Lake City Utah, February 2-5, 2011

University of Utah 7th Annual Product and Service Innovation Conference, "Marketing Operations," Salt Lake City, Utah, February 4 – 6, 2010

MSI The Practice & Impact of Marketing Science, Cambridge, MA January 15-16, 2010

Fifth International Conference on Brand Management, Asian Centre for Brand Management at the Hong Kong Polytechnic University, Hong Kong, November 30 – December 1, 2009

Estee Lauder, CLV Group – New York, New York, July 21, 2009

AMA Sheth Doctoral Consortium, Robinson College of Business, Firm and Strategy," Track Session
Participant, Atlanta, Georgia, June 13-14, 2009.

Estee Lauder, CFO Group – New York, New York, June 1, 2009

"Ubiquitous Marketing in a Fragmented Age," Forresters Marketing Forum, Orlando, Florida,
April 25, 2009

MSI Young Scholars Program – Park City, Utah, March 5-8, 2009

University of Utah 5th Annual Product and Service Innovation Conference, "Measuring Innovation", Salt
Lake City, Utah, February 5 – 7, 2009

"Measured Thoughts:  Assessing New Media and Marketing Choices," Navigating the New Marketsphere,
Orlando, Florida, January 26 - 27, 2009

Kimberly Clark University – Las Vegas, NV January 18-20, 2009

"Measuring Innovation," with George Day and Venky Shankar, *Managing and Measuring Innovation,* The
Mack Center Conference, November 7, 2008

"Marketing Metrics and their Financial Implications," Australia Marketing Institute Annual Conference,
October 22 - 23, 2008

MSI Meeting, Marketing Metrics for the Connected Organization, "Product Innovation Metrics," Austin,
Texas, September 10 - 12, 2008

Evidence-Based Marketing Mix Resource Allocation and Planning (AMA-sponsored), Atlanta, Georgia,
July 9 - 11, 2008

"Marketing Metrics," Executive Analytics Conference, Cary, North Carolina, June 10 - 11, 2008

"Retail Metrics," Thought Leadership Conference, Babson College, April, 2008

MSI Young Scholars Program, Park City, Utah, March 2008

Wharton MBA Marketing Conference, Philadelphia, PA, Oct. 26 – 27, 2007

The Practice & Impact of Marketing Science, Philadelphia, Oct. 14 – 16, 2007

2007 INFORMS Marketing Science Conference, Singapore, June 28 – 30, 2007

2007 AMA Sheth Foundation Doctorial Consortium, Phoenix, AZ, May 18, 2007

University of Arizona's "3rd Annual Thinking Forward: Leadership & Innovation Conference",
Tucson, AZ, March 23, 2007

4th Annual Product and Service Innovation Conference, University of Utah, Salt Lake City, Utah,
Feb. 7 – 11, 2007

MSI's 2007 Young Scholars Program, Park City, UT, Jan. 4-7, 2007

MSI's December Conference on "Marketing Metrics and Financial Performance", Boston, MA, December 6-8, 2006

Golden Gate University Presentation, San Francisco, CA, November 7, 2006

Northwestern University Presentation, Chicago, IL, July 14, 2006

Reunion of the 2001 Marketing Science Institute Young Scholars, Santa Fe, NM, May 18-21, 2006

Yale Center for Customer Insight's 2nd Annual Conference on "Collaborative & Multidisciplinary Research", New Haven, CT, May 4-6, 2006

Third Annual PSI Conference, Park City, Utah, February 9-11, 2006

HSM in the Mexico World Marketing Forum, Mexico City. November 10, 2005

"Marketing Management: A Strategic Perspective" MSI Asian Marketing Conference, Singapore Management University, July 25-26, 2005.

Panel Member: "Customer Value- Co-Creation +Quality" Service Innovations and New Service Business Models Workshop, Penn State University, June 21-22, 2005.

"Optimal Product Variety Over Time," INFORMS Marketing Science Conference, Emory University June 16-18, 2005.

"Marketing Dashboards: A Decision Support System for Assessing Marketing Productivity," INFORMS Marketing Science Conference, Emory University, June 16-18, 2005.

Chair, "Marketing Metrics" session, INFORMS Marketing Science Conference, Emory University June 16-18, 2005.

"Marketing Dashboards" 2005 AMA Winter Educators Conference, San Antonio, TX Feb. 11-13, 2005

2005 Product and Service Innovation Conference, Park City, Utah Feb, 10-11, 2005

MSI Young Scholars Conference, Park City, Utah.  Jan. 6-9, 2005

"Optimal Product Variety," with Yogesh Joshi, Winter Product and Process Innovation Conference, Utah, February 2004.

 "Contagion in Product Line Expansion," with Marion Debruyne, TIMS Conference, Atlanta, GA, October 2003.

 "Doing Research on Who's Buying on the Internet," The Wharton Marketing Club, Philadelphia, PA, February 11, 1999.

"Advertising Budgeting: A Report from the Field," with Paul Farris and Erv Shames, MSI-MAX Project, New York, NY, November 18-19, 1998.

"The Digital Era: Implications for the Supply Chain," with Marshall Fisher, The Digital Marketing Conference, Philadelphia, PA, October 23, 1998.

"Marketing Strategies That Make a Difference," Equipment Leasing Association, Atlanta, GA, October 18-20, 1998.

22

"Building Cross-Institutional Bridges," with Paul Root, International Academy of Management (IAM), New York, NY, May 28-29, 1998.

"Obstacles to Variety," Wharton Fishman-Davidson Variety Workshop, The Wharton School, January 8, 1997.

"Product Variety: Industry Applications," Product variety Management Conference, Center for Technology Management at the University of California at Los Angeles, January 31 - February 1, 1997.

"Competitive Marketing Strategy," CEO Speaker Series, Taipei, Taiwan, January 21, 1997.

"The Dynamics of Competitive Marketing Strategies," Interdisciplinary Center for the Study of Business, Law, and Technology, December 21 - January 3, 1997.

"Internet Links on the Cuffs of Other Websites," with Ronald C. Goodstein, Marketing Science Conference, Berkeley, CA, March 21-24, 1997.

"Marketing Strategy in a Dynamically Changing Environment," International Forum, Steinberg Conference Center, September 13, 1997.

"Budget Allocation Process for Media, Products, and Geographics," (moderator) Marketing Science Institute, Workshop on Managing Advertising Expenditures (MAX), Boston, MA, September 17-19-, 1997.

"When &*!# (Bad Stuff) Happens to Good Companies," Association for Consumer Research, Denver, CO., October 17-19, 1997.

"Consumer Brand Loyalty's Impact on the Relationship Between Distribution and Market Share," with Paul Farris, Marketing Science Conference, University of Florida, Gainesville, Fl, March 1996.

"Managing Product Variety: A Study of the U.S. Bicycle Industry," with Karl Ulrich, Taylor Randall, and Marshall Fisher, INFORMS, Washington, D.C., May 1996.

"The Influence of Product Line Extent of Brand Equity," with Karl Ulrich, Taylor Randall, and Marshall Fisher, 1996 Manufacturing and Service Operations Management Conference, Institute for Operations Research and the Management Sciences, Dartmouth College, Hanover, NH, June 24-25, 1996.

"Decision Support Systems for Managerial Decisions," NYU/Columbia Choice Symposium, June 1996.

"Marketing in a Fast Cycle Environment/Time to Market," Software Development and Marketing for Competitive Advantage Program, IC$^2$ Institute, The University of Texas at Austin, March 20-22, 1996.

"Marketing Pedagogy," Marketing Doctoral Consortium, Boulder, CO, University of Colorado, July 1996.

"How Managers Reach their Pricing Decisions (and How They Should)." Presented at The Seventh Annual U.S. Pricing Conference, Chicago, Illinois, April 18-21, 1994.

"Processes for Developing Integrative/Cross Disciplinary Courses." Presented at the 1994 Summer Marketing Educators' Conference, San Francisco, California, August 6-9, 1994.

1994 Summer Marketing Educators' Conference, Track Chair for the Education Track, August 6-9, 1994, San Francisco, California.

"Impact of Availability/Access (Information and Distribution)," with Paul Farris. Paper presented at the Value of Marketing Conference, Stanford, California, August 9, 1994.

23

"Making the Most of Your Marketing Dollars," presented at the Drive Marketing Excellence: Evaluate Marketing Effectiveness Through Measurement & Analysis, Institute for International Research, Chicago, November, 1994.

"How Managers Make Pricing Decisions," presented at the Pricing Advisor's Pricing Conference and Seminar, Chicago, November, 1994.

"The Relationship between Distribution (Retail Availability) and Market Share," with Paul Farris. Presented at the Empirical Generalizations in Marketing Conference, The Wharton School, February 16-18, 1994.

"Are There Strategic Laws or Principles?" Marketing Science Conference, Seattle, Washington, March 1988.

"Factors Affecting Competitive Reactions," with Hubert Gatignon and Venkat Ramaswamy, Marketing Science Conference, Seattle, Washington, March 1988.

"Marketing Pedagogy," Summer Educator's Conference, American Marketing Association, Chicago, Illinois.

"Commercial Clutter:  Effects of 15-Second Television Ads on Consumer Recall," with Scott Ward, Terence A. Oliva, and Victoria Taylor, Association for Consumer Research, *Advances in Consumer Research*, Hawaii, October 1988.

"An Empirical Analysis of the Determinants of Competitive Rivalry," with Hubert Gatignon and Venkatram Ramaswamy, ORSA/TIMS Conference, Seattle, Washington, March 1988.

"Developing A Promotion Expert System," Marketing Science Conference, with John M. McCann, Paris, France 1987.

"Conjoint Analysis Reliability:  Empirical Findings," with John Bateson and William Boulding, Association for Consumer Research, Toronto, Ontario, October 1986.

"Marketing Techniques of Japanese Firms with Operations in the U.S." with Toshi Taga, ORSA/TIMS, Brisbane, Australia, August 1986.

"Holistic Conjoint," with Caroline Henderson, *Association for Consumer Research Proceedings*, Volume XIII, Ed. Richard Lutz, Vegas, October 1985, pp. 282-285.

"Definition and Nature of Advertising-Price Interactions," with Paul W. Farris, American Marketing Association, Washington, August 1985.

"Using PIMS Data for Strategic Decision Making," with William Boulding, ORSA/TIMS, Atlanta, November 1985.

"Testing an Optimal Control Model of Promotion Response," with Steve Garrett, ORSA/TIMS Conference, Houston, Texas, November 1984.

"Structural Solutions to Strategic Problems," with William Boulding, Marketing Science Conference, Chicago, Ill., March 1984.

"Structural Solutions to Strategic Issues," with William Boulding, Marketing Science Conference, Chicago, Illinois, February 1984.

"The Impact of Price Levels on Product Line Demand," with Hubert Gatignon, *AMA Causal Modeling Conference Proceedings*, 1983, Sarasota, Florida, pp. 120-8.

"The Advertising Frequency Response Function: Testing Differences Across Brands," with Hubert Gatignon, ORSA/TIMS National Meetings, November 1983.

"An Optimal Control Approach to Response to Promotions," with Stephen E. Garrett and Shiv K. Gupta, ORSA/TIMS National Meetings, November 1983.

"Organizing Organizational Choice," with Robert J. Thomas and Rowland Moriarty, presented at ORSA/TIMS Market Measurement Conference, March 1982.

"Estimating Consumer Response to Advertising from Cross-Sectional Survey Data," with Paul W. Farris and William Moult, ORSA/TIMS, Toronto, May 1981.

"Projecting Served Market Growth for Strategic Planning Decisions," with John McCann, *Marketing Strategy – Controlling the Marketing Effort*, 7th International Research Seminar in Marketing, Senanque, France, June 1980, pp. M.1-M.17.

"Consistency in Relative Advertising and Relative Pricing Strategies:  A Cross-Sectional Analysis of the PIMS Data," with Paul W. Farris, *Marketing Measurement and Analysis, Proceedings of ORSA/TIMS Special Interest Conference*, edited by David B. Montgomery and Dick R. Wittink, March 26-28, 1979, pp. 35-54.

"Averaging Individual Probabilities for the Prediction of Brand Switching Behavior," ORSA/TIMS, Hawaii, June 1979.

"Developing Marketing Strategy for Public Transportation:  Insights for Attitude-Behavior Research," with Christopher H. Lovelock, International Seminar in Marketing, Senanque, France, June 1978.

"Robustness of Unit and Equal Weighting Linear Models for Dynamic Multivariate Decisions," with Herbert Moskowitz, Doyle L. Weiss and Kah Kee Chung, *Modeling and Simulation; Proceedings of the Ninth Annual Pittsburgh Conference*, Vol. 9, Part 2, University of Pittsburgh, 1978, pp. 575-582.

"Analysis of Dynamic Product Planning via the Principle of Optimality," with Herbert Moskowitz, *Modeling and Simulation; Proceedings of the Ninth Annual Pittsburgh Conference*, Vol. 9, Part 2, University of Pittsburgh, 1978, pp. 583-591.

"Can the Multi-Attribute Attitude Model Be Utilized to Predict Probabilities of Brand Choice?" *Advances in Consumer Research*, Vol. IV, 1976, pp. 111-16

"A Method for Analyzing Interdependent Decisions – Marketing Applications," with Herbert Moskowitz, *AIDS Proceedings*, 1976 National AIDS meeting, November 10-12, 1976.

"Conditional Versus Unconditional Analysis of Dynamic Decisions," with Herbert Moskowitz, Institute Paper No. 450, Institute for Research in the Behavioral, Economic and Management Sciences, Krannert Graduate School of Industrial Administration, Purdue University, April 1974.  Presented at the Midwest AIDS Conference, May 1974.

"Halo Effects in Brand Belief Measurement:  Implications of Attitude Model Development," with William L. Wilkie and John M. McCann, *Proceedings, Fourth Annual Conference*, Association for Consumer Research, November 1973.

**Cases and Notes**

Kindle Fire (Wharton Case)
Piel Cosmetic (Wharton Case)
Shell Oil (Wharton Case)
Viagra (Wharton Case)
Note on Marketing Research:  Process and Methods (9-579-136)*
Marketing Research and Information Systems, Technical Note:  Computer-Based Simulation of Hinesbury
   Mills (4-579-097)*
Marketing Research and Information Systems, Technical Note:  Cross-tabulation and the Chi-Square Test
   (9-574-001)*
MassNORML (A)   (9-578-060)*
MassNORML (B)   (1-579-106)*
MassNORML 8   (9-579-017)*
Olympia Brewing Company:  Market Forecasting (A)   (9-580-027)*
Olympia Brewing Company:  Market Forecasting (B)   (9-580-028)*
Olympia Brewing Company:  Market Forecasting (C)   (9-580-029)*
The Strategic Planning Institute:  Marketing and the Briefing Session (A)*
The Strategic Planning Institute:  Marketing and the Briefing Session (B)*
The Strategic Planning Institute:  Marketing and the Briefing Session (C)*
Attitude Research Project (A) and (B) Cases in *Marketing Research*, Hart, Reinholt and Winston, Chicago,
   1975.

**Media Coverage**

**"Measured Thoughts" Radio Show, SiriusXM, Channel 132, Monday's at 4-5 p.m. EST, 2015-
2019**

**2003**

"At the Intersection," Teradata Magazine Interview together with Rick Staelin, Hugh Watson and
   Mark Jeffrey.1Q 2003. pp. 26-31.

"When Art Meets Science: The Challenge of ROI Marketing"  *Knowledge@Wharton*,
   Business+Strategy, http://knowledge.wharton.upenn.edu/s+b/121603.html.

Article in the Sino-Manager (Chinese magazine) regarding speaking at a joint meeting
   WEMBA students and CEIBS students, pp.126-132.

Article in *Business+Strategy* on Marketing Metrics

Several citations in *Wall Street Journal, New York Times, Sports Illustrated, Knowledge@Wharton*

**2013**

"Nuts & Bolts – Attribution:  In Your Face, Last Clickers!" Target Marketing Mag,
   http://www.targetmarketingmag.com/article/marketing-attribution-think-long-term-say-
   google-wharton-professor/1#

"A look at Philly's sneaker culture," Philly.com, http://articles.philly.com/2013-08-
   12/news/41337351_1_air_jordan-sneaker-fans-shoes

"Global Digital Marketing Forum Kicks off," MBCNEWS Korea,
   http://inews.imbc.com/replay/nwtoday/article/3328386_5782.html

---

\* Intercollegiate Case Clearing House, Soldiers Field, Boston, MA  02163

"The CMO.com Interview:  Wharton's Dr. David Reibstein," CMO.com,
http://cmo.com/content/cmo-com/home/articles/2013/8/8/wharton_the_cmocom_interview.html

"Old Slogan Returns as United Asserts It Is Customer-Focused," The New York Times,
http://mobile.nytimes.com/2013/09/20/business/media/old-slogan-returns-as-united-asserts-it-is-customer-focused.html?oq=levere%20friendly%20united&gs_l=mobile-heirloom-serp.12...3812.10388.0.16476.24.16.0.2.2.0.965.2116.5-2j1.3.0....0...1ac.1.24.mobile-heirloom-serp..21.3.1558.FQHRoRTeO0I&

**2014**

"Cheers to CVS for dropping tobacco, "Philadelphia Inquirer,
http://articles.philly.com/2014-02-10/news/47171530_1_cvs-caremark-tobacco-in-store-clinics

"Kraft hits refresh button on vintage brands," Marketplace.org,
http://www.marketplace.org/topics/business/kraft-hits-refresh-button-vintage-brands

"Philadelphia:  Straining for a slogan," Philadelphia Inquirer,
http://www.philly.com/philly/news/20140430_Philadelphia__Straining_for_a_slogan.html

"The Bear Case For Uber (Yes, There Is One)," Forbes.com,
http://www.forbes.com/sites/jeffbercovici/2014/07/28/the-bear-case-for-uber/#66bea8dd99f8

"Film directors want to give Kodak another artsy moment," Marketplace.org,
http://www.marketplace.org/topics/business/film-directors-want-give-kodak-another-artsy-moment

"Consumer Products Companies are Seeking Less Shelf Space," Wall Street Journal,
http://blogs.wsj.com/moneybeat/2014/08/01/consumer-products-companies-are-seeking-less-shelf-space/

"El verdadero peso," Dinero.com, http://www.dinero.com/edicion-impresa/informe-especial/articulo/mmarketing-variable-estrategica/201680

"Apple , Microsoft and Google are World's Most Valuable Brands," Forbes.com,
http://www.forbes.com/sites/kurtbadenhausen/2014/11/05/apple-microsoft-and-google-are-worlds-most-valuable-brands/?partner=yahootix

**2015**

Sports Fans Questions, wallethub.com, http://wallethub.com/edu/best-worst-cities-for- football-fans/9691/#david-j-reibstein

"But First, A Word From 100 Podcasts' Sponsors," fivethirtyeight.com,
http://fivethirtyeight.com/features/but-first-a-word-from-100-podcast-sponsors/, May 1, 2015

"Ido Aharoni:  Why Brand Capital Is Part of National Security,"
http://knowledge.wharton.upenn.edu/article/why-brand-capital-is-part-of-national-security/, May 1, 2015

27

"Arsenal are not as good as other people," untold-arsenal.com, http://untold-arsenal.com/archives/43962

"The Right Way to Calculate Marketing ROI, "forbes.com, http://www.forbes.com/sites/forbesinsights/2015/07/29/the-right-way-to-calculate-marketing-roi/

"A merger meant to shake up the sleepy mattress biz," marketplace.org, http://www.marketplace.org/2015/12/01/business/merger-meant-shake-sleepy-mattress-biz

**2016**

"It's safe to eat Chipotle burritos – and buy some stock," marketwatch.com, http://www.marketwatch.com/story/its-safe-to-eat-chipotle-burritos-and-buy-some-stock-2016-01-13?page=1, January 13, 2016.

"Why Countries Need to Sell Themselves," usnews.com, http://www.usnews.com/news/best-countries/articles/2016-01-20/why-countries-need-to-sell-themselves, January 20, 2016.

"Jimmy Kimmel Live! Jokes About Best Countries Report," hownationsbrand.com, http://www.hownationsbrand.com/#!jimmy-kimmel-transcript/eufvp, January 20, 2016.

"U.S. News Unveils 2016 Best Countries Rankings," usnews.com, http://www.usnews.com/news/best-countries/articles/us-news-unveils-best-countries-rankings, January 20, 2016.

"The world's countries, ranked – by Wharton," thedp.com, http://www.thedp.com/article/2016/02/wharton-best-countries, February 3, 2016.

"Apple Brand Could Become Casualty of FBI Tussle Over iPhone Hack," Bloomberg.com, http://www.bloomberg.com/news/articles/2016-02-24/apple-brand-could-become-casualty-of-fbi-tussle-over-iphone-hack, February 24, 2016.

"The global marketplace is changing too fast for complacency," ibm.com, http://www-935.ibm.com/services/c-suite/study/perspectives/david-reibstein/?S_TACT=M16603WW&cm_mmc=CSLT-Outbrain-CS-_-M16603WW-_-C-suite_Study_Launch_Teaser-_-david-reibstein, March 2016.

"The World's Most Valuable Brands 2016," forbes.com, http://www.forbes.com/sites/kurtbadenhausen/2016/05/11/the-worlds-most-valuable-brands/#18d0ae417561, May 11, 2016.

"Will Dancing with the Stars Redeem Ryan Lochte?," vanityfair.com, http://www.vanityfair.com/style/2016/08/ryan-lochte-dancing-with-the-stars, August 30, 2016.

"Brand India: How loudly can it lay siege?," The Economic Times, http://blogs.economictimes.indiatimes.com/the-needles-eye/brand-india-how-loudly-can-it-lay-siege/, October 20, 2016.

"India needs to improve entrepreneurship, quality of life," business-standard.com, http://www.business-standard.com/article/pti-stories/india-needs-to-improve-on-entrepreneurship-quality-of-life-116102100939_1.html, October 21, 2016.

"Why Nations Need to Brand Themselves," usnews.com, http://www.usnews.com/news/best-countries/articles/2016-10-31/why-nations-need-to-brand-themselves, October 31, 2016.

"Wharton conference looks at how branding effects countries," thedp.com, http://www.thedp.com:8080/article/2016/10/how-branding-effects-countries, October 31, 2016.

"America Is Great and Can Be Greater," usnews.com, http://www.usnews.com/news/best-countries/articles/2016-11-04/whats-it-really-going-to-take-to-make-america-even-greater, November 4, 2016.

**2017**

"How Can The Best Countries Survey Help?," usnews.com, https://www.usnews.com/news/best-countries/articles/2017-03-01/how-can-the-best-countries-survey-help, March 7, 2017.

"Is Brand America Tanking?," forbes.com, https://www.forbes.com/sites/andrewlevine2/2017/03/28/is-brand-america-tanking/#235f4a616b99, March 28, 2017.

"Visa Credit Card Questions," wallethub.com, https://wallethub.com/credit-cards/visa/?v=0#David_J._Reibstein, April 24, 2017.

"Yo, Philly@ We crunched the numbers and we're not Amazon's prime location," philly.com, http://www.philly.com/philly/business/tool-where-amazon-headquarters-should-go.html, September 27, 2017.

"The entrepreneurial spirit and all the innovation in China are dramatic, US expert," New China TV, https://www.youtube.com/watch?v=pIegux1lwTI&feature=youtu.be, October 5, 2017.

"Image of China changes at "china speed," U.S. experts say," New China, http://news.xinhuanet.com/english/2017-10/07/c_136662621.htm, October 10, 2017.

"Atlanta Given Best Gambling Odds To Land Amazon's HQ2," WABE.org, https://www.wabe.org/atlanta-odds-amazons-hq2/, October 26, 2017.

"When Disruption Happens, What's the Best Way for Brands to Respond?" ana.net, https://www.ana.net/magazines/show/id/ana-2017-11-how-brands-should-deal-with-disruption, November 17, 2017.

**2018**

"Best Countries in the world report: Why SA Ranks 39 and the US is falling," biznews.com, https://www.biznews.com/wef/davos-2018/2018/01/23/best-countries-world-report-sa-us/, January 23, 2018.

"U.S. slips to No. 8 in world rankings, from No. 4 in 2016, Wharton prof tells Davos," The Inquirer, http://www.philly.com/philly/hp/news_top/wharton-trump-davos-u-s-world-rankings-professor-reibstein-david-20180123.html?utm_source=Primary&utm_campaign=086d885d2a-

EMAIL_CAMPAIGN_2018_01_26&utm_medium=email&utm_term=0_3777f2ca8f-086d885d2a-, January 23, 2018.

"Is America Great Again? Data Say No," with Suneal Bedi, U.S.News, https://www.usnews.com/news/best-countries/articles/2018-01-23/the-worlds-perceptions-of-the-us-is-going-in-the-wrong-direction, January 23, 2018.

"Wharton marketing professor says Trump hasn't helped America's brand and that isn't good for the economy," Business Insider, http://www.businessinsider.com/wharton-professor-nation-brands-amazons-second-hq-2018-1, January 30, 2018.

"The top 10 best countries to raise children in 2018," CNBC, https://www.cnbc.com/2018/02/06/us-news-world-report-2018-top-10-best-countries-to-raise-children.html, February 6, 2018.

"Why the U.S. Needs to Act on its Brand," with Suneal Bedi, U.S.News, https://www.usnews.com/news/best-countries/articles/2018-03-20/the-importance-of-nation-branding-and-why-the-us-needs-to-take-action, March 20, 2018.

"A Liberty Bell and a severed snake: 76ers marketing looks to score a big win," The Inquirer, http://www.philly.com/philly/business/philadelphia-76ers-marketing-logo-liberty-bell-20180411.html, April 11, 2018.

"A new Philly-themed bar is drawing crowds in London," WHYY, https://whyy.org/segments/a-new-philly-themed-bar-is-drawing-crowds-in-london/, May 12, 2018.

"Pumpkin Spice Sales Spike For All-Time High Before Start Of Fall," 3 CBS Philly, https://philadelphia.cbslocal.com/2018/09/12/pumpkin-spice-sales-spike-for-all-time-high-before-start-of-fall/, September 12, 2018.

"Amazon's HQ2 beauty contest a wake-up call to many cities," Opinion Contributor, The Hill, https://thehill.com/opinion/finance/416222-amazons-hq2-beauty-contest-a-wake-up-call-to-many-cities, November 12, 2018.

"Amazon shifts to U.S. East Coast tech hubs," xinhuanet.com, http://www.xinhuanet.com/english/2018-11/15/c_137608021.htm, November 16, 2018.

"Spotlight: Is it worth it to pay Amazon 2-bln-USD incentives?," Xinhua, http://www.xinhuanet.com/english/2018-11/27/c_137635144.htm, November 27, 2018.

"Payless Opens Fake Luxury Store, Sells Customers $20 Shoes For $600 In Experiment," CBS Philly, https://philadelphia.cbslocal.com/2018/11/28/payless-palessi-opens-fake-luxury-store-experiment-sells-customers-expensive-shoes-luxury-adweek-marketing/, November 28, 2018.

**2019**

"Japan's Lessons on Branding a Country," with Suneal Bedi, U.S. News, https://www.usnews.com/news/best-countries/articles/2019-01-23/the-lessons-japan-provides-on-how-countries-should-brand-themselves, January 23, 2019.

"Grooming Brands Are Waging War Over Masculinity," GQ, https://www.gq.com/story/grooming-brand-culture-war, January 23, 2019.

"Spotlight: Amazon's decision to ditch New York expansion plans leads to mixed reactions," Xinhua, http://www.xinhuanet.com/english/2019-02/17/c_137828578.htm, February 17, 2019.

"How Brands Weather the Next Recession," ANA, https://www.ana.net/magazines/show/id/ana-2019-03-how-to-prepare-your-brand-for-a-recession, March 15, 2019.

30

"Inside The 'Aflac Isn't' Campaign," Forbes, https://www.forbes.com/sites/paultalbot/2019/03/29/inside-the-aflac-isnt-campaign/#1a2ca0c653d1, March 29, 2019.

"Should Boeing Change the Name of the 737 Max to Put Passengers at Ease?," Skift, https://skift.com/2019/07/18/should-boeing-change-the-name-of-the-737-max-to-put-passengers-at-ease/, July 18, 2019.

"Airbnb and Nashville thrive together. What's the 'party house' ban going to mean for NashVegas?," The Tennessean, Airbnb and Nashville thrive together. What's the 'party house' ban going to mean for NashVegas?, November 7, 2019.

"This Week in Marketing," Wharton Business Daily Podcast, https://www.measuredthoughts.com/november2019a, November 13, 2019.

"Elon Musk says 250,000 people have already pre-ordered Tesla's new Cybertruck. Here's what entrepreneurs and marketers can learn from his ability to inspire 'true believers' to commit to his brand," Business Insider, https://www.businessinsider.com/how-entrepreneurs-can-learn-from-musks-ability-to-inspire-believers-2019-11, November 27, 2019.

"This Week in Marketing," Wharton Business Daily Podcast, https://www.measuredthoughts.com/november2019b, November 27, 2019.

"Macy's Thanksgiving Day Parade May Be Expensive, But the Company needs It Now More Than Ever," Footwear News, https://footwearnews.com/2019/business/retail/macys-thanksgiving-day-parade-costs-brand-value-1202879415/, November 28, 2019.

"This Week in Marketing," Wharton Business Daily Podcast, https://www.measuredthoughts.com/december2019, December 11, 2019.

**2020**

"America Great Again? Not According To Americans," usnews.com, https://www.usnews.com/news/best-countries/articles/2020-01-15/us-citizens-views-of-their-country-decline-since-2019, January 15, 2020.

"Best Countries Live Interview," Wharton Business Daily, https://www.measuredthoughts.com/nation-branding, January 22, 2020.

"This Week in Marketing," Wharton Business Daily Podcast, https://www.measuredthoughts.com/february2020, February 5, 2020.

"Groupon and Blue Apron's real problem: Neither business model works, experts say," MarketWatch.com, https://www.marketwatch.com/story/groupon-and-blue-aprons-real-problem-neither-business-model-works-experts-say-2020-02-19?mod=home-page, February 21, 2020.

"This Week in Marketing," Wharton Business Daily Podcast, https://www.measuredthoughts.com/march2020, March 25, 2020.

"This Week in Marketing," Wharton Business Daily Podcast, https://www.measuredthoughts.com/april2020, April 15, 2020.

"Spotlight: Retailers see bumpy road ahead even as U.S. states race to reopen," Xinhuanet.com, http://www.xinhuanet.com/english/2020-05/13/c_139053087.htm, May 13, 2020.

"Less than half of small and medium-sized enterprises suspended in the US, employment
resumption," Nikkei, https://www.nikkei.com/article/DGXMZO59273620Z10C20A5000000/,
May 19, 2020.

"This Week in Marketing," Wharton Business Daily Podcast,
https://www.measuredthoughts.com/may2020, May 20, 2020.

"This Week in Marketing," Wharton Business Daily Podcast,
https://www.measuredthoughts.com/marketing-june-2020, June 17, 2020.

"This Week in Marketing," Wharton Business Daily Podcast,
https://www.measuredthoughts.com/marketing-july-2020, July 8, 2020.

"This Week in Marketing," Wharton Business Daily Podcast,
https://www.measuredthoughts.com/currenteventsaugust2020, August 12, 2020.

"This Week in Marketing," Wharton Business Daily Podcast,
https://www.measuredthoughts.com/marketingseptember2020, September 9, 2020.

"This Week in Marketing," Wharton Business Daily Podcast,
https://www.measuredthoughts.com/marketing-october-2020, October 14, 2020.

"This Week in Marketing," Wharton Business Daily Podcast,
https://www.measuredthoughts.com/marketing-november-2020, November 18, 2020.

"Spotlight: Holiday shopping moves online amid surging COVID-19, retailers face shaky
prospects," Xinhuanet.com, http://www.xinhuanet.com/english/2020-11/26/c_139544593.htm,
November 26, 2020.

"This Week in Marketing," Wharton Business Daily Podcast,
https://www.measuredthoughts.com/december-2020, December 9, 2020.

"Markets In Motion," Forbes.com, https://www.forbes.com/sites/stephendiorio/2020/12/22/markets-
in-motion/?sh=3b79a04b7070, December 22, 2020.

**2021**

"Measure to Measure: How Marketing Metrics Have Evolved," MSI,
https://www.msi.org/articles/measure-for-measure-how-marketing-metrics-have-evolved/,
Interview: December 14, Posted online: January 12, 2021.

"This Week in Marketing," Wharton Business Daily Podcast,
https://www.measuredthoughts.com/january-2021, January 13, 2021.

"This Week in Marketing," Wharton Business Daily Podcast,
https://www.measuredthoughts.com/marketing-february-2021, February 10, 2021.

"Das Land wird einen echten Neustart erleben," Absatzwirtschaft, March 2021.

"This Week in Marketing," Wharton Business Daily Podcast,
https://www.measuredthoughts.com/marketing-march-2021, March 10, 2021.

"This Week in Marketing," Wharton Business Daily Podcast,
https://www.measuredthoughts.com/april-2021, April 7, 2021.

"American Saw Their Country As More Politically Stable After the Capitol Assault. Why?," U.S.News, https://www.usnews.com/news/best-countries/articles/2021-04-13/how-the-capitol-riot-tarnished-americas-global-image, April 13, 2021.

"This Week in Marketing," Wharton Business Daily Podcast, https://www.measuredthoughts.com/marketing-april-20212, April 14, 2021.

"This Week in Marketing," Wharton Business Daily Podcast, https://www.measuredthoughts.com/marketing-may-2021, May 12, 2021.

"This Week in Marketing," Wharton Business Daily Podcast, https://www.measuredthoughts.com/marketing-june-2021, June 16, 2021.

"This Week in Marketing," Wharton Business Daily Podcast, https://www.measuredthoughts.com/marketing-july-2021, July 14, 2021.

"This Week in Marketing," Wharton Business Daily Podcast, https://www.measuredthoughts.com/marketingseptember2021, September 8, 2021.

"This Week in Marketing," Wharton Business Daily Podcast, https://www.measuredthoughts.com/marketing-october-2021, October 13, 2021.

"Let's Talk Marketing: A Conversation with David Reibstein," 74&WEST Exclusive Podcast, https://play.acast.com/s/5f8efaa33a11617fcf0d7fa8/lets-talk-marketing-a-conversation-with-david-reibstein, November 1, 2021.

"This Week in Marketing, "Wharton Business Daily Podcast, https://www.measuredthoughts.com/november-2021, November 24, 2021.

"This Week in Marketing, "Wharton Business Daily Podcast, https://www.measuredthoughts.com/marketing-december-2021, December 22, 2021.

**2022**

"This Week in Marketing, "Wharton Business Daily Podcast," https://www.measuredthoughts.com/marketing-january-2022, January 12, 2022.

"Pursuit of social purpose sends business schools back to their roots," Financial Times, https://www.ft.com/content/cbaa4038-8628-4003-8197-36fc5a955b21, January 16, 2022.

"Academic research award: smart ideas with real-world impact," Financial Times, https://www.ft.com/content/d5ca2a09-333b-4f86-9e99-3a3bf1b86c75, January 19, 2022 (Judge).

"Gen Z and the business of being woke," openDemocracy.net, https://beta.opendemocracy.net/en/oureconomy/gen-z-and-the-business-of-being-woke/, February 19, 2022.

"This Week in Marketing, "Wharton Business Daily Podcast," https://www.measuredthoughts.com/marketing-february-2022, February 23, 2022.

"This Week in Marketing, "Wharton Business Daily Podcast," https://www.measuredthoughts.com/march2022, March 9, 2022.

"This Week in Marketing, "Wharton Business Daily Podcast," https://www.measuredthoughts.com/april-2022, April 6, 2022.

"This Week in Marketing, "Wharton Business Daily Podcast,"
https://www.measuredthoughts.com/marketing-june-2022, June 22, 2022.


**Knowledge@Wharton**

When a Black Tee Shirt Is More than a Black Tee Shirt: Why Brands Aren't Losing Their Luster
The Price Is Right, but Maybe It's Not, and How Do You Know?
Blu-ray vs. HD-DVD: Knocking Each Other Out?
Brand It Like Beckham: Can the Soccer Star Sustain the Hype?
Verizon's High-Speed Network: If They Build It, Will You Come?
Marketing for the Bottom Line
Death in the Middle: Why Consumers Seek Value at the Top and Bottom of Markets
Marketing Metrics and Financial Performance
Finding New Opportunities to Market 'Lost' and Other TV Shows
Burgers and Other Goods in the Blink of an Eye: How Effective Are Short Ads?
The Coffee Wars Heat Up: New Strategies to Jolt the Caffeine-Conscious Consumer
Farewell, Peter Drucker: A Tribute to an Intellectual Giant
When Art Meets Science: The Challenge of ROI Marketing
Why the Red Sox Brand Keeps Hitting Home Runs
Managing Brands in Global Markets: One Size Doesn't Fit All
Million Dollar Booboo, Or Are the Oscars Still Golden?
Boy Meets Girl: Gillette and P&G Hood up Their Brands
The $2.4 Million Question: What is the ROI for Super Bowl Ads?
James Bond's BMW and Other Product Placements: New, Racier Ways to Advertise
Connecting Marketing Metrics to Financial Consequences :
Executives Trade Stories on the Challenges of Doing Business in a Global Economy
Whither Global Inequality? Reviving an Old Debate
Companies Must Learn to Achieve the Price Advantage (or Pay the Price)
Low-carb, High-arg: What's a Baker/Pasta Maker to Do?
When the CEO is the Brand, but Falls from Grace, What's Next?
Darn Those Pop-Up Ads! They're Maddening, but Do They Work?
Finding a Link between Shareholder Value and Social Good
In Service Businesses, Does Growth Always Lead to Profits? Think Again
Is the Happy Meal over for McDonald's?
Marketers Turn to Metrics to Measure the Impact of Their Initiatives
What's in a Name? Not Much Without a Branding Strategy
Will Commission Cuts Kill the Small Travel Agent?
The Failure of Customization: Or Why People Don't Buy Jeans Online
The Microsoft Settlement: A Remedy That Pleases Almost No One
Will Consumers Be Willing to Pay for their Formerly Free Lunch on the Internet?
Can Priceline Remain Profitable?
How Companies Sponsor, Listen In and Learn from Chat Rooms
Starting a Business Today: Less Competition But Also Less Cash
Despite a Turbulent Take-off, Orbitz Is in Demand
Can You Learn Anything from These Sites' XXXpertise?
Winners and Losers in the E-Commerce Shakeout
The Problem with Priceline
Just-in-Time Education: Learning in the Global Information Age
What's Behind the Food Industry's Appetite for Mergers
How to Keep Customers In Line for Your Online Business
Christmas E-tailers: Will It Be Ho-Ho or So-So?
Who's Buying on the Internet? (See also the full article as published)
Market Share and Distribution: A Generalization, A Speculation, and Some Implications
Introduction to the Special Issue on B2B Research
Backlash:  How Early Adopters React When the Mass Market Embraces a New Brand
Market Segmentation:  Connecting Data to Decisions with Customer Analytics

Can Ello – or Any Social Network – Take on Facebook?
Billions in the Balance:  Why Managing a Nation's Brand Matters
Nation Branding: Perception Can Be Reality – So Manage It
How Should China Change Its National Brand?
Why Retailers Could Pay a Price for Not Accepting Mobile Payments
The Death of the Daily Deal
The Headquarters Checklist: How Do Companies Pick a Location?
America First? To the World, It's Eighth
Nation Branding: Which Countries Ranked Highest This Year?
Can Kraft Heinz Catch Up with Its Changing Market?
'Best Countries' 2020: Which Nations Ranked Highest – and Why?

## PROFESSIONAL AFFILIATIONS

American Marketing Association
Association for Consumer Research
Beta Gamma Sigma Society
Marketing Science Institute, Executive Directors Council
ORSA/TIMS

## INDUSTRIAL EMPLOYMENT

Hoffman-LaRoche Pharmaceuticals, Sauter Laboratories, Clifton, New Jersey, Summers, 1970 and 1971: Marketing Department; major responsibilities consisted of training of salesmen, merchandising and sales.

Management Education:

More than 300 companies.

Consulting:

Marketing Consulting Activities have involved a variety of firms, such as:

Google
AT&T, Basking Ridge, New Jersey
General Electric, Fairfield, Connecticut
Hewlett Packard, Palo Alto
Intercontinental Hotels, New York, New York
Rohm and Haas, Philadelphia
Merck Pharmaceuticals, NY, NY
Dow Chemical, Midland, Michigan
British Airways, London, England
Johnson & Johnson
Novartis
SCJohnson
Shell Oil

Boards:

General Information, Philadelphia, Pennsylvania, Board of Directors, 1982-1986
American Councils, National Board of Senior Advisors, 1991 – Current
MEE Productions, Board of Directors, 1991-1997
Fleisher Art Memorial, Board of Directors, 1997-2006
And1, Board of Directors, 1993-2006
Advanced Competitive Strategies, Inc., 1985-2001
Bizrate/Shopzilla, Board of Directors, 1996-2006

Xmpie, Board of Directors, 2001-2006
Marketing Letters, A Journal of Research in Marketing, Editorial Board, 2001 – Current
CMO Partners, 2004 – 2007
Charles Coolidge Parlin, Board of Governors, 2007 – Current
Marketing NPV, Managing Partner, 2007 – 2011
American Marketing Association, Board of Directors, 2007 – 2014
American Marketing Association, VP Treasurer/Secretary, 2009 – 2010
American Marketing Association, Chairman Elect, 2011-2012
American Marketing Association, Chairman, 2012-2013
American Marketing Association, Immediate Past Chairman, 2013-2014
Marketing Accountability Standards Board, Charter Director, 2010 – Current
SEI
Site Intelligence/iJento, 2010-2012
International Commerce Review Board, 2010 – Current
Marketing Science Institute – Former Executive Director
mAdtivity Board of Directors, 2012 – Current
Responsible Research in Business Management (RRBM), Working Board, 2014-Current
    Chair, 2021-Current
Philadelphia Ballet, 2019 - Current

Advisory Boards

IPSS
ISBM
BazaarVoice
VoiceStar
Hooja
BuySafe
Merchant Circle
PetSmart
Mentor Tech
IPSS
Wharton Publishing
Knowledge@Wharton
Camileonheels
LandRoller
Commission on Graduates of Foreign Nursing Schools
Fallon, McElligott & Rice Advertising Agency, Minneapolis, Minnesota Board of
    Consultants, 1982 - 1986
American Council of Teachers of Russian, American Council for Collaboration in Education and
    Language Study (ACTR-ACCELS); Board of Senior Advisors
Senior Homes
MarketShare

**TESTIMONY IN THE PAST FOUR YEARS**

| Case | Case No. | Court | On Behalf Of | Testimony | Report Filing Date |
|---|---|---|---|---|---|
| Suzanna Bowling v. Johnson & Johnson and McNeil Nutritionals, LLC. | 1:17-cv-03982 | United States District Court, Southern District of New York | Johnson & Johnson and McNeil Nutritionals, LLC. | Deposition (October 26, 2018) | September 20, 2018 |
| Seven Networks, LLC v. Google LLC. | 2:17cv442 | United States District Court, Eastern District of New York | Google | Deposition (October 21, 2018) | October 5, 2018 |
| X One v. Uber Technologies | 5:16-cv-06050 | United States District Court, Northern District of California | Uber Technologies | Deposition (September 17, 2019) | September 6, 2019 |
| The Vineyard House, LLC v. Constellation Brands U.S. Operations, Inc. | 4:19cv1424 | United States District Court, Northern District of California | Constellation Brands U.S. Operations, Inc. | Deposition (January 15, 2020) | December 16, 2019 |
| Patagonia, Inc. And Patagonia Provisions, Inc. v. Anheuser-Busch, LLC Dba Patagonia Brewing Co. | 2:19-cv-02702-VAP | United States District Court, Central District of California Western Division – Los Angeles | Anheuser-Busch, LLC | No deposition | November 15, 2020 |

**TESTIMONY IN THE PAST FOUR YEARS**

| Case | Case No. | Court | On Behalf Of | Testimony | Report Filing Date |
|---|---|---|---|---|---|
| In the Matter of Certain Audio Players and Controllers, Components Thereof, and Products Containing Same | ITC -337-TA-1191 | International Trade Commission | Google, Inc. | Deposition (January 12, 2021) and trial (February 25, 2021) | December 2, 2020 |
| DZ Reserve and Cain Maxwell (d/b/a Max Martialis) individually and on behalf of others similarly situated v. Facebook, Inc. | 3:18-cv-04978 | United States District Court for the Northern District of California | Facebook | Deposition (April 2, 2021) | March 3, 2021 |
| United States of America and Tobacco Free Kids Action Fund, et al. v. Philip Morris USA Inc., et al. .and ITG Brands, LLC, et al. | 99-cv-2496 (PLF) | United States District Court for the District of Columbia | Philip Morris USA Inc., et al | Deposition (March 5, 2021) | January 6, 2021 |
| United States of America v. John Krawczyk | 2:19-cr-00519 | United States District Court for the Eastern District of Pennsylvania | John Krawczyk | Trial (June 7, 2021) | May 28, 2021 |
| Vivint v. Alarm.com | 2:15-cv-00392-CW | United States District Court for the District of Utah | Alarm.com | Deposition (October 26, 2021) | September 15, 2021 |

**TESTIMONY IN THE PAST FOUR YEARS**

| Case | Case No. | Court | On Behalf Of | Testimony | Report Filing Date |
|---|---|---|---|---|---|
| Chewy v. IBM | 1:21-cv-01319-JSR | United States District Court Southern District of New York | Chewy | Deposition (January 11, 2022) | December 14, 2021 |
| Lashawn Sharpe and Jim Castoro, individually and on behalf of all others similarly situated, v. A & W Concentrate Company and Keurig Dr Pepper Inc. | 1:19-cv-00768-BMC | United States District Court Eastern District of New York | A & W Concentrate Company and Keurig Dr Pepper | Deposition (February 2, 2022) | January 13, 2022 |
| H&R Block, Inc. and HRB Innovations, Inc. v. Block, Inc. | 4:21-cv-00913-NKL | United States District Court Western District of Missouri | H&R Block, Inc. and HRB Innovations, Inc. | No deposition | January 21, 2022; February 9, 2022 |
| Cervecería Modelo de México, S. de R.L. de C.V. and Trademarks Grupo Modelo, S. de R.L. de C.V. v. CB Brand Strategies, LLC, Crown Imports LLC, and Compañía Cervecera de Coahuila, S. de R.L. de C.V. | 1:21-cv-01317-LAK | United States District Court Southern District of New York | Cervecería Modelo de México, S. de R.L. de C.V. and Trademarks Grupo Modelo, S. de R.L. de C.V. | Deposition (June 14, 2022) | March 18, 2022 |

**EXHIBIT 2**

**MATERIALS REVIEWED AND/OR RELIED UPON**

| Bates Ranges | | |
|---|---|---|
| JJCI-NOOHI_00000001 | — | JJCI-NOOHI_00000002 |
| JJCI-NOOHI_00001639 | | |
| JJCI-NOOHI_00001942 | — | JJCI-NOOHI_00001970 |
| JJCI-NOOHI_00002054 | — | JJCI-NOOHI_00002068 |
| JJCI-NOOHI_00002163 | — | JJCI-NOOHI_00002166 |
| JJCI-NOOHI_00002180 | — | JJCI-NOOHI_00002182 |
| JJCI-NOOHI_00002197 | — | JJCI-NOOHI_00002266 |
| JJCI-NOOHI_00002269 | — | JJCI-NOOHI_00002338 |
| JJCI-NOOHI_00002875 | — | JJCI-NOOHI_00002949 |
| JJCI-NOOHI_00004603 | | |
| JJCI-NOOHI_00005679 | | |
| JJCI-NOOHI_00005739 | | |
| JJCI-NOOHI_00005741 | | |
| JJCI-NOOHI_00005974 | — | JJCI-NOOHI_00005975 |
| JJCI-NOOHI_00006179 | | |
| JJCI-NOOHI_00007238 | — | JJCI-NOOHI_00007278 |
| JJCI-NOOHI_00010220 | — | JJCI-NOOHI_00010239 |
| JJCI-NOOHI_00010254 | | |
| JJCI-NOOHI_00010955 | — | JJCI-NOOHI_00010985 |
| JJCI-NOOHI_00011046 | — | JJCI-NOOHI_00011076 |
| JJCI-NOOHI_00011160 | — | JJCI-NOOHI_00011178 |
| JJCI-NOOHI_00011321 | — | JJCI-NOOHI_00011322 |
| JJCI-NOOHI_00011357 | | |
| JJCI-NOOHI_00011360 | | |
| JJCI-NOOHI_00011362 | | |
| JJCI-NOOHI_00011365 | | |
| JJCI-NOOHI_00011367 | | |
| JJCI-NOOHI_00011524 | — | JJCI-NOOHI_00011591 |
| JJCI-NOOHI_00011807 | — | JJCI-NOOHI_00011809 |
| JJCI-NOOHI_00013026 | — | JJCI-NOOHI_00013106 |
| JJCI-NOOHI_00013153 | | |
| JJCI-NOOHI_00013840 | — | JJCI-NOOHI_00013914 |
| JJCI-NOOHI_00014352 | — | JJCI-NOOHI_00014452 |
| JJCI-NOOHI_00014734 | — | JJCI-NOOHI_00014735 |
| JJCI-NOOHI_00015689 | — | JJCI-NOOHI_00015723 |
| JJCI-NOOHI_00015793 | — | JJCI-NOOHI_00015829 |

# EXHIBIT 2

## MATERIALS REVIEWED AND/OR RELIED UPON

---

Bates Ranges

---

| | | |
|---|---|---|
| JJCI-NOOHI_00015846 | | |
| JJCI-NOOHI_00015858 | | |
| JJCI-NOOHI_00018599 | — | JJCI-NOOHI_00018600 |
| JJCI-NOOHI_00019843 | | |
| JJCI-NOOHI_00020683 | — | JJCI-NOOHI_00020709 |
| JJCI-NOOHI_00023842 | — | JJCI-NOOHI_00023843 |
| JJCI-NOOHI_00025154 | — | JJCI-NOOHI_00025155 |
| JJCI-NOOHI_00025237 | — | JJCI-NOOHI_00025240 |

Legal Documents and Case Law:
*In Re: General Motors LLC Ignition Switch Litigation*, 427 F. Supp. 3d 374 (D.N.Y. 2019).
*Keith Jonsson, Michael Jonsson, Cedar Valley Fur Farm vs. National Feeds, Inc.*, Case No. 2:11-cv-140 (D. Utah), Trial Transcript, January 15, 2014.
Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Class Certification Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) and to be Appointed Class Counsel, August 15, 2022.
Plaintiff Narguess Noohi's Responses to Defendant Johnson & Johnson Consumer Inc.'[s] Subpoena to Wade Roberts, June 14, 2022.
Plaintiff's Second Amended Complaint, July 8, 2021.

Expert Reports and Declarations:
Declaration of Steven G. Perry in Support of Plaintiff's Application for Leave to File Under Seal, May 2, 2022, with Exhibits.
Expert Report of Leslie Baumann, M.D., July 1, 2022.
Expert Report of Wade C. Roberts, May 2, 2022.

Depositions:
Deposition of Jessica Snell, April 5, 2022, with Errata.
Deposition of Kathryn Drehs Sauers, April 19, 2022.
Deposition of Narguess Noohi, December 13, 2021.
Deposition of Wade Roberts, Ph.D., June 16, 2022.

Academic Articles, Books, and Reports:
Allenby, G., J. Brazell, J. Howell, and P. Rossi, "Economic Valuation of Product Features," *Quantitative Marketing Economics*, Vol. 12 (2014), pp. 421-456.
Allenby, G., J. Brazell, J. Howell, and P. Rossi, "Valuation of Patented Product Features," *Journal of Law and Economics*, Vol. 57, No. 3 (2014), pp. 629-663.
Arrow, K., et al., "Report of the NOAA Panel on Contingent Valuation," January 11, 1993, pp. 32-35.
Bedi, S. and D. Reibstein, "Damaged Damages: Errors in Patent and False Advertising Litigation," *Alabama Law Review*, Vol. 73, No. 2 (2021), pp. 385-436.
Carlsson, F., et al., "Using Cheap-Talk as a Test of Validity in Choice Experiments," *Economic Letters*, Vol. 89, No. 2 (2005), pp. 147-152.
Ceylana, H. H., et al., "Value Based Pricing: A Research on Service Sector using Van Westendorp Price Sensitivity Scale," *Procedia - Social and Behavioral Sciences*, Vol. 148 (2014), pp. 1-6.
Chang, J., J. Lusk and F. Norwood, "How Closely Do Hypothetical Surveys and Laboratory Experiments Predict Field Behavior," *American Journal of Agricultural Economics*, Vol. 91, No. 2 (2009), pp. 518-534.
Chhabra, S., "Determining the Optimal Price Point: Using Van Westendorp's Price Sensitivity Meter," in *Managing in Recovering Markets*, Eds. Chatterjee, S., et al., Springer India (2015), pp. 257-270.

# EXHIBIT 2

## MATERIALS REVIEWED AND/OR RELIED UPON

Academic Articles, Books, and Reports (cont.):

Darke, P. R. and R. J. B. Ritchie, "The Defensive Consumer: Advertising Deception, Defensive Processing, and Distrust," *Journal of Marketing Research*, Vol. 44, No. 1 (2007), pp. 114-127.

Diamond, S. S., "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence*, Third Edition, The National Academies Press (2011), pp. 359-423.

Ding, M., R. Grewal, and J. Liechty, "Incentive-Aligned Conjoint Analysis," *Journal of Marketing Research*, Vol. 42, No. 1 (2005), pp. 67-82.

Draelos, Z. D., "The Skin Moisturizer Debate: Oil or Oil-Free?," *Cosmetic Dermatology*, Vol. 23, No. 7 (2010), pp. 302-303.

Hausman, J., "Contingent Valuation: From Dubious to Hopeless," *Journal of Economic Perspectives*, Vol. 26, No. 4 (2012), pp. 43-56.

Huber, J., "What We Have Learned from 20 Years of Conjoint Research: When to Use Self-Explicated, Graded Pairs, Full Profiles or Choice Experiments," *Sawtooth Software Research Paper Series* (1997), pp. 1-16.

Kahneman, D., J. L. Knetsch, and R. H. Thaler, "Experimental Tests of the Endowment Effect and the Coase Theorem," *Journal of Political Economy*, Vol. 98, No. 6 (1990), pp. 1325-1348.

List, J. and C. Gallet, "What Experimental Protocol Influence Disparities Between Actual and Hypothetical Stated Values? Evidence from a Meta-Analysis," *Environmental and Resource Economics*, Vol. 20 (2001), pp. 241-254.

Loomis, J., "What's to Know About Hypothetical Bias in Stated Preference Valuation Studies?" *Journal of Economic Surveys*, Vol. 25, No. 2 (2011), pp. 363-370.

Lyon, D., "The Price is Right (Or is It?)," *Marketing Research* (Winter 2002), pp. 9-13.

McFadden, D., "The Choice Theory Approach to Market Research," *Marketing Science*, Vol. 5, No. 4 (1986), pp. 275-297.

Murphy, J. J., Allen, P. G., Stevens, T. H., and Weatherhead, D., "A meta-analysis of hypothetical bias in stated preference valuation," *Environmental and Resource Economics*, Vol. 30 (2005), pp. 313-325.

Nagle, T. and G. Muller, "Measurement of Price Sensitivity," in *The Strategy and Tactics of Pricing: A Guide to Growing More Profitably*, Sixth Edition, Routledge (2018).

Pokryshevskaya, E. B. and E. A. Antipov, "The strategic analysis of online customers' repeat purchase intentions," *Journal of Targeting, Measurement and Analysis for Marketing*, Vol. 20, No. 3/4 (2012), pp. 203-211.

Roberts, W. and C. Bilginsoy, "Risking life and limb in the global economy: Scrap metal price and landmine/UXO incidents in Cambodia," *World Development Perspectives*, Vol. 1 (2016), pp. 15-22.

Rodan, K., et al., "Skincare Bootcamp: The Evolving Role of Skincare," *Plastic and Reconstructive Surgery. Global Open*, Vol. 4, No. 12 (Suppl.) (2016), pp. 1-6.

Sawyer, A. G., "Demand Artifacts in Laboratory Experiments in Consumer Research," *Journal of Consumer Research*, Vol. 1, No. 4 (1975), pp. 20-30.

Schkade, D. A. and D. Kahneman, "Does Living in California Make People Happy? A Focusing Illusion in Judgments of Life Satisfaction," *Psychological Science*, Vol. 9, No. 5 (1998), pp. 340-346.

Widodo, J. S., "Literature Review of Consumer Behavior: Customer Loyalty, Repeat Purchase and Purchase Interest," *Dinasti International Journal of Economics, Finance and Accounting*, Vol. 2, No. 2 (2021), pp. 242-250.

Xie, G., R. Madrigal, and D. M. Bousch, "Disentangling the Effects of Perceived Deception and Anticipated Harm on Consumer Responses to Deceptive Advertising," *Journal of Business Ethics*, Vol. 129, No. 2 (2015), pp. 281-293.


Websites:

https://archive.researchworld.com/a-new-approach-to-study-consumer-perception-of-price/ (viewed 6/2/2022).

https://dermatology.mhmedical.com/content.aspx?bookid=2812&sectionid=244978358 (viewed 5/31/2022).

https://esomar.org/about-esomar (viewed 6/16/2022).

https://skinresourcemd.com/products/oil-free-facial-antioxidant-moisturizer (viewed 6/20/2022).

https://www.aad.org/public/everyday-care/skin-care-basics/dry/oily-skin (viewed 5/25/2022).

https://www.allure.com/gallery/15-best-summer-moisturizers-for-oily-skin (viewed 5/25/2022).

https://www.amazon.com/Alba-Botanica-Hawaiian-Oil-Free-Moisturizer/dp/B001ET7BPS?th=1 (viewed 6/20/2022).

**EXHIBIT 2**

**MATERIALS REVIEWED AND/OR RELIED UPON**

Websites (cont.):

https://www.amazon.com/Neutrogena-Moisturizer-Ultra-Gentle-Lightweight-Moisturizers/dp/B000052YOX?ref_=ast_sto_dp&th=1&psc=1 (viewed 6/27/2022).

https://www.essence.com/beauty/skin/beauty-myth-debunked-oil-bad-your-face/ (viewed 6/12/2022).

https://www.forbes.com/sites/rebeccasadwick/2020/06/22/how-to-price-products/?sh=81b05455c752 (viewed 6/2/2022).

https://www.harpersbazaar.com/uk/beauty/skincare/news/g24310/best-face-moisturisers/ (viewed 5/31/2022).

https://www.jivome.com/articles/the-importance-of-oils-for-our-skin#:~:text=The%20sebaceous%20glands%20(oil%2Dproducing,the%20skin%20to%20function%20properly. (viewed 6/12/2022).

https://www.lorealparisusa.com/beauty-magazine/skin-care/skin-care-essentials/face-oil-reasons (viewed 6/12/2022).

https://www.marieclaire.com/beauty/g34399769/best-oil-free-moisturizers/ (viewed 5/25/2022).

https://www.medicalnewstoday.com/articles/noncomedogenic (viewed 6/3/2022).

https://www.nbcnews.com/select/lifestyle/best-products-oily-skin-according-dermatologists-ncna1025881 (viewed 5/25/2022).

https://www.neutrogena.com/products/skincare/neutrogena-oil-free-face-moisturizer-for-sensitive-skin-fragrance-free-non-comedogenic/6805400.html (viewed 6/29/2022).

https://www.neutrogena.com/products/skincare/neutrogena-oil-free-face-moisturizer-for-sensitive-skin-fragrance-free-non-comedogenic/6805400.html?cgid=skin-moisturizers-moisturizers&tilePosition=5#BVReviewsContainer (viewed 6/16/2022).

https://www.neutrogena.com/skin/skin-moisturizers/skin-moisturizers-moisturizers?prefn1=oilFree&prefv1=No (viewed 6/2/2022).

https://www.neutrogena.com/skin/skin-moisturizers/skin-moisturizers-moisturizers?prefn1=oilFree&prefv1=Yes (viewed 6/2/2022).

https://www.neutrogena.com/the-bar/how-to-find-the-best-moisturizer-for-your-skin-type.html (viewed 6/13/2022).

https://www.paulaschoice.com/expert-advice/skincare-advice/sensitive-skin/why-fragrance-free-products-are-best-for-everyone.html (viewed 6/3/2022).

https://www.target.com/p/neutrogena-oil-free-daily-sensitive-skin-face-moisturizer-4-fl-oz/-/A-11536498 (viewed 6/10/2022).

https://www.target.com/p/unscented-neutrogena-hydro-boost-water-gel-face-moisturizer-with-hyaluronic-acid-1-7oz/-/A-16600134 (viewed 6/27/2022).

https://www.totalbeauty.com/content/gallery/skin-rule-break/p97162/page5 (viewed 6/12/2022).

https://www.verywellhealth.com/best-oils-for-skin-5088968 (viewed 6/12/2022).

https://www.walgreens.com/store/c/neutrogena-oil-free-daily-sensitive-skin-face-moisturizer-fragrance-free/ID=prod6035-product (viewed 6/10/2022).

https://www.walmart.com/ip/Equate-Beauty-Oil-Free-Facial-Moisturizer-for-Sensitive-Skin-4-fl-oz/752495725?wmlspartner=wlpa&selectedSellerId=0 (viewed 6/20/2022).

https://www.walmart.com/ip/Neutrogena-Oil-Free-Moisture-Ultra-Gentle-Face-Moisturizer-Sensitive-Skin-Care-4-fl-oz-118-ml/10805084 (viewed 6/10/2022).

**EXHIBIT 3**

**ILLUSTRATIVE ANALYSIS OF NEUTROGENA PRODUCTS PRICE PER OZ**
**OIL-FREE V. NON-OIL-FREE**

| | | SPF | Non-comedogenic | Acne Treatment | Anti-Aging | Vitamin(s) | Water Resistant | Hyaluronic Acid | Alcohol Free | Fragrance Free | Hypo-allergenic | Oz | Price | Price / Oz |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | [A] | [B] | [C] | [D] | [E] | [F] | [G] | [H] | [I] | [J] | [K] | [L] | [M] |
| | **Oil-Free Products** | | | | | | | | | | | | | |
| [1] | Non-Comedogenic Oil-Free Pink Grapefruit Acne Face Moisturizer with Salicylic Acid | | X | X | | | | | | | | 4.00 | $9.49 | $2.37 |
| [2] | **Neutrogena Oil-Free Face Moisturizer for Sensitive Skin, Fragrance-Free, Non-Comedogenic** | | X | | | | | | | X | X | 4.00 | $14.49 | $3.62 |
| [3] | Oil-Free Moisture-Combination Skin | | X | | | | | | | X | X | 4.00 | $14.49 | $3.62 |
| [4] | Oil-Free Moisture Broad Spectrum SPF 15 | X | X | | | | | | X | X | X | 4.00 | $14.49 | $3.62 |
| [5] | Clear Face Break-Out Free Liquid Lotion Sunscreen Broad Spectrum SPF 30 | X | X | | | | X | | | X | | 3.00 | $11.99 | $4.00 |
| [6] | Oil-Free Moisture Broad Spectrum SPF 35 | X | X | | | | | | X | X | X | 2.50 | $11.99 | $4.80 |
| [7] | Rapid Clear Acne Defense Oil-Free Face Lotion & Moisturizer | | X | X | | | | | | | | 1.70 | $9.49 | $5.58 |
| [8] | Healthy Skin Face Lotion with Sunscreen Broad Spectrum SPF 15 | X | X | | | X | | | X | | X | 2.50 | $15.49 | $6.20 |
| [9] | Neutrogena Hydro Boost Water Gel with Sunscreen Broad Spectrum SPF 15 | X | X | | | | | X | | | | 1.70 | $21.49 | $12.64 |
| [10] | Neutrogena Hydro Boost Gel-Cream with Hyaluronic Acid for Extra-Dry Skin | | X | | | | | X | | X | | 1.70 | $23.99 | $14.11 |
| [11] | Neutrogena Hydro Boost Water Gel with Hyaluronic Acid for Dry Skin | | X | | | | | X | | | | 1.70 | $23.99 | $14.11 |
| [12] | Average Price per Oz | | | | | | | | | | | | | $6.79 |
| | **Non-Oil-Free Products** | | | | | | | | | | | | | |
| [13] | Neutrogena Naturals Multi-Vitamin Nourishing Moisturizer | | X | | | X | | | | | X | 3.00 | $14.99 | $5.00 |
| [14] | Deep Moisture Night Cream | | X | | | X | | | | | | 2.25 | $13.49 | $6.00 |
| [15] | Deep Moisture Day Cream with Sunscreen Broad Spectrum SPF 20 | X | X | | | X | | | | | | 2.25 | $13.49 | $6.00 |
| [16] | Healthy Skin Firming Cream Broad Spectrum SPF 15 | X | X | | X | | | | | | X | 2.50 | $15.49 | $6.20 |
| [17] | Healthy Defense Daily Moisturizer with Sunscreen Broad Spectrum SPF 50 | X | X | | | X | | | | | X | 1.70 | $17.49 | $10.29 |
| [18] | Healthy Defense Daily Moisturizer with Sunscreen Broad Spectrum SPF 50-Sensitive Skin | X | | | | | | | | X | | 1.70 | $17.49 | $10.29 |
| [19] | Visibly Even Daily Moisturizer with Sunscreen Broad Spectrum SPF 30 | X | X | | | | | | | | X | 1.70 | $18.99 | $11.17 |
| [20] | Triple Age Repair Night Moisturizer | | | | X | X | | | | | | 1.70 | $23.99 | $14.11 |
| [21] | Triple Age Repair Moisturizer Broad Spectrum SPF 25 | X | | | X | X | | | | | | 1.70 | $23.99 | $14.11 |
| [22] | Ageless Intensives Anti-Wrinkle Deep Wrinkle Night Moisturizer | | X | | X | | | X | | | X | 1.40 | $21.49 | $15.35 |
| [23] | Ageless Intensives Anti-Wrinkle Deep Wrinkle Daily Moisturizer Broad Spectrum SPF 20 | X | X | | X | | | X | | | X | 1.40 | $21.49 | $15.35 |
| [24] | Rapid Wrinkle Repair Regenerating Anti-Wrinkle Retinol Cream + Hyaluronic Acid | | | | X | | | X | | | | 1.70 | $31.49 | $18.52 |
| [25] | Rapid Firming™ Peptide Contour Lift Face Cream | | | | X | | | | | | X | 1.70 | $39.99 | $23.52 |
| [26] | Rapid Wrinkle Repair Daily Face Moisturizer with SPF 30 + Hyaluronic Acid | X | | | X | | | X | | | | 1.00 | $24.99 | $24.99 |
| [27] | Rapid Wrinkle Repair Night Face Moisturizer with Retinol, Hyaluronic Acid | | | | X | | | X | | | | 1.00 | $24.99 | $24.99 |
| [28] | Rapid Tone Repair Moisturizer Broad Spectrum SPF 30 | X | | | X | X | | | | | | 1.00 | $24.99 | $24.99 |
| [29] | Rapid Firming™ Collagen Triple Lift Face Serum | | | | X | | | | | | X | 1.00 | $39.99 | $39.99 |
| [30] | Average Price per Oz | | | | | | | | | | | | | $15.93 |
| [31] | Average Price per Oz excluding anti-aging treatments | | | | | | | | | | | | | $8.12 |
| [32] | Difference in Average Price per Oz | | | | | | | | | | | | | ($9.14) |
| [33] | Difference in Average Price per Oz excluding anti-aging treatments | | | | | | | | | | | | | ($1.33) |

Selected Other Product Benefits

**EXHIBIT 3**

**ILLUSTRATIVE ANALYSIS OF NEUTROGENA PRODUCTS PRICE PER OZ**
**OIL-FREE V. NON-OIL-FREE**

Notes & Sources:

Selected product benefits identified based on descriptions and main product image on individual product pages.

[C]  Includes products described as acne treatments and/or containing salicylic acid.

[D]  Includes products described as reducing the appearance of wrinkles, firming treatments, and/or containing retinol, collagen, or anti-aging peptides.

[E]  Includes products described as multi-vitamin and/or containing specific vitamins, such as vitamins B, C, D3, or E.

[H]  Includes products described as alcohol-free and/or containing no drying alcohol.

[J]  Includes products described as hypoallergenic or allergy tested.

[M]  = [L] / [K].

[1]-[11]  From https://www.neutrogena.com/skin-moisturizers/skin-moisturizers-moisturizers?prefn1=oilFree&prefv1=Yes (viewed 6/2/2022).

Excludes 0.5 oz Neutrogena Hydro Boost Water Gel with Hyaluronic Acid for Dry Skin and 1.4 oz Neutrogena Men Age Fighter Face Moisturizer with Sunscreen Broad Spectrum SPF 15.

[10]  Product size from https://www.target.com/p/unscented-neutrogena-hydro-boost-water-gel-face-moisturizer-with-hyaluronic-acid-1-7oz/-/A-16600134 (viewed 6/27/2022). Product size was unavailable on Neutrogena's website.

[12]  Average of [1] through [11].

[13]-[29]  From https://www.neutrogena.com/skin-moisturizers/skin-moisturizers-moisturizers?prefn1=oilFree&prefv1=No (viewed 6/2/2022).

Excludes 0.5 oz Rapid Wrinkle Repair Regenerating Anti-Wrinkle Retinol Cream + Hyaluronic Acid and 1.7 oz Neutrogena Men Triple Protect Face Lotion Broad Spectrum SPF 20.

[30]  Average of [13] through [29].

[31]  Average of [13] through [29], excluding products identified as anti-aging treatments.

[32]  = [12] - [30].

[33]  = [12] - [31].